Lane MCNAMARA, et al., Plaintiffs,

v.

BRE–X MINERALS LTD., Bresea Resources, Ltd., John B. Felderhof, Estate of David G. Walsh, T. Stephen McAnulty, John B. Thorpe, Rolando C. Francisco, Hugh C. Lyons, Paul M. Kavanaugh, J.P. Morgan Securities, Inc., P.T. Kilborn Pakar Rekayasa, Kilborn Engineering Pacific, Ltd., SNC–Lavalin, Inc., Nesbit Burns, Inc., Lehman Brothers, Inc., Barrick Gold Corporation, Defendants.

No. 5:97–CV–159.

United States District Court, E.D. Texas, Texarkana Division.

March 30, 2001.

H. Lee Godfrey, Susman Godfrey LLP, Houston, TX, Damon Young, Young Pickett & Lee, Texarkana, TX, A. Paul Miller, Miller James Miller Wyly & Hornsby, Texarkana, TX, R. Paul Yetter, Yetter & Warden, James T. Southwick, Houston, TX, Steven J. Toll, Cohen, Milstein, Housfeld & Toll, Washington, DC, Michael C. Spencer, Hynes & Lerach LLP, New York City, Thomas Robert Ajamie, Schirrmeister Ajamie, Houston, TX, U. Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Adam R. Gonnelli, Jeffrey G. Smith, Peter W. Smith, Wolfe Haldenstein Adler Freeman & Herz LLP, New York City, Robert C. Schubert, Schubert & Reed LLP, San Francisco, CA, Murray Lewis, Matthew J. Ide, Cohen Milstein Hausfeld & Toll, Seattle, WA, Curt P. Beck, James S. Notis, Abbey Gardy LLP, New York City, Guy A. Wilson, Worhtington & Worthington, Santa Rosa, CA, Charles Robert Eskridge, III, Susman Godfrey LLP, Houston, TX, Edward Miller, Keeney Anderson Miller James & Miller, Texarkana, TX, for Plaintiffs.

John Anderson Gilliam, T. Richard Handler, Jenkens & Gilchrist, Dallas, TX, Andrius R. Kontrimas, Jenkens & Gilchrist, Houston, TX, John Robert Mercy, Mercy Carter & Elliot, Texarkana, TX, Karen Patton Seymour, Tiffany M. Erwin, D. Stuart Meiklejohn, Sharon Nelles, Sullivan & Cromwell, New York City, Preston Worley McGee, Flowers Davis LLP, Tyler, TX,

Gary D. Grimes, David Gibson Paul, Grimes & Craytor, Texarkana, TX, Johnny Paul Arnold, Texarkana, TX, David E. McCraw, Clifford Chance Rogers & Wells, New York City, David J. Beck, Beck Redden & Secrest LLP, Houston, TX, Paul E. Summit, Sullivan & Worcester, Boston, MA, Andrew T. Solomon, Sullivan & Worcester, New York City, Winford L. Dunn, Jr., Dunn Nutter Morgan & Shaw, Texarkana, AR, L. Nicole Batey, Eric J.R. Nichols, Beck Redden &Secrest LLP, Houston, TX, John Hess McElhaney, Locke Liddell & Sapp, Dallas, TX, John David Crisp, Crisp Boyd Poff, Texarkana, TX, Mark Douglas Wegener, Martin Cunniff, Howrey Simon Arnold & White LLP, Washington, DC, William S. Hommel, Jr., McGee Hommel & Starr PC, Tyler, TX, Zack A. Clement, Linda L. Addison, William J. Boyce, Fulbright & Jaworski, Houston, TX, Preston Worley McGee, McGee Hommel & Starr PC, Tyler, TX, Nicholas H. Patton, Patton Tidwell Sandefur, Texarkana, TX, Robert M. Buschmann, Gerald D. Silver, Winston & Strawn, New York City, Daniel R. Murdock, Winston & Strawn, New York City, Philip Smith, Winston & Strawn, New York City, David Massengill, Simpson, Thacher & Bartlett, New York City, J. Hoke Peacock, II, Orgain Bell & Tucker, Beaumont, TX, Bruce Domenick Angiolillo, Simon A. Steel, Michael A. Berg, Simpson Thacher & Bartlett, New York City, James N. Haltom, Patton Haltom Roberts, McWilliams & Geer LLP, Texarkansas, TX, Eric F. Grossman, Lewis B. Kaden, Lawrence J. Portnoy, Abraham Gesser, Daniel E. Wenner, Helen Harris, Davis Polk & Wardwell, New York City, for Defendants.

Aundrea Kristine/Fiede Gulley, Gibbs & Bruns, Houston, TX, for Movant.

## MEMORANDUM OPINION AND ORDER

FOLSOM, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ................................................... 629

II. RELEVANT LAW ................................................. 630

   A.  10b–5 Claims ............................................. 630

   B.  Pleading Requirements ................................... 631

III. FOURTH AMENDED COMPLAINT .......................... 632

   A.  Introduction ............................................. 632

   B.  The Bre–X Gold Fraud ................................. 635

IV. KILBORN DEFENDANTS .................................... 670

   A.  Pleading Misrepresentation ............................. 670

   B.  Pleading Scienter ....................................... 674

V. J.P. MORGAN ................................................ 679

   A.  Pleading Misrepresentation or Omission ................ 679

   B.  Pleading Scienter ....................................... 680

C.   J.P. Morgan's Motion to Dismiss Claims of Purchasers Prior to
July 23, 1996 and After March 27, 1997 ..............................683

VI.  BARRICK .............................................................684

A.   Pleading Misrepresentation or Omission ............................684

B.   Pleading Scienter ...............................................688

VII. NESBITT BURNS .......................................................690

VIII. LEHMAN ..............................................................693

A.   Pleading Misrepresentation or Omission ..........................693

B.   Pleading Scienter ...............................................693

IX.  STATE LAW CLAIMS ....................................................697

X.   CONCLUSION ..........................................................699

## I.

### INTRODUCTION

This is a securities fraud case. Seeking class certification, the named Plaintiffs are persons who purchased common stock of Bre–X Minerals Ltd. ("Bre–X") and/or Bresea Resources Ltd. ("Bresea") between January 17, 1994 and May 2, 1997 alleging that Bre–X publicly and fraudulently announced increasingly large gold resource estimates—from less than three million ounces in 1994 to 200 million ounces in February 1997—for its Busang properties in Indonesia. As these estimates increased, Bre–X's stock price rose from C$2.85 in early 1995 to C$224.75 in early 1996. Plaintiffs allege that over the class period, Bre–X "salted" its core samples and that these resource estimates were based on tests of these samples.

In addition to Bre–X, Bresea, and eight officers and directors of these companies, Plaintiffs name several institutional defendants: (1) P.T. Kilborn Pakar Rekayasa, Kilborn Engineering Pacific, Ltd., and SNC–Lavalin, Inc. ("Kilborn Defendants"), engineering companies that Plaintiffs allege performed resource estimates, mine pre-feasibility studies, and other ser-

vices for Bre–X and issued false and misleading reports regarding Bre–X's gold reserves; (2) J.P. Morgan Securities, Inc. ("J.P.Morgan"), an American investment bank hired by Bre–X in September 1996 as a financial advisor to aid in negotiating with potential joint venture partners to develop a mine at Busang; (3) Barrick Gold Corporation ("Barrick"), a Canadian mining company that Plaintiffs allege disseminated false and misleading statements in the course of its joint venture negotiations with Bre–X; (4) Nesbit Burns, Inc. ("Nesbitt"), a Canadian investment bank and broker-dealer that Plaintiffs allege issued false and misleading securities research reports regarding Bre–X's gold reserves; and (5) Lehman Brothers, Inc. ("Lehman"), an American investment bank and broker-dealer that Plaintiffs allege issued false and misleading securities research reports regarding Bre–X's gold reserves.

The Court granted previous motions by these institutional Defendants to dismiss the Plaintiffs' Second Amended Complaint as to them on July 13, 1999. (Dkt. No. 370.) *See McNamara v. Bre–X Minerals Ltd.*, 57 F.Supp.2d 396 (E.D.Tex.1999). The Plaintiffs then filed a Third Amended

Complaint on August 19, 1999. (Dkt. No. 374.) On February 18, 2000, Plaintiffs requested leave to file a supplement to this third complaint. The Court granted Plaintiffs leave, but ordered that any additions be incorporated within a fourth amended complaint instead of merely a supplement. Plaintiffs filed their Fourth Amended Class Action Complaint on June 14, 2000. (Dkt. No. 437.)[1] The following motions to dismiss this 189-page Fourth Amended Class Action Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) are pending:

- P.T. Kilborn Pakar Rekayasa ("P.T.Kilborn") (Dkt. No. 446);

- Kilborn Engineering Pacific Ltd. ("Kilborn Engineering") (Dkt. No. 444); and

- SNC–Lavalin, Inc. ("SNC–Lavalin") (Dkt. No. 442);

- J.P. Morgan (Dkt. No. 448);

- Barrick (Dkt. No. 441);

- Nesbitt (Dkt. No. 450).

- Lehman (Dkt. No. 451);

These Defendants move to dismiss both the federal securities claims and the state common law claims. After reviewing these motions, Plaintiffs' responses, and any replies, the Court finds that the state laws claims should be dismissed with prejudice because after four attempts, the Plaintiffs have failed to plead actual reliance, which is an element of their state law claims. As for the Plaintiffs' claims under the federal securities laws, the Court finds that Lehman's and SNC–Lavalin's motions should be granted and all others denied.

1. Unless otherwise indicated, "Complaint" hereinafter refers to Plaintiffs' Fourth Amended Class Action Complaint. (Dkt. No. 437.)

## II.

### RELEVANT LAW

In deciding a motion to dismiss for failure to state a claim, the Court must look only to facts stated in the complaint and in documents attached to or incorporated in the complaint. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir. 1996). For purposes of deciding the instant motions, the Court will accept as true the well-pleaded factual allegations in the Complaint and any reasonable inferences which can be drawn from them. *See Tuchman v. DSC Comm.,* 14 F.3d 1061, 1067 (5th Cir.1994). The Plaintiffs, however, "must plead specific facts, not merely conclusory allegations . . . ." *Id.* The Court will "not accept as true conclusory allegations or unwarranted deductions of fact." *Id.*

### A. 10b–5 Claims

■ The Plaintiffs bring their primary claim under section 10(b) of the Exchange Act. This section makes it unlawful for any person

[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC rule promulgated under section 10(b), known as Rule 10b–5, makes it unlawful for any person, directly or indirectly

[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circum-

stances under which they were made, not misleading . . .

. . . . .

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. For ease of discussion, the Court will refer to these claims as the "10b–5 claims." To establish their 10b–5 claims, the Plaintiffs must show "(1) a material misstatement or omission (2) which occurred in connection with the purchase or sale of securities (3) that was made with scienter (4) harm, and (5) causation." *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 546 (5th Cir.2001).

■■■ A false statement or omission is material if its disclosure would alter the "total mix" of facts available to an investor and "if there is a substantial likelihood a reasonable shareholder would consider it important" to the investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Whether a statement is material is usually a question for the fact finder. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). A complaint should not be dismissed on the grounds that the alleged misstatements or omissions are immaterial unless they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985).

■■■ Scienter is the intent to deceive, defraud, or manipulate. *See Mercury Air*, 237 F.3d at 546 n. 3. Scienter also "encompasses reckless indifference such that the omission or misrepresentation was 'so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir.1994)).

■■■ The causation element mentioned in *Mercury Air* requires reliance. To satisfy the reliance elements, the Plaintiffs in this action rely on the fraud-on-the-market doctrine. The premise of this doctrine is that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, all material misrepresentations." *Basic*, 485 U.S. at 246, 108 S.Ct. 978. Under this doctrine, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id.* at 247, 108 S.Ct. 978. The Plaintiffs "need only allege facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss." *See Zuckerman v. Foxmeyer Health Corp.*, 4 F.Supp.2d 618, 626 (N.D.Tex.1998).

## B. Pleading Requirements

Congress addressed the pleading requirements for securities fraud actions in the Private Securities Litigation Reform Act of 1995, Pub L. No 104–67 ("PSLRA"). The PSLRA requires the court, upon a motion of any defendant, to dismiss a case when certain pleading requirements are not met. 15 U.S.C. § 78u–4(b)(3). There are basically two pleading requirements under the PSLRA. *See McNamara*, 57 F.Supp.2d at 405–06. The first requirement deals with the alleged statements or omissions. The second deals with the defendant's state of mind when making these statement or omissions.

### 1. Pleading the Misleading Statements or Omissions

■■■ The first requirement of the Reform Act is that the complaint "shall speci-

fy each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The Fifth Circuit has indicated that this statutory language is merely an adoption of the Second Circuit's requirement that plaintiffs in fraud cases must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *See Williams,* 112 F.3d at 177–78.

### 2. Pleading Scienter

■ The second pleading requirement of the Reform Act addresses the scienter requirement. The PSLRA states:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). The "required state of mind" is scienter. Scienter may be adequately plead by alleging facts that would permit a strong inference of conscious misbehavior or severe recklessness. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 n. 2 (5th Cir.1996); *Coates v. Heartland Wireless Communications,* 100 F.Supp.2d 417, 422 (N.D.Tex. 2000). If the facts alleged permit such an inference, the Plaintiffs' 10b–5 claim will survive the motion to dismiss. *See Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.,* 2 F.Supp.2d 1345, 1359 (D.Colo.1998).

■ Prior to the PSLRA, plaintiffs needed only to plead facts that demonstrated that the defendants had both the motive and opportunity to commit securities fraud. While such allegations will no longer automatically survive a motion to dismiss, the Court will consider facts concerning a defendant's alleged motive in determining whether the complaint raises a strong inference of scienter. *See id.; In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1107–08 (D.Nev.1998); *In Re Glenayre Technologies, Inc.,* 982 F.Supp. 294, 298 (S.D.N.Y.1997)("That 'motive and opportunity' no longer automatically suffices to raise a strong inference of scienter does not mean that facts relating to motive and opportunity are not relevant to the scienter analysis."); *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 241–42 (S.D.N.Y.1997); *Silicon Graphics II,* 970 F.Supp. at 757.

With these legal principles in mind, the Court will now examine the Plaintiffs' allegations in the Fourth Amended Complaint.

### III.

### FOURTH AMENDED COMPLAINT

The Court constructed the following narrative from the facts as alleged in the Fourth Amended Complaint. For the purpose of ruling on these motions, the Court assumes that these facts are true. *See Tuchman,* 14 F.3d at 1067.

### A. Introduction

David Walsh, a former stock broker, founded Bre–X in 1988. Walsh, however, was unable to obtain sufficient funding to explore the various mineral claims Bre–X had acquired. The Plaintiffs allege that as a result of this, Walsh went into personal bankruptcy in 1992. Bre–X remained small, and Walsh remained in financial trouble. In 1993, when Bre–X became

involved in Busang, the company still had only five employees.

The story of the Bre–X gold fraud began in 1993 when Walsh paid $80,000 for mineral rights to 475,000 acres near Busang, an area on the Island of Borneo in the East Kalimantan province of Indonesia. Busang consisted of three properties—Busang I (Central Zone), Busang II (Southeast Zone), and Busang III (Northwest Zone). Thereafter, Walsh and his cohorts allegedly embarked on a scheme to convince the investing public that Busang was one of the richest gold deposits ever discovered. For the next three and half years, Bre–X published reports of ever increasing amounts of gold at Busang.

In the Complaint, the Plaintiffs set forth how a find such as the one announced by Bre–X would generally be evaluated. The first step in the evaluation process is a determination of the volume and grade of the mineral resource. These are determined by drilling for core samples and then performing mineral assays on those core samples. The handling, processing, and assaying of core samples must follow generally accepted mining industry practices in order to be credible. Plaintiffs state that these procedures are especially important to mining companies and mine financiers who might participate in the mine development, as well as to investors in the mine owner's securities.

Assays are normally prepared by independent contractors. Periodically, samples from the same core interval are sent to multiple assaying laboratories to verify the "repeatability" of the assay results using the same and different assaying techniques. Poor repeatability within the same core interval causes concern because it usually indicates a problem with either the sampling protocols or the assay procedures.

Plaintiffs state that a high level of confidence in the veracity of assay results is probably the most important factor in the evaluation of an undeveloped mineral property. The Complaint states that historically, the gold mining industry has been victimized by fraudulent assay data resulting from the "salting" of core samples with gold from an external source. "Salting" is industry jargon for adding gold to the rock samples before they are tested. It creates a false value for an otherwise non-existent or non-commercial mineral deposit. The gold industry is particularly vulnerable to salting schemes because a small amount of gold added to a core sample can translate into the appearance of a tremendously valuable deposit.

Since a core drill hole is an expensive undertaking, core data is collected on drill hole spacing adequate to establish a "resource" and then with later, narrower, infill spacing to convert the resource into a "reserve." Drill hole spacing is also typically patterned to provide adequate data for the development of a preliminary engineering mine plan for prefeasibility evaluation. Thereafter, a statistical analysis is prepared on the basis of the geological and assay data to determine the nature and continuity of the mineral in the rock between the drillholes. An estimation of the mineral resource is made by determining the volume of rock between the drill holes, the average density of the rock, and the average concentration of the mineral ("grade") from the mineral assays.

The alleged fraud at Busang involved salting of the crushed samples. One would expect the Complaint to clearly set forth the alleged scheme used to commit this fraud. It doesn't. From various sections of the Complaint, however, the Court has constructed it as follows.

Bre–X drilled the core samples at Busang. The samples were then crushed by Bre–X at the site. The normal practice is to split the core sample and send half to an

independent lab for assaying and to save the other half for future reference. These procedures prevent salting by the exploration company. Bre–X crushed the whole core sample on site and saved only a 10 centimeter sliver for future reference. Not only did Bre–X crush the samples itself, the core samples also sat for extended periods of time in Bre–X's sample storage facility in Samarinda. This gave Bre–X ample opportunity to add gold to the crushed samples.

It was important in this scheme that the whole core sample be crushed. If an independent party had wanted to crush and test the other half, someone from Bre–X would have needed to be there to salt it. This is also the alleged reason why Bre–X switched from the industry standard fire assay method to the cyanide leach method—the cyanide method involves destruction of the core sample. Bre–X's sample preparation procedures and assay procedures ensured that little was left of the samples for someone else to test.

Not only did Bre–X adopt sample preparation and assay techniques to hide the fraud, Bre–X also refused to allow anyone else to drill for their own core samples. Barrick, who tried to negotiate a joint venture with Bre–X to develop Busang, attempted for several months to do its own due diligence on site, and Bre–X flatly refused. Bre–X kept the fraud going in this manner for nearly three years.

The Complaint describes a serious flaw in this plan. Gold in igneous hard rock deposits such as that at Busang is in the form of tiny, wiry flakes. Whoever salted the samples had to use alluvial gold, the type of gold found in river beds. This gold comes in the form of small nuggets that are much larger than the tiny particles that one would expect to find in a crushed sample from a hard rock igneous deposit. Several reports cited by the Plaintiffs and made available at different times to the

moving Defendants described this coarse, nugget-like appearance of the gold. This and other unusual characteristics of the gold, the Plaintiffs allege, made these Defendants aware that there was a serious risk that the samples were being salted.

Eventually, Bre–X had to allow someone to drill their own holes at Busang. Bre–X was too small to develop a mine by itself, so it was inevitable that Bre–X would have to choose a partner to help it develop the mine at Busang. This company would want to do its own drilling as part of its due diligence prior to any agreement between it and Bre–X. This occurred in late February 1997 and the company was Freeport–McMoRan Copper and Gold, Inc. ("Freeport"), a New Orleans-based mining company. Of course anyone involved in the actual salting of the samples knew that the fraud would now be discovered. As expected, when Freeport drilled for its own core samples and assayed them, it found no gold. Freeport announced these results on a March 26, 1997.

Now that the fraud has been exposed, all Defendants point their fingers to Michael de Guzman, Bre–X's chief geologist. During Freeport's due diligence, de Guzman fell 800 feet from a helicopter on March 19, 1997 and died, and most of his work had been burned in a fire at Busang in January of 1997. Thus, he makes an excellent scapegoat.

As described below, Plaintiffs allege that Defendants J.P. Morgan, Lehman, Nesbitt, and Barrick consciously disregarded multiple red flags and other warning signs that Busang was a fraud of unparalleled proportions. Plaintiffs also allege that the Kilborn Defendants intentionally and substantially deviated from the accepted methods of testing and analyzing the potential gold reserves at Busang and that the Kilborn Defendants knew that Bre–X

would communicate these test results to investors.

## B. The Bre–X Gold Fraud

Beginning in January 1994, Bre–X announced that drilling in Busang revealed significant amounts of gold. With each announcement, the potential gold reserve at Busang increased. For example, on September 20, 1994, Bre–X issued a press release announcing that 22 of the 31 drill holes completed at Busang intersected "significant widths of gold mineralization." In an interview from the Company's Jakarta office, John Felderhof, a Bre–X Senior Vice President and Chief Geologist, stated that he was "confident that an open pittable resource ranging between 30 million ton to 60 million ton at an average grade better than 3g Au/t ... can be attained at Busang." His representation, if true, would have translated to 3 to 6 million ounces of gold. On May 10, 1995, Walsh and Felderhof upped that estimate to 6 to 8 million ounces of gold.

On May 15, 1995, Bre–X hired Nesbitt, together with other underwriters, to sell 1,350,000 common shares of Bre–X at C$3.75 per share. This is also when Nesbitt's mining analyst Egizo Bianchini began to follow Bre–X. The Complaint states that Bianchini had nine years experience in the mining industry as a geologist and mining research analyst. Bianchini holds a Geology degree and a Master of Business Administration degree from the University of British Columbia. Plaintiffs allege that over the next two years, Bianchini developed an extremely close relationship with Bre–X's management and that this relationship made him privy to information to which other analysts did not have access. The Complaint also alleges that Bianchini had a strong financial interest in ensuring Bre–X's success. The Complaint states that according to *Bre–X: The Inside Story*, a book written about the Bre–X gold fraud, Bianchini personally held one million Bre–X shares.

Bianchini spoke with Walsh and the other insiders frequently and made several trips to Busang. Bianchini first visited Busang during September 23–30, 1995. Plaintiffs claim that he was the first analyst to visit the Busang site.[2] According to his itinerary, he spent the entire day of September 25 at the Busang site, toured Bre–X's exploration office in Manado on September 29, and visited Bre–X's office in Jakarta on September 30. Plaintiffs allege that many analysts were denied access to the site or were given limited access.

Bianchini's "cheerleading" for Bre–X began in September 1995. That is when he first issued a "Buy" recommendation for the stock. In the report, which stated a target price of C$21 for shares of Bre–X, Bianchini stated that Busang was "likely to evolve into a world-class gold mining project," based on his own review of "all the drill data." He then estimated that "the resource can be converted to a reserve of approximately 4.5 to 5 million ounces." Bianchini went on to vouch for the technical competence of Bre–X management and its financial strength.

**2.** The Complaint alleges that Bianchini was the first analyst to visit the site and that this was consistent with his close relationship with Bre–X insiders like Walsh. (¶ 372.) Nesbitt disputes this and attached to it's motion the itineraries of three other Canadian securities analysts who Nesbitt claims were to make the trip with Bianchini in September 1995. (Nesbitt's Mot. to Dismiss 3d Am. Compl., Ex. B.) Nesbitt also attached a Bre–X memorandum indicating that Bianchini cancelled that trip. (*Id.*, Ex. C.) Thus, Nesbitt argues that Bianchini did not even go to Busang in September. In ruling on this motion, however, the Court assumes the facts alleged in the Complaint are true. *See Tuchman,* 14 F.3d at 1067.

On October 8, 1995, Nesbitt issued a new research report as a result of further drilling results announced by Bre–X. In its report, Nesbitt increased its one-year target price for the shares to C$50. Nesbitt stated, again, that "Busang will become one of the elite world class ore bodies," based on Nesbitt's own review of "all the available technical data." At this point, of course, all Nesbitt or any other analyst had to go on was Bre–X's public announcements of its own test results. The Complaint states that Bre–X needed an outsider to add credibility to its claims and that Bre–X chose P.T. Kilborn.

On October 12, 1995, P.T. Kilborn entered into a contract with Bre–X to perform geostatistical analyses and mine feasibility studies of Busang. This work included on-site inspections, resource calculations, and mining feasibility studies, with the alleged goal of confirming the existence and amount of gold at Busang. It did not include drilling for core samples, assaying the core samples, or supervising drilling.

Bre–X allegedly hired P.T. Kilborn and Kilborn Engineering because they are part of a well known mining services company with a solid reputation in the industry, especially in Canada. Plaintiffs allege that two years later on May 17, 1997, Roger Pooley, who had performed consulting work for Bre–X at Busang before the Kilborn Defendants were hired, stated that "Bre–X clearly wanted reports written by a high profile Canadian firm whose credibility would be accepted without hesitation by the market."

When first hired in October 1995, the Kilborn Defendants were given copies of core assay reports prepared by Indo Assay Laboratories ("Indo Assay"), who had previously performed assay work for Bre–X. Plaintiffs allege that these reports questioned the validity of the testing process. The allegations regarding the Indo Assay reports, however, are confusing. For example, Plaintiffs point to a memorandum by Indo Assay that states "possible gold was observed megascopically." The Complaint states that one should infer from this statement that Indo Assay was concerned about the inability to observe gold in the whole core samples. The Court fails to see the logic behind such an inference. "Megascopic" means visible to the naked eye.[3] The Complaint also states that Indo Assay's fire-assays resulted in lower gold recovery than its assays using the cyanide method, which is allegedly abnormal. The Complaint then states that most of what appeared to be "problem batches" were allegedly prepared on-site by Bre–X, thus giving Bre–X an opportunity to salt the sample with gold.

The Kilborn Defendants were also provided reports prepared by Normet PTY Ltd., a metallurgical firm based in Burswood, West Australia. Normet's reports were allegedly filled with red flags. For example, the Complaint states that Normet found that more than 90 percent of the gold in the Busang samples could be recovered in a gravity concentrate. As evidence that this should have alerted Kilborn to the possibility of fraud, Plaintiffs point to a report issued almost two years later by a company hired to investigate the fraud. The report stated, "Although one could expect to see such exceptional recoveries in a gravity circuit for material coming from an alluvial [river-bed] deposit, we have never before seen such a response from a primary deposit." The Complaint also states that Normet described the gold as "particle shapes ... mostly rounded with beaded outlines." According to Plaintiffs, this also describes alluvial gold found in riverbeds. After reviewing Normet's

---

**3.** OXFORD ENGLISH DICTIONARY (2d ed. 1989).

report, Freeport's due diligence team declared that the description by Normet was "possibly the best description of alluvial grain gold ever written." Plaintiffs allege that due to these findings by Normet, P.T. Kilborn should have been skeptical from the beginning. As the story continues, these same red flags will reappear in every independent report prepared.

Nevertheless, the scheme continued. By October 17, 1995, Bre–X stock had risen to C$18.25 per share. That day, Bre–X reported that an updated resource calculation "completed by Kilborn Engineering" showed that the Central Zone contained in excess of 2.75 million ounces of gold.[4] Felderhof indicated that the Southeast Zone had the potential to possess even greater amounts of gold, stating that the Central Zone "pales in comparison" to the potential of the Southeast Zone. Felderhof also claimed that "the Busang project in its entirety has the potential of becoming one of the world's great gold orebodies." The next day, October 18, 1995, T. Stephen McAnulty, the Vice President of Investor Relations and Treasurer of Bre–X, told *Reuters* that he was comfortable with estimates that Busang could contain more than 30 million ounces of gold.

Meanwhile, Nesbitt's Bianchini continued to follow Bre–X. He returned to Busang during November 11–16, 1995. On this visit, he was allegedly treated to a private tour of the property by Michael de Guzman, a Bre–X geologist, and Cesar Puspos, a Bre–X project manager.[5] After Bianchini departed, de Guzman wrote to Felderhof summarizing the results of the visit. De Guzman praised the "Nesbitt-led group of analysts" as the "most professionally open-minded" that Bre–X had ever encountered. He also informed Felderhof that "over-all corporate plans, strategy were discussed to their optimum satisfaction."

After this visit by Bianchini, Nesbitt issued a revised report on November 21, 1995. It repeated its recommendation of Bre–X as a "Buy," and estimated that Bre–X had 30 million ounces of resources: "In our view the most recent drill results put out by BXM demonstrate that Busang prospect is very likely to contain a gold deposit which can only be categorized in

4. Plaintiffs allege that each of these resource calculations was represented as "measure, indicated, and inferred." According to the Complaint, these are classifications of gold reserves that each represent a different level of accuracy—"Measured" being the most accurate and "Indicated" being the least. As explained in the Complaint, when exploring for gold, core samples are collected from holes drilled in the ground. At first these holes are drilled rather far apart and the core samples are assayed to determine the amount of gold contained in those core samples. Once a resource is outlined, one can calculate an "inferred" resource. As "infill" holes are drilled between these exploratory holes, that amount of gold in the resource can be more accurately calculated. According to the Complaint, the U.S. Bureau of Mines and the U.S. Geological Survey define "Measured Resources" as follows:

The sites for inspection, sampling, and measurement are spaced so closely and the geological character is so well defined that size, shape, depth, and mineral content of the resource are well established.
(¶ 334(i).) The definition of "Indicated Resource" states:
The degree of assurance, although lower than that for measured resources, is high enough to assume continuity between points of observation.
(334(i).)

5. Nesbitt disputes that this tour was private. According to another Bre–X memorandum attached to Nesbitt's motion, analysts from at least six other investment firms accompanied Bianchini on this visit. (Nesbitt's Mot. to Dismiss 3d Am. Compl., Ex. D.) In deciding this motion, however, the Court assumes that all of Plaintiffs' allegations are true. *See Tuchman,* 14 F.3d at 1067.

the elite class of deposits around the world." Shortly thereafter in a December 8 research report, Nesbitt and Bianchini declared Busang to likely be "one of the largest gold deposits in the world." Nesbitt set a 12–month target for the stock of C$70. At the time, Bre–X traded at C$53.50.

On December 15, 1995, Bre–X issued a year-end update on its mineral properties in Indonesia. "Based on preliminary results available to Bre–X, a pre-feasibility study also undertaken by Kilborn Engineering and scheduled for release in February is expected to be very favorable." Felderhof went on to state in this report that the "Busang deposit is very likely to become a gold mine of elite world class status. Our current objective is to drill out 30 million ounces by early fall 1996."

The scheme continued throughout 1996. In a press release dated January 15, 1996, Felderhof announced that a resource of 30 million ounces at Busang could be readily attained. Such a resource, if true, would have put Busang in the top four largest gold finds in the world. Plaintiffs state that the world's largest gold deposit is the Grasberg copper and gold mine operated by Freeport in Indonesia, which holds 51 million ounces. As seen below, Bre–X would soon be claiming reserves far in excess of this amount.

On January 16, 1996, Nesbitt and Bianchini, in reliance on Bre–X's most recent statements at the time, revised the target price for the shares of Bre–X to C$110.

On February 20, 1996, Bre–X publicly announced an updated resource calculation "completed by Kilborn Engineering" pegging the total measured, indicated, and inferred gold resource for the Central Zone at nearly 15 million ounces. The next day, Nesbitt and Bianchini issued another report, bumping up their own estimate of total resources:

> We are increasing our estimate of total resources on the Busang property to 42.6 million ounces [of gold]. As a result we are increasing our 12–month target price to $180 per share and our 18–month target price to $220 per share. In our view, the Busang discovery represents one of the most prolific and soon-to-be profitable gold discoveries over the past 20 years.

This target price was impressive considering that Bre–X had gone public a year earlier on May 15, 1995 at C$3.75 per share. Plaintiffs also point out that Bianchini's reserve estimates consistently exceeded even those reported by Bre–X.

■ On March 7, 1996, P.T. Kilborn and Kilborn Engineering issued their Prefeasibility Study to Bre–X. The executive summary stated that the purpose of the study was "to determine the viability of the project." P.T. Kilborn received data from Bre–X on drill hole locations and sampling and assay results. P.T. Kilborn then performed its statistical analysis for the Prefeasibility Study based on that data. The metallurgical work for the Prefeasibility Study was done by Normet. Plaintiffs claim that the Prefeasibility Study contained numerous red flags concerning Bre–X's claims about Busang:

- the cyanide leach assay procedures at Busang were not standard practice; [6]

---

**6.** The Plaintiffs allege that the Kilborn Defendants knew at this time of serious assay problems at Busang. Section 5.2.4 of the Prefeasibility Study stated: "The initial preliminary metallurgical work showed significant discrepancies between head assays from fire assaying and calculated heads from gravity and cyanide leach test work. This is consistent with assay problems experienced by Indo Assay Laboratories in the initial assay work on Busang."

- Bre–X's assay results had chronic problems with variance and repeatability;
- the rates of recovery from simple coarse grinding were extraordinarily high, indicating that the gold particles were not embedded in the host rock;
- simple coarse grinding yielded large free gold grains, which were strongly atypical of a primary rock deposit where gold particles were embedded in the host rock;
- the gold in Bre–X's samples was unusually large for a primary deposit like Busang—86.3% of the Busang gold was larger than 106 microns;
- the core sampling procedure, which used whole (not split) cores and saved only 10cm of the core samples for future reference, was not industry standard;
- the absence of gold in the composite mineralized samples initially examined by Mintek Services Trust, an Australian geological consultant that Bre–X had hired in 1995; and
- Kilborn believed that a higher confidence level in the test results was needed.

These red flags are repeated numerous times in the Complaint.[7]

Another report prepared near this time by Hazen Research, Inc. allegedly contained additional red flags at Busang. Hazen's report stated that the gold particles from the Busang samples were "relatively coarse nuggets," "very compact," and "often nearly spherical in shape." These findings were similar to those of Normet discussed above. Plaintiffs allege that any competent mining engineer knows that the nature and shape of the gold particles described by Hazen and Normet were wholly inconsistent with the size and shape of gold found in a deposit such as Busang. Thus, Plaintiffs argue that the Kilborn Defendants had to have been aware of the strong likelihood of salting by Bre–X.

By the Spring of 1996, Plaintiffs allege that others in the mining industry were doubting the reliability of Bre–X's claims. According to a *Financial Post* article dated March 23, 1996, "technical experts watching the methods that Bre–X is using to estimate the amount of gold at Busang warn that no large mining company would consider investing in the project without a lot more data." Howard Stockford, executive vice-president of one of Canada's most successful mining companies, also cast doubt on the reliability of Bre–X's studies. "Their methodology is not accurate enough to correctly tell you what you are investing in," Stockford warned. The article goes on to question Bre–X's assaying method. In 1995, Bre–X had switched from the more standard fire assaying technique to the cyanide leach method. According to Glen Clark, a Toronto-based engineering consultant, "Cyanide leaching is more commonly used to evaluate gold processing methods rather than the orebody itself. Since it also involves the destruction of the original drill core, interested buyers will

7. The Complaint alleges the existence of other red flags in the Prefeasibility Study but does not explain them. For example, the Complaint alleges that the Prefeasibility Study showed that Bre–X was only assaying mineralized zones. What is a mineralized zones? What is the significance of not assaying samples from them? If the Complaint fails to explain the meaning of these terms of art in the mining industry, the Court will not con-

sider those allegations in deciding this motion. This is true even if the terms make perfect sense to the Defendants. The Court is not going to look beyond the Complaint and research mining terms and techniques on its own. If a plaintiff's allegations involve terms of art or other matters beyond the understanding of a layman, the plaintiff should clearly explain these matters to the Court and the defendants in his or her complaint.

want to check Bre–X's numbers by doing more drilling on the property. That's just good due diligence."

In response to the *Financial Post* article, Nesbitt's Bianchini told Walsh that he would personally vouch for Bre–X's assaying method. Walsh wrote to Felderhof on March 23, 1996:

Someone's trying to do a number on us and its really starting to piss me off. Egizo [Bianchini] is also pissed off at Peter Kennedy [the author of the *Financial Post* article] who he refuses to talk to ever. He's off to Chile for a week with other analysts but will call his office Monday morning and explain that our assaying method is a world recognized standard technique for grade determination and that Glen Clark [the consulting engineer who was questioning Bre–X's numbers] is B.S.

Bianchini also allegedly offered to blunt the effect of the *Financial Post* article by contacting institutional buyers and urging them to buy Bre–X stock. Walsh wrote to Felderhof: "He (Egizo) also will call all the institutions to buy the stock if it sells off." Plaintiffs argue that the response of Bre–X, Walsh, and Nesbitt to this article is significant proof of the collusive nature of the relationship among these Defendants; the extent to which they went to avoid detection of their fraudulent conduct; and the lack of due diligence by Nesbitt with regard to the serious questions concerning the Bre–X studies and assay results.

Felderhof defended his assaying methods in a March 28, 1996 press release. Felderhof stated that the assay methods employed by Bre–X actually understated the Busang resources, attributing this conclusion to "internationally recognized Kilborn Engineering":

In addition, metallurgical testwork conducted by internationally recognized Kilborn Engineering, as part of their recently completed prefeasibility study on

Busang, resulted in their determining that Bre–X's current and previously reported gold assay results are in fact understated by as much as 12.9%.

Three days later on March 31, 1996, Felderhof described Busang as a "monster." Another Bre–X spokesman estimated "30 million, plus, plus, plus."

It is clear that P.T. Kilborn and Kilborn Engineering were well aware Bre–X's assay methods and sample preparation process. In a memo to de Guzman dated April 2, 1996, Sean Walter, Kilborn Engineering engineer, describes his visit to Busang:

INDO ASSAY LAB

The Indo Assay facility had suitable assay equipment that appeared to be in satisfactory condition. The facility was clean, orderly, and appeared to be well run.

John Irvin has been operating this lab for approximately seven years and the lab has a good reputation for quality assay work. John will expedite the metallurgical samples to NORMET in Australia and Hazen in the United States.

METALLURGICAL SAMPLE PREPARATION AND COMPOSITING AT SAMARINDA

Upon arrival at Samarinda on March 26 a meeting was held with Mike de Guzman and Mr. Jerome Alo of Bre–X, Mr. Tony Showell of NORMET and myself to discuss the metallurgical samples. The procedures as previously defined in correspondence were confirmed and *Mike [de Guzman] supplied a list of samples available for testwork*

I arrived at the Bre–X sample preparation and storage facility on March 27, 1996 and worked there each day through Saturday March 30, 1996.

The facility was new, large, well equipped, clean, orderly and very satis-

factory for the duty required. Indonesian employees were present to start work immediately.

The samples prepared were crushed drill core (minus 1/4) inch and are to be used primarily for metallurgical testwork. .... The required sample preparation program was completed on Saturday, March 30. The samples were placed in large plastic drums and forwarded to Indo Assay in Balikpapan.

BUSANG SITE VISIT

Tony Showell and I arrived at the Busang project site on March 31, 1996 and returned to Samarinda on April 2, 1996. The campsite and project facilities were excellent. The handling of drill core from delivery at the camp through storage appeared very satisfactory. The sample preparation facility was large, well equipped, clean, orderly, and very satisfactory for the duty required. Again I was very impressed with the project facilities and the project appeared to be very organized and well supervised.

Note that de Guzman supplied the list of samples. None of the samples that were to be tested by Normet or Hazen were independently gathered or prepared. Plaintiffs allege that Walter also sent a copy of his memo to John Robertson, P.T. Kilborn's resident manager, and Paul Semple, who was the vice president and general manager of Kilborn Engineering in Vancouver. Thus, Plaintiffs argue, these men were fully aware of the process for handling and storing the core samples from Busang.

A Bre–X press release dated April 4, 1996 reported that as a result of additional testing, "Bre–X's technical team remains confident that 30 million ounces of gold are readily attainable." Every time Bre–X made a public statement in 1996, Nesbitt and Bianchini would increase the target price. Sure enough, on April 8, 1996, Nesbitt and Bianchini issued a new research report in which they strongly recommended Bre–X's stock. They again raised their target price, this time to C$230 (the price was then C$159.75). In this report, Nesbitt and Bianchini stated, "We have increased our overall estimate of the Busang I and II resource potential from 42.6 million ounces to 46 million ounces. Our new estimate is more than likely to be conservative."

Defendant SNC–Lavalin purchased Kilborn in early 1996. Plaintiffs allege that shortly after this acquisition, SNC–Lavalin aggressively moved to play an active role in the Busang project. In a July 18, 1996 letter to Walsh, James Booker, P.T. Kilborn's President, explained the kind of role the newly merged company wanted to play at Busang:

> Kilborn SNC–Lavalin has considered all requirements to take the project from its present stage through into commercial operations, and believe that we can provide the expertise necessary to design, build, commission and operate the complete facilities without the need for participation of a major mining company.

Plaintiffs offer this as an allegation of SNC–Lavalin's role in Busang. Booker's proposal touted the fact that Kilborn was owned by SNC–Lavalin, and he promised that SNC–Lavalin, "the largest engineering/construction company in Canada," would be actively involved in the project.

On April 17, 1996, Bre–X announced that an initial resource calculation had been "completed by Kilborn SNC–Lavalin" on certain sections of Busang. Thus, Bre–X was now associating SNC–Lavalin's name with its resource announcements. Based on this new calculation, Busang contained a total of 24.87 million ounces of

gold, a 60 percent increase over the previous estimate.[8]

Also on April 17, Defendant Barrick approached Bre–X to discuss a possible agreement relating to Busang. The Plaintiffs allege that this was the second time that Barrick had approached Bre–X. Barrick had previously discussed a joint venture with Bre–X in 1993 and 1994. These discussions had eventually broken down. According to the Complaint, pressure by its own shareholders to increase its reserves convinced Barrick to try again to negotiate an agreement with Bre–X concerning Busang. Bre–X expressed little interest in concluding a quick deal with Barrick, but being a small mining company, Bre–X needed a partner to help it develop its imaginary gold reserve. So on April 22, 1996, Bre–X announced that it would start to look for a partner for Busang. Barrick was reported to be a contender for the position.

Around April 23, 1996, Bre–X began trading again on the Toronto Stock Exchange. Within minutes of the opening of trading, the price of Bre–X stock skyrocketed from C$50+ to nearly C$200.

The next day, April 24, Bre–X delivered a copy of Kilborn's Prefeasibility Study to Bianchini's home address. Based on the alleged red flags in this study, Plaintiffs argue that Bianchini knew that comprehensive additional due diligence was required at Busang to confirm the huge preliminary Bre–X gold resource estimates. Plaintiffs allege that instead of proceeding with caution in light of these warning signs, Nesbitt, through Bianchini, dove in blinded with the prospect of participating in one of the greatest gold mines in history and ignored the obvious signs that something was severely wrong.

On May 15, 1996, Bre–X filed its Annual Report, which claimed that Busang contained resources of 30 million ounces of gold. Within a month of its initial trading day on the Toronto Stock Exchange, shareholders had approved a 10–for–1 split in Bre–X stock, which took effect on May 22, 1996. Share prices continued to rise after the split, at one point surpassing C$28.

On May 28, 1996, Bre–X stock reached a new high of C$26.10 per share (post-split). On the same day, Nesbitt gave a presentation to clients in the packed grand ballroom of Toronto's Sheraton Centre. Bianchini told the crowd that Bre–X was "a double." Bianchini stated, "I still think it's a buy here, but the really easy money has been made, and all we have left now is a double. I remember when doubles used to be great." As was later reported in the *Ottawa Citizen,*

> Clients who packed a Toronto hotel ballroom were told by an enthusiastic Nesbitt team—not only from sales, but from the economics and research departments—of the incredible opportunities to be found in the booming junior mining sector.
>
> Nesbitt's superstar gold analyst, Egizio Bianchini, and its senior mining analyst, Julian Baldry, made glowing presentations about the fortunes to be made while Nesbitt's chief economist Sherry Cooper provided an overview.
>
> Mr. Bianchini was introduced as the man who recommended Bre–X when it was at $2.40 per share.

Over the next several months, just prior to Bre–X's opening on the NASDAQ, Bre–X's public disclosures concerning Busang grew more and more extraordinary. Bre–

---

**8.** Note the difference between this estimate and Nesbitt's estimate on April 4 of 46 million ounces. Nesbitt was basing its resources estimate on "inferred" resource calculations and the Kilborn Defendants' estimates were "measured, indicate, and inferred." *See supra* note 4.

X's resource calculations increased by millions of ounces. In a press release dated June 20, 1996, Bre–X stated that an updated resource calculation "completed by Kilborn SNC–Lavalin" resulted in a total estimate of 39.15 million ounces of gold at Busang. Bre–X announced its "objective to outline 50 million ounces in the measured/indicated resource category by the end of 1996."

The Complaint states that Bianchini returned to Busang on June 9–10, 1996. On this visit, he videoed the sample preparation facility. He was also allegedly given a personal tour by de Guzman and Jerry Alo of the sample preparation laboratory where he was shown Bre–X's procedures for crushing and pulverizing core samples. Alo later explained to Bianchini how Bre–X prepared sample bags prior to shipping to Indo Assay, what was involved in the check assay process, and the procedure for preparing mineralized core samples. After this visit, Nesbitt released a report which again increased the estimate of Busang's total resource potential. This time it pegged an amazing 62 million ounces of gold. In a June 17, 1996 research report, Nesbitt and Bianchini began to talk of Busang as perhaps the largest gold deposit ever.

Meanwhile Barrick, which was allegedly still under pressure to increase its own gold reserves, began to exert political pressure on Bre–X to permit Barrick to gain an interest in Busang. On June 17, 1996, Peter Munk, Barrick's CEO, made a formal presentation to the Indonesian Mines and Energy Minister and other key officials concerning Busang. Barrick also allegedly recruited other influential Indonesian lobbyists to help it secure participation in Busang.

Bre–X continued to court financial analysts in an effort to increase its stock price. In July 1996, Bre–X took a group of ten mining stock analysts on a tour of Busang.

David Neuhaus, an analyst at J.P. Morgan, and Daniel McConvey, an analyst at Lehman, were among them. They spent July 13–14, 1996 with de Guzman and Felderhof touring in and around Busang. They also visited the assay labs of Indo Assay Laboratories in the town of Balikpapan on July 13, 1996. Accompanied by de Guzman and Felderhof, Neuhaus and McConvey were given a tour of the facility by the lab's chief chemist, Jamie Ordona, who showed McConvey how Bre–X's core samples were assayed.

The Complaint states that Neuhaus's and McConvey's access to the assay labs was significant in light of news articles published in March 1996 that questioned Bre–X's cyanide leaching assay process. Plaintiffs argue that they should therefore have been on the lookout for anything suspicious, and Plaintiffs allege that there was plenty there to arouse suspicion. Plaintiffs allege that during their visit, Neuhaus and McConvey were shown Bre–X's "core yard" where core samples were stored for prolonged periods of time while awaiting processing. They allegedly saw that Bre–X was drilling cores far in excess of their ability to process the cores and dumping the unprocessed core samples in the core yard.

In a press release dated July 22, 1996, Bre–X stated that as a result of additional calculations conducted by "Kilborn SNC–Lavalin," there were 46.92 million ounces of measured, indicated and inferred gold in Busang. The next day, on July 23, 1996, Nesbitt released a morning research report parroting new drill hole data released by Bre–X based on the work of the Kilborn Defendants. The Nesbitt report stated:

> Yesterday's release of new drill hole data and revised resource estimate is further confirmation that the Busang deposit is among the two or three largest

gold deposits in the world.... At this point, our review of all the drill and resource data confirms our view that Busang contains a resource of more than 62 million ounces. As a result of the size of the underlying resource, we continue to be of the opinion that Bre–X shares remain significantly undervalued both in the short and the long term. We reiterate our strong buy recommendation for Bre–X.

On July 23, 1996, David Neuhaus, the J.P. Morgan analyst fresh from his Busang trip, was interviewed by a reporter at the *Financial Post*. Neuhaus made several statements concerning Busang. First, and most incredible, he stated that he believed that Busang could contain 100 to 150 million ounces of gold. Not only that, he said that "150 million ounces is a conservative guess as to what Bre–X will ultimately come up with." Remember, Plaintiffs alleged that the largest known gold reserve at the time was 51 million ounces. Neuhaus didn't stop there; he said his view was based on the "impressive geology at Busang...." Neuhaus said that size was no longer the key issue facing Busang. Now analysts wanted to know what kind of cash flow could be generated from the mine. Neuhaus said that Busang would emerge as a huge open gold mine with annual production in excess of 2.5 million ounces and cash costs of around US$200 an ounce. He reported that his preliminary estimates were that Busang would be a low-cost mine generating US$500 million in annual cash flow. Plaintiffs allege that at the time Neuhaus made the statements, J.P. Morgan had been working for five months trying to be hired as Bre–X's investment banker.

With these ever increasing gold estimates at Busang, testing to verify these claims became more and more important, and the Kilborn Defendants supposedly had direct responsibility for monitoring

and overseeing the conduct of metallurgical tests. But at least as of this time, the allegations indicate that Kilborn's role was still rather limited even though Bre–X was using Kilborn's name to legitimize its increasingly incredible estimates of gold reserves at Busang. The Complaint cites an August 5, 1996 memorandum from Rodolfo Vega, a Kilborn employee, to Jerry Alo, a Bre–X Geologist, regarding the "Metallurgy Meeting of August 1, 1996," in which Vega described the role of Kilborn:

Hazen Research Laboratory will handle the Phase II metallurgical testworks. Normet on the other hand will be an independent body and will run parallel metallurgical testworks as a check to Hazen's results. Kilborn as the Metallurgical Manager will oversee the conduction [sic] of the testworks by Hazen and coordinate with Normet.

But Kilborn and the other independent labs working at Busang rarely ever took or prepared core samples that they tested. In an April 1, 1997 memorandum to Steve McAnulty, Bre–X's vice president of investor relations, Bre–X manager Greg MacDonald explained the one occasion in which "Kilborn" allegedly collected core samples: "The only time that Kilborn collected core samples was during March 25 to April 3, 1996 when they, together with Normet, collected 10cm 1/2 core sections every 2 metres over a typical ore section from 4 holes." Despite this somewhat limited role at Busang, Plaintiffs argue that the signs of fraud should have been becoming clear to P.T. Kilborn and Kilborn Engineering. Besides having "free and open access" to Bre–X's operations at Busang, the Kilborn Defendants were allegedly provided the reports prepared by Indo Assay, Hazen, and Normet discussed above. The Complaint states that without exception, these reports contained evidence of serious inadequacies in Bre–X's procedures and these same red flags mentioned above concern-

ing the unusual characteristics of the gold in the samples.

On August 19, 1996, Bre–X common stock began trading on the NASDAQ National Market System. That same day, Walsh was quoted in the *Financial Post* as saying that Bre–X was developing the largest purely gold deposit in Indonesia. Following its NASDAQ listing, Bre–X filed an "Interim Report to Shareholders and Financial Statements for the seven months ended June 30, 1996." The Interim Report announced a new resource calculation, "independently verified by Kilborn Engineering," for the Busang site:

> An updated resource calculation subsequent to the end of June 1996 from drilling results at Busang Gold Project increased the total gold resource by 44.3 million ounces to 46.9 million ounces, compared to a total gold resource of 2.6 million ounces at November 30, 1995. This resource calculation has been independently verified by Kilborn Engineering, engineering consultants.
>
> To date, only 25% of the entire Busang property has been explored and the extent of the mineralization has not been fully delineated.

This statement implied that Kilborn Engineering independently sampled and assayed the Bre–X results when, in reality, Kilborn used assay results provided by Bre–X.

At this point, J.P. Morgan became more involved. Plaintiffs describe the J.P. Morgan team in charge of the Bre–X engagement. First, Doug McIntosh, a J.P. Morgan vice president, was the lead senior J.P. Morgan technical representative in connection with the Bre–X project. McIntosh is a trained mining engineer and highly experienced in the technical evaluation of mining projects worldwide. He has a degree in Mine Engineering from the Colorado School of Mines. He is also a member of the Society for Mining, Metallurgy and

Exploration, Inc., the national professional society for mining engineers. Second, Leslie Morrison, a J.P. Morgan managing director, was the lead senior deal strategist, client contact, and negotiator in connection with the Bre–X project. Plaintiffs allege that he was in contact with certain Insider Defendants and Barrick on a regular basis and was knowledgeable of Bre–X's operations.

On August 24–27, 1996 Doug McIntosh visited Busang accompanied by Richard Ward of Republic National Bank and by David Walsh's son. On his visit, McIntosh was given a comprehensive tour of Busang: the base camp, the Central Zone, and Southeast Zones I and II. Plaintiffs allege that during his trip to Busang, McIntosh had to have observed numerous anomalies. According to his August 29, 1996 memorandum to Michael de Guzman, McIntosh reviewed in considerable detail Bre–X's sampling techniques, drill hole data, and resource estimates during his stay in Busang.

Based on his review, McIntosh allegedly concluded that the sampling techniques and statistical methodology used by Bre–X and Kilborn to determine Busang's gold reserves were "nonstandard, incomplete, and possibly inaccurate." The Complaint states that as a result, McIntosh recommended that Bre–X retain Mineral Resource Development Inc. ("MRDI") of San Mateo, California, a geostatistical consultant, to recalculate Bre–X's estimates using a more reliable methodology. Bre–X followed McIntosh's advice. On September 6, 1996, Emmanuel Puspos, Bre–X's Mine Planning Manager, hired MRDI to prepare an analysis of the Bre–X drill data.

Despite McIntosh's alleged concerns about the sampling techniques and statistical methodology used by Bre–X and Kilborn, J.P. Morgan and Bre–X executed an

agreement on September 3, 1996 whereby Bre–X hired J.P. Morgan to advise Bre–X "with respect to any sale, merger, consolidation or any other business combination." In their agreement, J.P. Morgan agreed to do the following: perform a valuation of the Busang development; assist Bre–X in preparing an offering memorandum describing Bre–X and the Project, its operations, historical performance, and future prospects; identify and contact selected qualified partners; arrange for potential partners to conduct business investigations; assist Bre–X in negotiating the final aspects of any proposed transaction; and deliver an opinion to the Bre–X Board of Directors, if requested, as to the fairness of any proposed transaction. The agreement further provided that J.P. Morgan would receive a monthly retainer of $50,000, an additional $250,000 for a written valuation of the Busang project, another $500,000 for a fairness opinion, and a success fee of $3 million upon the closing of any transaction involving Bre–X. J.P. Morgan also executed a confidentiality agreement with Bre–X. On September 5, 1996, Bre–X publicly announced that J.P. Morgan had been hired by Bre–X as its financial advisor and that Republic National Bank had been retained as its corporate advisor.

On September 10, 1996, Felderhof authorized the release of Busang technical data to J.P. Morgan. A day later, Bre–X sent McIntosh Kilborn's Prefeasibility Study, which contained summaries of Bre–X's geology, drilling, sampling procedures, assay test data, and ore processing test data. Kilborn also included resource estimates in their studies. The Prefeasibility Study also contained a mining and mineral processing plan, capital and operating cost estimates, projected cash flows, net present values under different scenarios, and Kilborn's recommendation that certain additional work be performed.

Plaintiffs allege that the Prefeasibility Study also alerted J.P. Morgan and McIntosh to the same red flags mentioned above. For example, the Prefeasibility Report referenced earlier problems with Bre–X assay results. The Prefeasibility Study also discussed Bre–X's unorthodox sampling techniques, including the use of whole cores in assaying rather than split cores, the retention of only 10 centimeters of each core meter for future reference, and the use of cyanide leach process assays rather than conventional fire assay technique. The Prefeasibility Study recommended further metallurgical test work and a statistical analysis of assay variability. Plaintiffs state that a review of such materials by a mining engineer such as McIntosh would have immediately alerted him to red flags which, if pursued, would have led to the discovery that Busang was a sham.

Two weeks after J.P. Morgan received this technical data, on September 25, 1996, Bre–X held a meeting of its board of directors at J.P. Morgan's offices. McIntosh and Morrison were present on behalf of J.P. Morgan. At the meeting, J.P. Morgan presented a chart, which summarized its conclusions. The J.P. Morgan bankers told the board that they believed that Busang is the most attractive gold project known in the world today and that the reserves there were worth between US$4.5 billion and US$4.9 billion. They also advised the board that Bre–X needed a major mining company to develop and operate the mine in order to maximize Busang's value. They also stated that due to Busang's size, capital requirements, and geographic location, only about six companies are qualified to be Bre–X's partner, Barrick being among the six.

According to minutes of the meeting, Bre–X directors questioned the J.P. Morgan representatives closely concerning

their presentation. They specifically inquired about "the validity of the grade averages used in the report, certain other assumptions about the size of the Busang deposits, [and] the potential mining methods and related issues." In response, McIntosh stated that he was "familiar with the preliminary conclusions from the initial feasibility study by Kilborn SNC–Lavalin" and that "there would be further due diligence required with Kilborn at the Busang deposits."

Meanwhile, Nesbitt was still releasing positive reports about Bre–X's stock based upon Bre–X's public statements. In September 1996 report, Nesbitt and Bianchini estimated that the total reserve potential for the Busang property was 62 million ounces of gold. They also stated that "recent drilling and mapping indicates that our estimate may be significantly underestimating the size of the deposit" and that the Busang deposit was "likely to be one of the three largest deposits in the world."

On September 26, 1996, on the advice of J.P. Morgan, Bre–X issued a press release publicly announcing that it would be seeking a partner to help develop Busang. A few days later on October 2, 1996, Bre–X and J.P. Morgan (represented by McIntosh) held a conference call with representatives of Barrick to review Busang's resource estimates. According to notes of the call, the group discussed these same red flags that continually worried everyone involved: the "coarse" nature of the gold; the fact that Bre–X's assay results could not be repeated with any degree of confidence; and the abnormally high percentage of recovery of gold after simple grinding.

On October 18, 1996, P.T. Kilborn and Kilborn Engineering presented a draft of the Intermediate Feasibility Study Executive Summary to Bre–X and its advisors, including J.P. Morgan. Representatives of Kilborn Engineering attended meetings on

October 20–21, 1996 at Busang with McIntosh of J.P. Morgan and members of Bre–X's Indonesian drilling team to review this report and to address questions raised by J.P. Morgan and Bre–X. The Kilborn Defendants allegedly admitted to J.P. Morgan that discrepancies in existing testwork mandated additional work. The Complaint states that the group decided to perform additional sample test work because the existing data and tests had not achieved a level of reliability.

The Intermediate Feasibility Study also contained results from a report titled "Metallurgical Test Program for Busang Gold Project," prepared by Hazen. Like earlier reports from consultants, the Hazen report describes the same series of red flags. First, gold particles from Busang samples were "relatively coarse nuggets" and were "typically very compact and often nearly spherical in shape." Plaintiffs state that Hazen's description was plainly one of gold that was alluvial in nature, not the primary gold deposit Bre–X claimed existed at Busang. Second, the report describes processing results not typical of gold from a primary rock deposit. Hazen found a recovery rate of over 93 percent— an unprecedented rate for gold that was supposed to be embedded in its underground host rock. Third, there was an abundance of "coarse" and "free" gold in the samples. Hazen reported that "determination of overall gold extraction or the rate of gold extraction is problematic when leaching whole ore, due to the presence of coarse free gold and the difficulties with sampling such ores and residues." Finally, the gold grains were often nearly spherical in shape. Plaintiffs argue that this "coarse nugget effect" is completely inconsistent with the primary deposit Bre–X claimed existed at Busang, and it caused wide variation in the assay and processing test results.

The Complaint alleges that J.P. Morgan and Kilborn also discussed presentation of the Kilborn's resource calculations. Plaintiffs allege that Kilborn presented two cases for making the "pit estimate and production schedule" for Busang: the "Base Case," which evaluated a mine plan based solely on traditional "measured and indicated" standards; and "Case A," which added speculative "inferred" resources to the total, which for Busang was a huge figure that Kilborn calculated based on unverified geological assumptions regarding extremely widely-spaced drill holes. Plaintiffs state that according to a later Bre–X press release, the original Base Case used an estimate of 23.03 million ounces of gold at Busang, while Case A added an additional 34.30 million ounces of inferred resources.[9] Adding these speculative figures ballooned the total by 149 percent to 57.33 million ounces.

J.P. Morgan allegedly insisted that only the larger resource numbers in Case A be used and that the Base Case be redefined to incorporate those figures. The Kilborn Defendants allegedly objected because the figures would not be "bankable" and argued that any bank that would finance a mine would "only recognize measured and indicated resources." J.P. Morgan allegedly overruled the objections. In Kilborn's words, "J.P. Morgan explained that the purpose of this report was not for presentation to the banks." Instead, J.P. Morgan intended to use it to negotiate a joint venture agreement to develop Busang. The Complaint states that this aggressive treatment by J.P. Morgan of

speculative resource numbers as basically equivalent to measured and indicated calculations was a fundamental part of the overall market deception and that J.P. Morgan's "non-bankable" spin on the resource numbers went directly to investors.

By this time, Barrick's political connections began to produce results. On or about November 14, 1996, the Indonesian government determined that Barrick would receive 75 percent of Busang and that Bre–X would receive the remaining 25 percent. The government also informed Barrick and Bre–X that it would "appreciate" a 10 percent interest. In addition, the government imposed a November 20 deadline for the parties to conclude a joint development agreement. On November 15, 1996, representatives of Barrick and Bre–X met to negotiate a deal. It finally looked like Barrick was going to get a piece of the action.

Turning now to Lehman, the first mention of Lehman analyst McConvey was his trip to Busang back in the summer of 1996. The Complaint's first mention of reports by McConvey on Bre–X, however, is a report he issued around this time in November 1996. While not a mining geologist or engineer like Nesbitt's Bianchini and J.P. Morgan's McIntosh, McConvey was familiar with the science and engineering of gold mining. The Complaint states that in addition to being a financial analyst, McConvey spent six years as the operations controller of Barrick, and as a result, he was familiar with all aspects of gold mining operations.[10] In his first re-

9. For the discussion of the difference between "Measured," "Indicated," and "Inferred" resource estimates, see *supra* note 4.

10. Another allegation that the Plaintiffs did not fully develop is that McConvey had a financial interest in Barrick. The Complaint states that in 1993 McConvey netted approximately $282,000 from exercising options to

purchase 20,000 shares of Barrick stock. In 1994, McConvey allegedly netted another $325,550 by exercising options to purchase 10,000 Barrick shares. The Complaint states that after those transactions, McConvey still held 50,000 options, but it fails to state when and if McConvey exercised those options. (¶ 386.)

port on Bre–X, released on November 18, 1996, McConvey declared that Bre–X "looks to have made the gold discovery of the century." The report stated, "Although there is a lot of drilling to prove up Busang's reserves, the size of this deposit, which currently has a resource ... of almost 50 million ounces, could turn out to be in excess of 100 million ounces." The Lehman report also fueled the rumor that "one or more major mining companies could make a bid for all of Bre–X," concluding that "by the end of this year, we expect Bre–X to have done a deal with a major mining company capable of putting Busang into production."

On November 21, 1996, Lehman raised its rating of Bre–X stock from neutral to buy. A report issued on that date talked of an "imminent" takeover and touted the size of Bre–X's resources. The report, written by McConvey, stated:

> BRE–X TAKEOVER MAY BE IMMINENT. BUY THIS STOCK TODAY....
>
> Based on Bre–X's tremendous reserves, we believe that a C$28–C$30 share price is supportable....
>
> [W]e have reread more closely a recent paper by Bre–X Exploration Manager Michael de Guzman, whom we well respect. The paper had been reviewed by Bre–X's Senior Vice President John Felderhof. When referring to an annual production rate of 2.5 million ounces, de Guzman insinuates that the mine may well have a 50–year life, which would require a deposit in excess of 100 million ounces.

At this point, McConvey had nothing to go on but his visit to Busang several months before and the public announcements by Bre–X. Plaintiffs claim that based on what McConvey allegedly saw during his visit that he should have been proceeding with caution. He wasn't. The next day, Lehman issued another report written by McConvey in which he set a target price of $27–$30. Bre–X shares were then trading at $17.50 per share.[11]

Barrick received a copy of Kilborn's Intermediate Feasibility Study, which included the Hazen report, on November 17, 1996. This is the first allegation regarding Barrick's alleged awareness of serious problems at Busang. Barrick also received the results of assays performed for Bre–X by Indo Assay on 148 core samples from Busang. Barrick also obtained actual samples of the "library core" for those 148 original samples. Library core is an uncrushed segment of the original drill core sample that is used for possible future reference, identification, or testing. The Complaint explains that since library core is not crushed or otherwise "prepared" by the exploration company's personnel, it provides essentially pristine samples of the ore.[12]

Barrick employees obtained the library core on site at Busang. The core samples, as well as the test data by Indo Assay, correlated to drill holes in Busang II (Southeast Zone), which according to Bre–X was the richest sector of the entire deposit. Included with the data for the 148 samples was "check assay" data, also generated by Indo Assay, relating to thir-

---

**11.** It is unclear from the Complaint whether Lehman's target prices are quoted in terms of U.S. dollars or Canadian dollars.

**12.** The Court notes that these allegations concerning the library core seem at odds with the Plaintiffs' allegations regarding Bre–X's practice of crushing the entire core sample instead of splitting the core. While Bre–X may not

have been splitting the core samples, the existence of the library core contradicts Plaintiffs' earlier allegations that there was nothing of the core samples left on which to perform later tests. Is this library core the 10 centimeter section of the core that Bre–X saved? The Complaint implies that this was not a sufficient amount on which to perform meaningful tests.

teen of the 148 samples. All of the Indo Assay data was generated using cyanide bottle roll tests, which Barrick knew was not standard assay procedure at this stage of a mining project.

The library core samples and the Indo Assay data on the corresponding core samples allowed Barrick to independently test actual samples of the Busang ore to see what amount of gold it contained and, if there was gold, to determine whether the samples had grades of gold comparable to publicly-announced test results for the exact same core sample. Barrick sent the Busang library core samples to Lakefield Research Ltd., an independent lab located in Lakefield, Ontario, to have them assayed using industry-accepted fire assay techniques.

With Barrick, a large, established gold producer, apparently in a position to close a deal to develop the mine, Bre–X's stock became even more attractive. In a report issued on November 27, 1996, Lehman continued to rate Bre–X stock a buy. The report, written by McConvey, stated:

> Bre–X has likely found the gold discovery of the century. . . .
>
> Barrick is, however, in the driver's seat, and, if it can reach an agreement with Bre–X that is fair and acceptable to Bre–X shareholders, a lot of negative investor perception of the current situation may go away.
>
> We believe that the current Bre–X share price depression is temporary. . . . [W]e believe that Bre–X is worth, conservatively, $20 to $22 (C$27 to C$30) in a competitive market situation, and our best guess is that Barrick will pay close to such a price to take control of this deposit subject to doing some due dili-

gence and gaining assurance on the tenure issues.

At the time, Bre–X shares had lost some of their value due to concerns over ownership of Busang and whether Bre–X would be awarded a contract of work by the Indonesian government. The shares were trading at $15.63.

On December 2, 1996, Parker and Cottle, the MRDI consultants hired at J.P. Morgan's request, sent a letter to Felderhof and de Guzman along with MRDI's final report, which was entitled "Busang Hardrock Gold Project." The Kilborn Defendants were also provided a copy. Plaintiffs point to several findings in this report that they argue constituted red flags, which should have alerted the Defendants who received the report to the serious risk of fraud. First, the report stated that while the current Kilborn resource models were adequate for prefeasibility study efforts internal to Bre–X, they were not adequate for a feasibility study which would be used by external lenders and investors. Criticism of the resource models, however, would have done nothing to warn of possible salting of the samples. But Plaintiffs also note that MRDI found some of the same red flags as listed in previous reports, including the use of the cyanide assay method instead of fire assays and Bre–X's practice of not saving full split core reference samples. MRDI recommended that Bre–X takes several steps to correct its sampling procedures, such as using finer grinds, splitting the core samples, using the fire assay method, and preparing a report on previous fire assay and cyanide leach assay data. Plaintiffs allege that none of the MRDI recommendations were implemented.[13]

---

**13.** In a effort to downplay MRDI's criticism of Bre–X's sample collection and preparation procedures, P.T. Kilborn attached a copy the MRDI report to its motion and pointed to other parts of the report where MRDI praised

other aspects of Bre–X's work at Busang such as the geological mapping work being done and Bre–X's core logging procedures. (P.T. Kilborn Mot., Ex. 3 at 8, 9.) The positive comments, however, were not contained in

J.P. Morgan received both draft and final copies of the MRDI report. The Complaint states that even though J.P. Morgan had directed Bre–X to hire MRDI, J.P. Morgan nevertheless ignored the red flags that MRDI allegedly uncovered.

Bre–X meanwhile continued announcing increasing amounts of gold at Busang. On December 3, 1996, Bre–X issued a press release in which Bre–X announced an updated resource calculation "completed by Kilborn SNC–Lavalin." The release stated that the "Intermediate Feasibility Study completed by Kilborn SNC–Lavalin was received on November 15 and has been under review by the technical staff of Bre–X, Kilborn, and J.P. Morgan, Bre–X's financial advisors." The press release explained that according to the Intermediate Feasibility Study, Busang contained a "mineable resource" of 45.53 million ounces, which could be produced at "$US 96 per ounce of gold," an extremely low cost, at an annual rate of 1.9 million ounces. According to the Plaintiffs, at then-prevailing gold prices, this would have translated into yearly sales of at least US$600 million and operating profits of US$425 million.

The same day, December 3, Lehman issued another report by McConvey stating that Busang was "the gold discovery of the century" and that Lehman expected the Bre–X "growth story to continue in a major way for the rest of this decade." McConvey admitted in this report that he had studied the Normet report. "Bre–X cross checked its sample results with other laboratories including Normet ... whose June 5, 1996 report we have reviewed." Plaintiffs argue that to an experienced "mining professional" like McConvey, even a casual reading of Normet's report highlighted a number of problems at Busang.

Curiously, McConvey identified several of the facts that Plaintiffs now call red flags as positive aspects of the gold at Busang. He stated that the gold at Busang was coarse, loose, powder like, and free in nature, which Plaintiffs claim is patently inconsistent with primary deposit of gold embedded in host rock such as that Bre–X claimed to have discovered at Busang. He also stated that because gold particles in Bre–X's samples were not attached to their host rock, they could be separated with astounding ease—gravitational circuit recoveries were 75–85 percent in the Central Zone to 83–93 percent in the Southeast Zone. Plaintiffs argue that Recovery rates of such a magnitude are also inconsistent with a primary deposit and are indicative of alluvial gold. He even mentioned that Bre–X was using cyanide leaching process even though the fire assaying was "standard assay process." Lastly, he reported that Bre–X crushed the entire core sample. These are several of the crucial facts that Plaintiffs argue should have tipped off an experienced "mining professional" like McConvey to the fraud. If that were indeed the case, the Court finds it incredible that McConvey would highlight these facts in his report. Assuming the Plaintiffs' allegations concerning these red flags are true, the fact that McConvey reported them in this fashion creates an inference that he did not understand their true significance.

The December 3, 1996 report also includes a photograph of the core yard filled to the brim with unprocessed cores. Plaintiffs argue that this first-hand observation of Bre–X's practice of storing core samples in an open warehouse, and not processing the core samples in a timely manner, should have raised another red flag of the likelihood of tampering. That is clearly not so in McConvey's case, since

the portion of the report cited by the Plaintiffs.

if it were, he would not have included those pictures in his report. If Plaintiffs' allegations are all true, McConvey must have looked foolish to the other Defendants. He was publishing pictures and reports touting some of the same facts that allegedly made J.P. Morgan concerned enough to recommend hiring an independent consultant.

Barrick at this time was making some progress. On December 7, 1996, the *Calgary Herald* reported that Barrick and Bre–X, with the guidance of the Indonesian Government, had agreed to have a 75 percent and 25 percent interest in Busang, respectively, and to give the Indonesian Government a 10 percent interest coming from Barrick's and Bre–X's interests pro rata. At the time, Busang was reported to contain 57 million ounces of gold and was valued at more than $21 billion.

Barrick, however, was about to receive some bad news. Up until this time, Barrick had been relying exclusively on information provided by Bre–X. While it had received the Kilborn Intermediate Feasibility Report and the Hazen Report, Barrick had not done any of its own testing or drilling. By mid December 1996, however, Barrick received the new test data from Lakefield concerning the library core that Barrick had sent Lakefield in November. Plaintiffs allege that from this report, Barrick must have immediately known that it had a serious problem—the Lakefield results indicated no appreciable gold for almost every one of the library core samples tested. In fact, Lakefield's tests showed that only 5 of the 135 of the core samples had even a minimal amount of gold—at least one gram per metric tonne ("g/t")—and that the average over the entire set of tested samples was a mere 0.25 g/t. Lakefield's results were in stark contrast to the values reported by Indo Assay for the same drill core. For the corresponding samples, Indo Assay had reported gold

content averaging 6.32 g/t, with thirty of the samples returning extraordinarily rich values in excess of 10 g/t. Likewise, the thirteen check assays done by Indo Assay had shown an average of 5.61 g/t.

The negative Lakefield test results raised serious concerns for Barrick, which its executives expressed directly to Bre–X. On December 15, 1996, Pat Garver, Barrick's General Counsel, forwarded to John Sabine, Bre–X's chief outside legal counsel, three pages of assay data from Barrick's due diligence on the Busang deposit. The Barrick data indicated negligible gold values where Bre–X had claimed significant gold existed.

On the same day as Garver's letter, Bre–X held a Board of Directors meeting to discuss the proposed transaction with Barrick. McIntosh and Morrison were present on behalf of J.P. Morgan. At that meeting, Sabine told the group about the news from Pat Garver concerning Lakefield's tests. Sabine told them that the negative results "had raised concern with Barrick." As a result, Barrick was "pressing to perform further due diligence on the site." It was also insisting that successful results be a condition for concluding a transaction. Instead of investigating these test results, however, Morrison allegedly counseled avoidance. Morrison "stressed that there should be no condition in favor of Barrick on being satisfied with its due diligence and on particular assay results. Barrick had maintained from the onset of negotiations that it did not require due diligence and it should not now be permitted to add such a condition."

Plaintiffs allege that J.P. Morgan, and McIntosh in particular, had been aware of serious problems for a long time. Plaintiffs argue that this attempt to gloss over the no-gold results obtained by Barrick, despite the numerous other red flags that J.P. Morgan knew existed, demonstrates

J.P. Morgan's scienter. They knew not only of the problems with the Indo Assay, Kilborn, Normat, and Hazen tests, but also those of their own experts, MRDI. For J.P. Morgan's people, this was allegedly the sixth time that they had received indications that there was a potentially serious problem with Bre–X's representations about Busang. Plaintiffs point to this as evidence that accuracy and full disclosure were not J.P. Morgan's objective and that closing a joint venture deal was. With the closing, even if the bidder was forced to commit without adequate due diligence, J.P. Morgan would receive $3.25 million success and fairness opinion fees. Plaintiffs allege that J.P. Morgan refused to allow Barrick to make its own successful due diligence a condition of the deal because J.P. Morgan knew what Barrick would likely find at Busang—nothing! The final allegation concerning this meeting is that after hearing about Barrick's test results, the Bre–X Board unanimously adopted a resolution establishing a $5 million officer and directors' indemnity fund in the Channel Islands. McIntosh and Morrison were allegedly present for this action and the attendant discussions.

With political pressures and uncertainties rising, potentially jeopardizing any deal, Barrick acquiesced to J.P. Morgan's position. Rather than delay progress of the announced Bre–X/Barrick joint venture, Barrick agreed to "rely on public disclosures made to date by Bre–X," according to another letter sent by Garver to Sabine later that day on December 15. It was Garver's understanding that Bre–X was to work with Barrick "so that we can promptly confirm Bre–X's view that the results that were recently obtained from Barrick's independent assays are anomalous." Garver understood that J.P. Morgan (through McIntosh) would be contacting him "to follow up on this."

Allegedly shaken by the negative Lakefield test results, Barrick hired a well-known expert in mineral sampling to review and statistically analyze the data. On December 16, 1996, Barrick's Executive Vice President of Corporate Development, Alan R. Hill, who was responsible for Busang and other international Barrick projects, contacted Jan Merks, President of Matrix Consultants Ltd. Plaintiffs state that Merks is a widely respected mineral sampling specialist based in British Columbia and is renowned for his utilization of applied statistics in exploration. On December 17, 1996, Hill phoned Merks and outlined the project. He explained the testing to date and asked Merks to evaluate and statistically compare the test data from Indo Assay and Lakefield. Hill faxed Merks a cover letter and a table of data: original assay results of 148 core samples (performed by Indo Assay); check assays results for thirteen of those 148 samples (also by Indo Assay); and check assays results of 148 library core samples (by Lakefield). Hill's letter confirmed that Indo Assay had assayed the 148 original core samples and performed the thirteen check assays using cyanide bottle roll tests. Hill then explained that Lakefield had assayed library core samples using the more widely accepted fire assay technique. In other words, the three sets of test data were all based on the same drill core sections. Lakefield had reported "NA" (not applicable) for thirteen of the 148 library cores, so there was a total of 135 paired data points. Hill also informed Merks that Barrick had obtained another 2,200 sets of assay and check assay data from Bre–X's "full suite of drilling" at Busang and could provide that data if necessary.

Merks immediately analyzed the data from Indo Assay and Lakefield. He performed a "Student's t-test" on the paired assay results. This test is used to determine whether two means are statistically

identical or whether they differ significantly. Here, Merks compared the mean of the Lakefield assays with the mean of the corresponding 135 (of the 148) assays from Indo Assay. Plaintiffs allege that the results of this calculation indicated to a near certainty that either the library core tested by Lakefield and the core tested by Bre–X/Indo Assay were not from the same original core section or the sample core had been altered. Either scenario suggested a deception by Bre–X.

Merks also analyzed the variance both between and within the two core sample populations, which he determined by calculating the coefficient of variation ("CV"). A working definition for CV is the standard deviation expressed as a percentage of the measured value (here, the measured value being the mean). The higher the calculated CV, the worse it is, since it means that the data does not match up well. Merks allegedly found the CV between the Indo Assay and Lakefield assay results was 191 percent, a result which he stated was "extraordinarily high." In contrast, the highest CV that he recalled seeing previously for a bona fide gold deposit was about 55 percent. In most cases, the CV is 25 percent or less.

In a memo faxed late that very day, December 17, Merks informed Hill of his findings. Merks emphasized that his test results were not due to chance or accident. He pointed out that it was "highly improbable" that the difference between the means of 6.32 g/t for the Bre–X/Indo Assay tests and 0.25 g/t for the Lakefield assays—"an astounding 2,442 relative percent"—was due to "random variations" in the respective test processes. Rather, he concluded, the difference was "most probably (much more than 99.9%) due to a bias or systematic error of unknown origin."

Merks then pointed to a glaring anomaly in the test results. He found that "133 out of 135 large cores [tested by Indo Assay] exhibit higher gold grades than library cores [tested by Lakefield] do." Merks stressed that the probability of such an event is "close to $10^{-40}$," odds that "do indeed stretch the imagination." It would be like tossing a coin and getting heads 133 out of 135 flips.

Merks told Barrick, "My observations support a number of inferences most of which conflict with the premise that the original bottle roll tests [by Indo Assay] are unbiased." In contrast, he "accept[ed] that Lakefield's fire assays for gold in library core are unbiased and precise." Recognizing that the aberrant results arose from core that was prepared by Bre–X and assayed by Indo Assay, Merks doubted that analyzing the additional 2,200 pairs of assays (all done by Indo Assay) would be fruitful. Since all of the data emanated from Bre–X/Indo Assay, no analysis of that data could ever "dispel your [Barrick's] doubts."

Instead, Merks suggested that additional uncrushed library samples be assayed by Lakefield. He also wanted Barrick to examine any remaining portions of the Bre–X crushed samples to see "which particle size fraction contains most of the gold." In other words, he asked Barrick to find out whether the gold in the samples prepared by Bre–X was primarily large particles. This would be inconsistent with an igneous deposit, like Busang was supposed to be.

Merks then mentioned his prior experience investigating "a case of fraudulent gold assays" in which he determined the degree of continuity, or "spatial dependence," of gold mineralization between grades of contiguous core sections. His analysis in that case had revealed a likely fraud, and he suggested that a similar analysis be undertaken for Busang. Merks concluded: "I have carefully examined the sets of test results transmitted

with your letter of December 17th, and submit that *extreme caution* is in order. I trust that my interpretation will assist you in assessing how to proceed."

As Plaintiffs point out in the Complaint and in their responses to Defendants' motions, this was yet another expert concluding that Busang had some serious problems. For Barrick, who was late in the game as far as knowing of these red flags, Merks tests did what they were intended to do—they demonstrated that Lakefield's test results were not merely an anomaly. The Complaint states that at this point, December 17, 1996, Barrick was aware of a substantial risk that Bre–X's reported gold values for Busang were false.

On December 19, 1996, Hill faxed a letter to Merks to let him know that Barrick was having Lakefield do a second round of tests. Hill also included his proposed instructions to Lakefield regarding the testing to be performed and asked Merks to review them. One of Hill's directions to Lakefield was to give the work "top priority," even if it meant deferring other important work for Barrick on another project. Hill was clearly concerned. Merks reviewed the proposed assay procedures and responded by faxed memo on December 20, 1999. He made several suggestions, including that the test results from Lakefield on the new samples be grouped and evaluated by deposit (Busang I, II, and III). Merks made this point because he thought the previous data came from throughout the Busang site. The earlier sample data Merks had seen had actually all come from Busang II, the "richest" part of the entire deposit. Plaintiffs state that when Merks learned this fact a few days later, it only exacerbated his alarm.

In his December 20 memo, Merks again stressed the importance of first screening the pulp samples (which had been prepared by Bre–X) at "150 mesh" (105 microns) and assaying the larger and smaller particle-sized portions separately. This simple test would reveal the nature and origin of the gold. He was clearly concerned about salting. He wanted to know whether the gold was mostly found in the coarse particles that characterize alluvial gold, which would indicate fraud, or in the tiny flakes typical of gold found in igneous ore. Merks also urged Barrick to take precautionary steps to safeguard Bre–X's library cores. They are "likely to become even more relevant at a later stage," he warned in his memo. Merks also counseled heightened scrutiny of the sampling procedures at Busang. "Changes in procedures and equipment, and in personnel in particular, . . . should be recorded as soon as possible and preferably before memories fade." In short, by December 20, 1996, three days after being hired, Merks was urging Barrick to investigate the potential of fraudulent gold assays.

Later on December 20, Hill faxed Merks a response. Hill gave Merks permission to coordinate directly with Lakefield and sent him a chart of the "downhole variograms" of more than 15,000 Bre–X assay results for the Busang deposit.[14] Merks responded to Barrick the same day. He pointed out that the CV for the samples represented on Barrick's variogram was 113 percent, and that the CV for "duplicate test portions of the same test samples" was 108 percent. (Barrick Mot., Ex. 2 at 1.) Thus, the two measurements were statistically identical. Because the two CVs were essentially the same, there was no "room" left in the measurement variance for any variance to be coming from the ground. Merks explained that this "meant

---

14. The Complaint defines a variogram as a graph in which the variances of the ordered data are plotted against their spacing or "lag." It is used to get a sense for the degree of continuity of the gold mineralization.

that virtually all of the gold found was in the samples, not in the ground. Nature, of course, is not so selective." Merks' analyses also confirmed the extreme variability of the assay data previously generated by Indo Assay for Bre–X. The Complaint explains that normally, average variability between samples from the same piece of drill core is 10 to 20 percent. Here, the variability evident from Indo Assay test results on samples of the Bre–X prepared core was over 100 percent. Plaintiffs allege that this was a sure sign of irregularities in the preparation or testing of the ore.

This same data from Indo Assay that Merks analyzed was what P.T. Kilborn and Kilborn Engineering used to prepare their resource estimates. Plaintiffs allege that by conducting even the most basic data variability checks, which is standard industry practice and which Merks was able to do in just a few hours, Kilborn would have discovered the glaring problems with the data. According to Merks, it was inexcusable for reputable mining professionals like the Kilborn Defendants, charged with preparing resource estimates for release to the investing public, to review the Busang assay results and fail to see the obvious problems with the numbers.

Over the Christmas holidays, Merks continued studying the Barrick/Bre–X data he had been given. He wrote to Barrick on January 6, 1997, conveying the results of his correlation regression analysis to Hill.[15] The regression analysis supported the conclusions that Merks had already reported to Barrick. He found that the coefficient of determination was basically non-existent—"zero for all practical purposes"—which showed a complete lack of associative dependence.[16] Merks explained that this lack of associative dependence also conflicts with "the premise that the library cores and the test portions for the [Indo Assay] bottle roll tests once formed part of the same core sections." The two sets of samples simply did not match at all. In concluding his January 6, 1997 memo, Merks bluntly "question[ed] whether the library cores and the [original] test portions ... could have come from the samecore sections." After noting that this observation was "even more ominous" in light of certain other data he had generated, Merks closed with this note: "Since my message of December 20th I have contemplated many scenarios to explain the observed discrepancy but none are pretty."

On January 8, 1997, Barrick gave Merks computer disks containing data Barrick had received from Lakefield's second round of testing, including assay results on the 789 Busang pulp samples. Plaintiffs allege that the results of Barrick's second round of testing were just as alarming as the first. The new testing showed that the gold in the samples were unusually big and that smaller particles were entirely absent.

When Bre–X learned of the glaring problems uncovered by Lakefield's first round of tests, Bre–X asked P.T. Kilborn to conduct a study to verify the assay results produced by Indo Assay, whose results were used by Kilborn in its resource calculations. Bre–X asked P.T. Kilborn to select random samples from among the samples that had been collected and stored by Bre–X, supervise prepara-

15. This is used to check for "associative dependence" between paired data. According to the Complaint, if the results are negative, the two samples did not come from the same core.

16. Coefficient of variation ($R^2$) is a measure that indicates the percentage of variation in Y that is explained by or attributed to the X variables. Here X and Y were the paired data points from the Lakefield tests and the Indo Assay tests.

tion of these random samples, select two independent laboratories to complete the check assays, perform a statistical analysis of the results, and report the findings to Bre–X. P.T. Kilborn selected its samples in January 1997. In addition to samples randomly selected by P.T. Kilborn, Bre–X selected other samples whose previous assay results appeared "anomalous." The collection of the samples was "supervised" by Ashby, a Kilborn Engineering employee, who was at the site "for the first two days until the Indonesian crew had gained enough experience to perform a satisfactory job." The samples were then shipped to Vancouver to be assayed by one of two assay laboratories.

Barrick's due diligence forms the basis of the Plaintiffs' claims not only against Barrick, but also against Lehman. Plaintiffs allege that McConvey, a former senior officer of Barrick, was told about or provided the results of Barrick's due diligence testing in late 1996. Plaintiffs allege that McConvey's source concerning the Barrick test results "may" have been one of the participants at the December 15, 1996 meeting of the Bre–X Board of Directors. As proof of this allegation, Plaintiffs note that at the meeting, Morrison stated that J.P. Morgan was prepared to sign a fairness opinion with respect to the pending Barrick transaction. Bre–X, however, did not inform the public of J.P. Morgan's opinion. Yet five days after the board meeting, McConvey disclosed in a research report that J.P. Morgan had informed Bre–X that it was willing "to sign a fairness opinion on the current agreement with Barrick." Thus, Plaintiffs allege, McConvey was privy to the discussions at that meeting. And at that meeting, Lakefield's negative test results were discussed in great detail. Barrick did not even contact Merks, however, until December 16. Thus, at most, Plaintiffs adequately allege that Lehman was aware of Lakefield's first round of tests.

Despite his alleged knowledge of these tests, McConvey continued to recommend Bre–X stock in his reports to investors. On January 9, 1997, Lehman issued a report stating: "In a bearish gold bullion market, we believe [Bre–X] will perform well in 1997." Lehman's report stated that "things are looking better for Bre–X" and that the price of Bre–X stock would "go up significantly from [then] current levels." In another report written by McConvey and issued on January 13, 1997, Lehman touted the purported drill results at Busang: "The spectacular drill results are a reminder of what makes this discover[y] so unique. * * * We continue our 1–Buy rating on Bre–X." That same day, Bre–X had announced an increase in reserves to 57.33 million ounces.

Meanwhile, the evidence of fraud at Busang continued to mount. Merks was now working on the new data from Lakefield. He faxed his preliminary results to Barrick on January 12, 1997. His analysis of the new data only deepened his concerns. Barrick points out that the results of Lakefield's new tests of the pulps were generally consistent with the corresponding Indo Assay test results. The Complaint explains, however, that Lakefield was testing samples that had been crushed and prepared in Indonesia by Bre–X, not library core. Therefore, it was merely assaying the same adulterated samples that Indo Assay had tested. Merks' January 12 memo reminded Barrick that the first Lakefield assays of library core "did not give test results comparable with those of Indo Assay," a fact that remained "a matter of grave concern."

Merks stressed the potential for salting. "It became of even greater concern," he wrote, if the coarse portion of the samples "prepared in Indonesia contain most of the gold." What Merks was telling Barrick was clear. If, after screening, the coarse

portion of the samples contained most of the gold, it was unlikely the gold came from natural sources. According to Merks, the fact that the measured gold overwhelmingly came from the coarse portion of samples prepared by Bre–X personnel was a dead give away that it was "gravity concentrate" or placer gold. These sorts of gold particles do not occur naturally in a deep hard-rock deposit such as Busang. In closing his January 12 memo, Merks noted the "critical importance of Barrick's drill program." Merks was obviously concerned about gold being added to the samples after they were crushed. He emphasized the importance of securing drill core samples: "I feel justified in reiterating that the integrity of all core must be ensured by handling it with even more care than a bullion shipment, and that core sections not even be crushed in Indonesia."

Merks sent a follow-up memo to Barrick on January 13, 1997. He relayed yet another damning fact from his analysis of the second round of Lakefield tests: "approximately 80%" of the gold in the Busang pulp samples was from coarse particles. This result, Merks wrote, was "quite extraordinary," especially in light of the minuscule gold grades (0.25 g/t) found in the unprocessed library core previously tested by Lakefield. With his memo, Merks gave Barrick a bar graph that illustrated the unnaturally imbalanced allocation of gold between the larger-particle and smaller-particle portions of the samples. Merks had never seen a similar depiction so obviously problematic and implausible. The hard evidence of salting by Bre–X—a concern that Barrick and Merks had shared for weeks—merely continued to build.

It is unclear just who outside of Barrick knew of Merks' tests and their results. Bre–X, however, was undeterred as far as perpetuating the fraud. On January 13, 1997, Bre–X publicly announced "stun-

ning" new assay results that were projected to provide a "significant increase" in the size of the deposit from its current level of 57 million ounces. It was at this time that Barrick spokesman, Borg, made the most damning statement as far as Barrick is concerned. Despite all that Barrick had learned from Lakefield and Merks, Borg stated that, "from our [Barrick's] point of view," the results were "consistent with our [Barrick's] understanding of the property," and that "you would expect infill results like these." Borg's statement was then quoted in the January 14, 1997 edition of *The Globe & Mail.* Plaintiffs argue that this was a direct, unqualified, and unequivocal representation by Barrick about gold at Busang.

Despite Borg's statement, the Complaint makes clear that Barrick was still extremely concerned with results of its initial due diligence. On January 20, 1997, Merks allegedly met with Barrick executive Hill in Toronto, at Barrick's headquarters. Also at the meeting was Rene Marion, a Staff Mining Engineer for Barrick. The meeting lasted for over an hour. Much of the discussion centered on the bar graph that Merks had attached to his January 13 memo. Plaintiffs allege that the group tried to come up with alternative explanations for the discrepancies but that Merks made it plain that the only plausible explanation was salting.

That same day, on January 20, *Reuters* reported that the Indonesian Government had sent a letter to Barrick and Bre–X stating that they had only one month to conclude a partnership agreement concerning Busang. If not, the government would intervene and take control of Busang II and III. Evidently, issues had arisen concerning ownership of Busang and participation by Indonesian partners. Barrick characterized the letter as reaffirming the government's support for its

participation in developing Busang and said it was moving ahead with development of the site.

McConvey continued to recommend Bre–X. On January 20, Lehman raised its target price of Bre–X stock from $19 to $22 per share and reiterated its buy rating. At the time, Bre–X stock was trading at $17.69 per share.

Barrick issued another press release on January 22, 1997 attributing its participation in the development of Busang to its reputation for expertise and financial strength. The press release quoted Munk as stating, "The [Indonesian] support for Barrick's participation reflects our unique development capabilities and financial strength. Barrick is the only company that has ever developed an open pit gold mine producing over two million ounces per year." Plaintiffs allege that his statement was also materially misleading. They also point out that Barrick's test results were flatly inconsistent with "an open pit gold mine" ever being built at Busang. Therefore, Plaintiffs argue, a statement like that by Munk at that time was reckless at best, and possibly intentionally misleading.

On January 23, 1997 a widely-reported fire at Busang destroyed all of de Guzman's records and other files. Amazingly, none of the moving Defendants seemed at all concerned. None of them saw it fit to investigate the causes of the fire.

On January 24, 1997, Merks followed up the Toronto meeting with a letter to Rene Marion. In it, Merks suggested further testing of the three library core samples (out of the 135) in which Lakefield had found some gold. As Lakefield had done on the 789 Bre–X–prepared pulp samples in its second round of tests, Merks wanted to screen the samples with 150 mesh (105–micron) to see where the gold came from. If these tests showed the same uneven distribution found in the pulps just tested by Lakefield, the presence of gold in even the three isolated samples of library core would be suspect. In any event, Merks observed, the testing "may well add some valuable information to the puzzle."

On January 31, 1997, Merks faxed further comments to Barrick on Lakefield's second round of test results. Noting that most of the gold in the samples prepared in Indonesia came from coarse particles, he commented that such an "extraordinary distribution" would occur "if a high grade gravity concentrate ... was added between the crushing and division stages"— in other words, from salting with river-panned gold. Merks proposed further testing to confirm the high probability that "high grade concentrate was added during the sample preparation stage in Indonesia."

In this January 31 fax, Merks asked whether the fire at Busang had destroyed identification tags on the library core samples. Merks noted his experience that "[u]ncommon events tend to occur when due diligence examinations are in progress." Merks also noted that certain remarks in Lehman's widely-published December 3, 1996 report on Bre–X were "confounding." Contrary to Lehman's statements describing Busang as a "geologist's and metallurgist's dream," he wrote, "[o]nly the drilling of additional holes near the glory holes" could lend sufficient support for such a notion.

With a February 1, 1997 memo, Merks forwarded to Barrick statistics underlying his previous memo. According to his analysis, Lakefield's second round of tests showed a rich average grade of 11.66 g/t for 252 samples from four holes in Busang. The gold in these samples was 81.5 percent in coarse particles. Moreover, Lakefield's test results for the Indo Assay 177 samples of seventeen holes showed that 78.8 percent of the gold was in coarse particles.

Again, these findings only strengthened the likelihood of salting. They also paralleled the study prepared by Hazen the year before.

Nesbitt, meanwhile, continued to promote Bre–X. On February 1, 1997, Nesbitt announced yet another resource estimate:

[Bre–X] has increased the resource estimate to 70 million ounces. We have reviewed the new estimates and previously announced drill data, and have developed a new potential resource estimate of 89.4 million ounces. We expect that throughout 1997 the total resource will grow substantially, perhaps even beyond our estimate.

On February 3, 1997, Merks again wrote to Barrick about the fire at Busang. He stated that recent media reports on the fire at Bre–X's geology room "did little to dispel my concern." Merks sent a second memo to Barrick on February 3, 1997 concerning tests on hole SE198, a hole for which Bre–X had announced spectacular gold grades. He wanted to determine whether a significant degree of spatial dependence existed along core sections within this hole. He then was going to compare Lakefield's test results for hole SE210, a directly adjacent hole with far less reported gold, to see if the results could be reconciled.

On February 5, 1997, Merks sent another memo to Barrick, reflecting his comparison of test results for holes SE198 and SE210. Although saying that "most of my worries would [have] disappear[ed]" if the gold grades for the holes (which were only 50 meters apart) were comparable, Merks found that the grades were widely dissimilar—1.15 g/t for hole SE210 versus 12.89 g/t for hole SE198. Thus, Merks concluded, "the observed difference in gold grade remains a matter of concern." He repeated his prior warnings. The best way to alleviate his concerns was for Barrick to assay more library core for SE198 and to drill its own hole "within a few meters of SE198." "More important," he said in his memo, this was necessary "to alleviate the concerns of Barrick's management."

The Complaint states that Merks' work did little to stop Barrick's self-promotion in its attempt to gain participation in a mine at Busang. On February 5, 1997, Munk boasted that only Barrick could construct the mine required to develop Busang. Munk told mining analysts on February 5 that Barrick has a "unique mine development team—the only team, the only team, gentlemen—that can point to putting on stream a mine operation the scale of Busang ... from scratch, on budget, on time, without a single hitch." Again, Plaintiffs argue that this statement was misleading since Munk knew of test results that were inconsistent with there ever being any "mine operation" at Busang.

In a February 11, 1997 memo to Barrick, Merks commented on the results from more Lakefield testing of Bre–X–prepared samples, including the marked discrepancies between holes SE198 and SE210. The disparities were unprecedented in his experience. In addition, Lakefield's original assays of the library core samples were not "even remotely close" to the earlier Indo Assay tests of the same core. Merks offered three possible explanations: "human error; deliberate switch; or fraudulent act."

Merks was clear in his memo that the second round of Lakefield tests, which showed mainly coarse gold in the Bre–X–prepared samples, "does not rule out the probability that high grade gravity concentrate was added to crushed core" prior to the testing process. In so many words, he told Barrick that the Bre–X samples probably were salted with placer gold, and the second Lakefield tests provided no reason to accept the Busang deposit as real. The

only way to disprove the evident fraud scenario was drilling and more testing, a recommendation that Merks had made to Barrick in writing at least twice before. In Bre–X's case, the probability that riverbed gold had been added to crushed core could be "reduced, if not eliminated," by assaying hole SE198's unprocessed library core. Any refusal by Bre–X to make the library cores available, said Merks in his February 11 memo, "should be regarded with suspicion and trepidation."

By February 14, 1997, Barrick had abandoned its efforts to obtain an interest in Busang. It is unclear how much this was due to the negative tests results and how much was merely due to a breakdown in the negotiations. But as late as February 15, 1997, Barrick continued talk about the gold at Busang. In commenting on the contents of a report Barrick intended to file with the Indonesian Government, spokesman Borg told the *Financial Post:* "We'll tell them we believe we're the most suitable and qualified operator. We understand the gold being in their hands, its their decision." Plaintiffs also claim that this statement was reckless because Barrick knew there was probably no gold at Busang.

On February 17, 1997, Bre–X announced its joint venture deal with Freeport. Bre–X also issued a press release publicly announcing that the Busang resource calculation had been increased by 13.6 million ounces and now stood at 70.95 million ounces.

Merks forwarded his time sheet to Barrick the next day, February 18, 1997. With it, Merks sent an article from the *Vancouver Sun* (Feb. 14, 1997) regarding a bogus gold deposit in Oregon as to which he had played a key role in exposing the fraud. He added that he had examined "various scams and frauds" through the years, and he had become concerned about Busang "when the library core turned out to be a bust." He continued, "Neither the test results for test samples and rejects [nor] the test results for whole core did much to restore my confidence in the reported reserves." Plaintiffs state that Freeport unknowingly had bailed out Barrick from what was an obvious fraud—one that, according to Merks, "flashed more red flags than a Bolshevist parade."

On February 19, 1997, Bre–X and J.P. Morgan conducted a conference call with stock analysts, including McConvey. During the call, Morrison explained the terms of the Freeport agreement and then turned over the presentation to McIntoch. According to a written transcript of the call, which was made available to investors by Bre–X, McIntosh stated that he "expect[ed] the cash costs [of production] to be significantly less than the US$96/ounce estimate" in the November 1996 Intermediate Feasibility Study by P.T. Kilborn. He added that the "resources are estimated to be 71 million ounces," adopting the estimate earlier made by the Kilborn Defendants. He further explained that he expected that the mine would be in production in 2000.

Morrison also participated in the J.P. Morgan presentation. He explained that the "back of the envelope work" that he had done "would indicate [production costs] something closer to US$75 an ounce." This was much lower than the US$96 per ounce estimated in the Intermediate Feasibility Study. Morrison continued, "If you look at the cash flows of this [project], it pays off at any reasonable gold price [and even at] unreasonably low gold prices. In a period of time which is way, way shorter than any mining project I've ever seen, the margins are so huge that it is relatively insensitive to either higher costs or lower gold prices.... [The project] clearly kicks off a lot of cash flow."

Plaintiffs allege that these statements made by Morrison and McIntosh during the February 19, 1997 conference call were false and misleading. Plaintiffs point out that they had visited the Busang site, reviewed the Kilborn Defendants' Prefeasibility Study and Feasibility Study, knew that Lakefield had found almost no gold in Bre–X's samples tested in late 1996, and knew of the inconsistencies between the properties of the gold in the samples and the that of gold normally found in primary deposits. J.P. Morgan nevertheless made these public statements touting the gold and future mine at Busang.

The following day, February 20, 1997, Lehman issued a report, written by McConvey, concerning the call with Bre–X and J.P. Morgan. In this report, McConvey stated that Lehman was bullish on Bre–X and reported that Felderhof stated during the call that he would prove up 200 million ounces of gold reserves over the next year.

In a press release issued on February 21, 1997, Bre–X publicly emphasized Felderhof's statement that he would "feel very comfortable with a potential of 200 million ounces." While asserting that Bre–X's official resource calculation remained at "70.95 million measured, indicated and inferred ounces of gold," Walsh stated that "Felderhof and the Bre–X technical team have been, to date, accurate in their projections." These statements relied on the resource calculations made by the one or more of the Kilborn Defendants, which were provided to Bre–X for public release.

On February 26, 1997, Bre–X issued a press release attaching a letter sent by Walsh to Bre–X shareholders. The letter was meant to address concerns about whether Bre–X would receive certain concessions from the Indonesian government to develop Busang. These concerns had driven Bre–X's stock price back down below $13. In the letter, Walsh reiterated the current resource calculations and spelled out how the ownership of Busang would be divided:

> Based on the latest resource calculations, the Busang property contains at least 70.95 million ounces of gold—making it the largest and richest gold mine in the world. At today's price of approximately U.S. $350 an ounce, the Busang property has a gross economic value of U.S. $24.8 billion. Further, production costs in Indonesia are estimated to be approximately U.S. $75 to $95 an ounce versus U.S. $200 an ounce as a world average.

> Busang Indonesia Gold JV assigns ownership at Bre–X, 45%; Indonesia partners 30%; Republic of Indonesia, 10%; and Freeport–McMoRan Copper & Gold, Inc., 15%.

Walsh then went on to say that Bre–X's 45% interest currently had an estimated value of U.S. $ 11.2 billion, but that he believed that this figure could go substantially higher as exploration continued.

Bianchini continued to cheer Bre–X stock. In a Nesbitt research report issued in March 1997, Bianchini stated that resources should be over 100 million ounces by April and that the ultimate resource for the property could be up to double that amount.

Also in March 1997, Kilborn completed the study that Bre–X had requested after Bre–X learned the results of Barrick's initial due diligence in December. Kilborn gave Bre–X a study entitled "Busang Gold Project: Check Assay Program." The results of these tests alerted the Kilborn Defendants to the same red flags as those found by Barrick, including poor repeatability ("there is a relatively large variance in assays for individual samples"), the need for testing from larger samples, and the presence of "coarse free gold."

It is unclear just what information McConvey had at this time, but he continued his positive reports on Bre–X even into March. On March 14, 1997, Lehman upgraded its rating of Bre–X stock and portraying the market's reaction to the questions concerning ownership and participation in Busang's development as excessive. The report stated that at 12½, Bre–X's stock price was overly depressed and that while there were still some uncertainties, the company's 45 percent interest in Busang was worth at least $18. The report continued, stating:

> Whether Bre–X stays independent or is taken over, we believe there is value in Bre–X's current share price. Investors must remember it is quite possible that Busang may end up possessing more gold (and much more profitable gold) than is currently known to exist in the entire State of Nevada.

But Bre–X's deceptions soon began to unravel. On March 19, 1997, Bre–X announced that Michael de Guzman, its chief geologist, had fallen 800 feet to his death from a helicopter as he was returning to the drill site. According to news reports, the Indonesian police found a suicide note in de Guzman's possessions. Mr. de Guzman was heavily involved in originally identifying and exploring the Busang site.

On March 20, 1997, Lehman issued a report to dispel questions about the truth of earlier Bre–X and Lehman statements. The report, written by McConvey, discounted de Guzman's death:

> The death of Senior Bre–X Geologist Michael de Guzman, who fell from a helicopter yesterday over Kalimantan, may raise questions as to the integrity of the geological data relating to the Busang Gold resource. We are not overly concerned. While we are not geologists, everything we have seen and heard makes us believe that the work

done in the determination of the resource was done in a respectable way. Lehman also vouched for Bre–X management and supported the assay techniques used, insisting that no one—including Barrick—had found fault with them.

Trading in Bre–X stock was temporarily halted on Friday, March 21, 1997. This occurred, according to the New York Times, "after word circulated of a report in . . . an Indonesian newspaper, that Freeport believed the size of the deposit had been overstated." In response, Bre–X issued a press release, publicly stating that due diligence efforts at the Busang site were still being conducted. That same day, Nesbitt issued a report, which stated:

> Our work and our discussions with the company and others leaves us confident that the gold is there and that the economics are as they have been portrayed. The question has been and remains—how big is the deposit. Our latest estimate is 96 million ounces with plenty of upside.

Over the next few days, Bre–X tried to reassure investors. According to a March 23, 1997 Dow Jones news release, Felderhof stated on March 22, 1997: "I'm getting tired of all these stories. . . . And I'm 110% confident the gold is there." A March 24, 1997 article in the London Edition of *Financial Times* reported that Felderhof dismissed as ludicrous doubts about the size and commercial viability of Busang and that he claimed that the reserve could be as much as 200 million ounces. Also on March 24, 1997, Bre–X issued a statement by Walsh, on behalf of the Bre–X Board of Directors. In it, Walsh stated that the Bre–X Board of Directors had "absolute confidence in the integrity and accuracy of assay results and resource calculations reported by the company for the Busang Gold deposit since inception of exploration in 1993." Walsh characterized

the rumors about Freeport's due diligence as "falsehoods and misinformation." He continued, stating that Bre–X was even considering legal action against those who were spreading these rumors.

In a report written by McConvey on March 24, Lehman assured investors, "we believe the deposit exists":

> [The press reported] that according to an internal Freeport report that it had seen, Freeport believes that there is far less than the 70 million ounce reserve that Bre–X has quoted and that the deposit may not be economic. While such a shocking conclusion seems unlikely in only three weeks of due diligence, and while the report could not be confirmed, it was disconcerting. . . .
>
> Until we hear substantive news to the contrary, we will continue on the premise that Busang contains more than 70 million ounces of gold. . . . [W]e are not changing our target price at this time. . . .
>
> [W]hile shaken and wondering what in the world is going on, we believe the deposit exists. We believe that John Felderhof and his team are solid, knowledgeable, and honorable professionals. The assay lab techniques being used, while not common place, have been looked at and reviewed by knowledgeable professionals. Kilborn has reviewed the procedures. JP Morgan, Bre–X's investment bankers have, we understand, reviewed the procedures, and Barrick Gold . . . has done its own checks. No one has, to our knowledge, questioned the premise of the deposit to date.
>
> Freeport may be having some early disappointments in its due diligence. However, it apparently has drilled only a few holes and it would appear to us to be extremely early for the company to make any broad-based comments on the viability of the project as indicated by

the press report. One area of difficulty may for example be assaying. Assaying Busang ore is not easy. The gold is coarse (which is the reasons for its expected high recovery rates from a gravity circuit), and if cores and samples are not handled delicately and carefully, large amounts of gold could be lost and missed in assay sampling.

While McConvey's statement that Barrick "has done its own checks" indicates that he was aware of Barrick's tests, it does not necessarily demonstrate that he knew of the results of those tests or of their implications with regard to the possibility of fraud. In fact he stated that to his knowledge, no one had questioned the "premise of the deposit to date." At the time of this report, Barrick's testing had not been publicly disclosed. If McConvey knew of the tests, he had to have been told about them privately.

Also on March 24, Nesbitt held a conference call with investors. The call was in response to rumors that Freeport's due diligence on the Busang property was failing to validate Bre–X's resource estimates. Bianchini tried to explain away the discrepancies between Freeport's and Bre–X's findings.

> I'm going to explain this . . . cyanide leach is the method that gives you the best representation of what is in the—in the—in the rock . . . If Freeport has indeed used fire assay as opposed to cyanide leach guess what? They are not going to get accurate results. . . . Freeport probably had some problems in their sample prep process re-assaying certain consultations with Bre–X and, maybe perhaps re-assaying certain parts of their initial assays, I think that they can—I think that they can rectify any problems that they may have had. Therefore, my recommendation does not change . . . The gold is there. There's

no question about it. . . . So to those of you that—that—you know, that the core was salted or that somehow the samples were salted or somehow that the numbers were jigged, I mean it is so preposterous I just—I just—I'm not even going to address the possibility of that happening because I just—it's just infinitesimal. So our conclusions remain that, you know, the deposit is as it's represented. . . . This deposit, and when it is shown once again that it is as represented in the market right now, is going to be bigger than—Well, the deposit itself will be bigger than the whole North American gold mining industry when measured on proven and probable reserves.

On March 25, 1997, Bianchini responded to increasing evidence of the fraud by challenging the independent testing of the Busang site. He told other analysts in a conference call that it was hard to believe that tests conducted by independent engineering firms for Bre–X could be so off the mark. "This thing has been drilled like Swiss cheese," he said in the conference. He also scoffed at speculation Bre–X has been pulling a fast one. "If this was some sort of scam," he said, "these guys would have been gone a long time ago." According to Bianchini, Freeport's trouble verifying Bre–X's estimates "was likely related to different techniques in assay procedure." Bianchini continued to recommend the stock as a "buy" and insisted: "The gold is there! Therefore, we continue to recommend the purchase of Bre–X shares."

Bre–X's attempted denial of the emerging truth regarding Busang was crushed, however, when Freeport issued the following press release on March 26, 1997:

NEW ORLEANS—March 26, 1997– Freeport–McMoRan Copper & Gold Inc. (FCX) has been in the process of undertaking due diligence activities with regard to the previously announced transaction with BRE–X Minerals Ltd. (BRE–X) and Indonesian interests whereby, subject to due diligence, FCX has agreed to acquire a 15 percent interest in two Indonesian companies that are expected to be granted Contracts of Work (COWs) to explore and develop the mining rights in the Busang II and Busang III areas of East Kalimantan, Indonesia.

During the past three weeks, FCX has drilled seven core holes within the Busang II project area to confirm the results of core holes previously drilled by BRE–X. To date, analyses of these cores, which remain incomplete, indicate insignificant amounts of gold.

Bre–X had already been notified of what Freeport was finding in its initial due diligence. The week before the Freeport announcement, Bre–X had retained Strathcona Mineral Services Limited, an independent mining consultant, to investigate. Strathcona allegedly found several irregularities in Bre–X's sampling process. On the same date as the Freeport press release, Walsh issued the following statement on behalf of the Bre–X Board of Directors:

BRE–X MINERALS LTD., (T–BXM, ME–BXM, NASDAQ–BXMNF), a member of the BRE–X Minerals Group of Companies, announced today it has advised the Ontario Securities Commission and The Toronto Stock Exchange that, earlier today, Bre–X was advised by Strathcona Mineral Services Limited, an independent Canadian mining industry consultant, that there appears to be a strong possibility that the potential gold resources on the Busang project in East Kalimantan, Indonesia have been overstated because of invalid samples and assaying of those samples.

Late last week, the Board of Directors of Bre–X retained Strathcona to review, audit and comment on the technical programs carried out to date by Bre–X and the results of those programs on the Busang project and to review the due diligence program being conducted by Freeport–McMoRan Copper & Gold Inc. (FCX). Strathcona has recommended to Bre–X that an audit be conducted of the drilling and sampling programs done by both Bre–X and FCX. This audit will include the drilling of further core samples and will take approximately four weeks. Bre–X has accepted Strathcona's recommendation and has advised Strathcona to immediately proceed with this audit program.

After these findings by Strathcona and Freeport, Bre–X's board asked Strathcona to begin a more thorough study of the conditions at Busang.

On the same day as these announcements, Lehman replaced McConvey as its analyst of Bre–X. In response to Bre–X's admission of the strong possibilities that gold resources at Busang had been overstated, Lehman issued a report on that date expressing concerns about the short-term risks of Bre–X stock. McConvey's name was not on the report.

Also on that day, Nesbitt and Bianchini issued the following message: "As a result of the announcements made today by Bre–X Minerals and Freeport–McMoRan which call into question previously announced drill results, we are suspending our S5 (highest buy) rating. An investment rating is no longer appropriate due to the extremely high level of uncertainty."

The Kilborn Defendants also issued explanations of their involvement at Busang. SNC–Lavalin, which allegedly directed the work done by the Kilborn Defendants at Busang, attempted to reassure the public that the work performed by its agents was valid. In a press release dated March 26,

disseminated over *Business Wire*, SNC–Lavalin stated:

> Over the past three years, P.T. Kilborn Pakar Rekayasa carried out resource studies and modeling based on geological data, sample and assay information provided to it by Bre–X. The conclusions and recommendations provided in the various studies are believed to be prudent and reasonable and are founded on calculations and observations that were performed to accepted industry standards. The resulting resource calculations showed that the gold resources at Busang, in all categories, were 889 million tonnes at an average grade of 2.48 grams gold per tonne for a total of 70.95 million ounces of gold.

In the same release, SNC–Lavalin disclosed, for the first time, that the original tests conducted by the Kilborn Defendants were not based on their own independent drilling and assaying: "However, these calculations are dependent on the validity of the samples. P.T. Kilborn Pakar Rekayasa did not drill, did not take their samples nor did it assay those samples. The scope of its mandate from Bre–X relates to resource studies and modeling." Plaintiffs note, however, at no point did SNC–Lavalin or the other Kilborn Defendants disclose the truth about Busang, as reflected in the several studies and reports known to them, such as from Indo Assay, Hazen, Normet, and MRDI.

Thereafter, the truth regarding the Busang site continued to unfold. Trading of Bre–X stock was again suspended on both the Toronto Stock Exchange and on the NASDAQ Exchange, as a result of the news concerning the size and value of the Busang project. Bre–X shares remained at C$15.50 in Toronto and at US$11.37 on NASDAQ on March 26, 1997.

In a press release issued on March 27, 1997, Bre–X publicly confirmed that the

samples drilled by Freeport—parallel to and just 1.5 meters from the Bre–X drill sites—"indicated insignificant amounts of gold in those samples."

Plaintiffs allege that Freeport's unmasking of the fraud was neither complicated nor time-consuming. Freeport's personnel pointed to several of the same red flags that had been evident from the beginning. According to interviews with members of the Freeport team published in the June 1998 edition of the *Engineering & Mining Journal,* the Freeport team concluded there were serious problems before they saw a single drill result from Busang. "We knew there were things wrong with the project pretty well immediately," stated Colin Jones, Freeport's then-vice president of exploration in Indonesia. Among the warning signs identified by the Freeport team were Bre–X's negligence in logging core samples, a huge backlog in assays to be tested, a total lack of mining activity by locals in the area, lack of both surface mineralization and visible gold, and a pervasive lack of professionalism at the site—all of which should have been evident to those who visited the site. Jones further stated: "It is mind-bogglingly amazing to me that no one had spotted any of this before."

In the same article, the Freeport team also pointed to several of the statistics that had so deeply troubled Merks. " 'Within-sample' variability tests of the Bre–X [assay] results showed that the variability relative to the original [assay] analyses was commonly greater than 100%." Like Merks, the Freeport team found that the "Busang database exhibited the opposite" variability characteristics from "the great majority of gold deposits."

After trading resumed on the afternoon of March 27, 1997, Bre–X's stock plunged on further news that the Indonesian government was suspending the Busang project by withholding the mining rights and work contracts that were necessary for mining to begin. Bre–X's stock closed on March 27, 1997 on the NASDAQ Exchange at $1 31/32, dropping $9 13/32 or 83% of its value before trading was suspended. Bre–X closed at C$2.69 on the Toronto Stock Exchange, dropping C$12.81 from the previous close before trading was suspended. Bresea shares also fell sharply on the news, from a close of C$6.90 on March 24, 1997, to a close of C$2.70 on March 27, 1997. A March 28, 1997 *Wall Street Journal* article noted, "By the end of the day, Bre–X's total market capitalization had fallen to $435 million, far from the peak of $4.5 billion it hit last year." The stock had risen "from pennies in 1994 to a high of 20 1/4 on NASDAQ in the middle of last year."

In an article in the *New York Times* on March 31, 1997, the dismal results of Freeport's testing at the Busang site were reported in more detail: "[F]rom the start, Freeport found something amiss. Holes that Bre–X indicated should be chock-full of gold were coming up almost empty, they said. In some samples, Bre–X reported finding four or five grams a ton. Freeport said it found 0.01 gram, what it called 'insignificant.' "

Press reports confirmed that, at all relevant times, the testing conducted by Bre–X was flawed and not performed in compliance with industry standards. A report in *Bloomberg Business News* stated the following:

> When the Canadian gold mining company said three years ago that it found a "significant" amount of gold on the Indonesian island of Borneo, it relied largely on the judgment of just three geologists: Senior Vice President John Felderhof, Chief Geologist Michael de Guzman and Cesar Puspos, who worked under de Guzman.

And although Bre–X later had the geologists' soil sample from the site, known as Busang, tested through a number of labs, it didn't bring in any independent experts to do their own drilling and sampling—contrary to practice elsewhere in the mining industry.

Furthermore, the report confirmed that Bre–X never took any industry-accepted steps to verify the true amount of resources at the Busang site:

> Bre–X's reliance on a few key people to handle the work that led to those estimates was at odds with mining exploration industry practice. Kilborn wasn't asked to do its own drilling or assaying to confirm Bre–X's results.

> "Any person who is not looking for trouble would send their own sampling crews," said Baki Yarar, metallurgy professor at the Colorado School of Mines in Golden, and an independent mining consultant.

> Freeport, for instance, has at least 20 full-time geologists based at its Irian Jaya site in eastern Indonesia—the location is the world's largest copper and gold deposit—and another 10 elsewhere checking on their work, according to people familiar with the company's operation.

> It wasn't until last week that Bre–X hired an independent industry consultant, Strathcona Mineral Services, to do checking. Strathcona concluded there was "a strong possibility" that Bre–X's most recent estimate of 70 million ounces at Busang is wrong, Bre–X said in a statement.

Nevertheless, in an interview on April 5, 1997, Walsh proclaimed: "I'm 120 percent confident that the gold is there and this has been a colossal screw up."

On April 13, 1997, SNC–Lavalin issued another press release explaining the role of P.T. Kilborn in checking the assay results of its subcontractor, Indo Assay Laboratories:

> P.T. Kilborn Pakar Rekayasa did not receive data reflecting two separate assays on these rock samples for this purpose. Failure to properly understand this fact has led such press reports to misinterpret our "Bre–X Minerals Ltd. Busang Gold Project Check Assay Program–March 1997" report.

The Complaint alleges that these statements were made in SNC–Lavalin's capacity as the principal directing the activities of its agents, the other Kilborn Defendants, and sought to defend and explain their work.

According to a *Financial Post* article dated April 19, 1997, "few boosted Bre–X as much as did Nesbitt's gold analyst, Egizio Bianchini." John Woods, of Canada Stockwatch (a Vancouver-based outfit that tracks junior mining companies in western Canada) called Nesbitt's conduct "vigorous drum-beating":

> We've never seen a blue-chip brokerage firm promote a penny mine stock so vigorously as did Nesbitt and several others. Nesbitt was the loudest of the cheerleaders. This was not just a dispassionate view from the analysts. It was vigorous drum-beating.

On May 1, 1997, Nesbitt's chief operating officer praised Bianchini in a internal memo to Nesbitt staff. The memo stated:

> Nesbitt is known for the excellence and exceptional track record of its research and is proud of its research department and Egizio Bianchini, the analyst following the Bre–X story.... As part of his research, Egizio spent time on the Busang property with the company's geologists, visited the assay lab, took note of its procedures, and considered the results of well-known and respected assaying firms and other information pub-

lished by both the company and other industry sources.

In a Form 6–K issued by Bre–X on May 12, 1997, Bre–X stated that it had received an interim report from Strathcona dated May 3, 1997. The report indicated that "the Busang II reserve was based on falsified data." The cover letter to Walsh stated there was "virtually no possibility of an economic gold deposit" at Busang:

> We very much regret having to express the firm opinion that an economic gold deposit has not been identified in the Southeast Zone of the Busang property, and is unlikely to be. We realize that the conclusions reached in this interim report will be a great disappointment to the many investors, employees, suppliers and the joint-venture partners associated with Bre–X, to the government of Indonesia, and to the mining Industry everywhere. However, the magnitude of the tampering with core samples that we believe has occurred and resulting falsification of assay values at Busang, is of a scale and over a period of time and with a precision that, to our knowledge, is without precedent in the history of mining anywhere in the world. . . . As a consequence, we believe there to be virtually no possibility of an economic gold deposit in the Southeast Zone I south of the Busang property. . . . The gold recovered in samples submitted by Bre–X has originated from a source other than the Southeast Zone of the Busang Property and has resulted in falsification of many thousands of samples with consequent and subsequent erroneous estimates of gold resources.

Stathacona had concluded that the fraud at Busang was simple and obvious. According to its top executive, Graham Farquharson, Strathcona discovered twenty "significant" red flags during its audit assignment, all of which pointed in the "same direction"—no gold. The Complaint outlines these key red flags as listed below:

1. No gold geochemical anomaly over the Southeast Zone.

2. No gold in outcrop samples—"it had been leached."

3. Location of new drill holes was never influenced by results of previous drilling.

4. Busang geologists never went to drill sites.

5. Drill core not split—all 14 kilograms of core from each two-metre sample "required for accurate assays."

6. Selected intervals designated visually as "mineralized" and received different sample treatment.

7. In over 60,000 metres of core logging, no reports of visible gold.

8. The geology of the 10–centimetre "skeletons" from reported high-grade intervals did not appear to support such assays.

9. No gold identified in 103 petrographic samples selected to represent the deposit.

10. An excellent sample preparation facility at Busang was under-utilized despite large backlog of core waiting to be sampled.

11. Only "in-fill samples" designated as "non-mineralized" could be prepared at Busang.

12. All sample bags delivered to Samarinda had to be opened to "check for bag breakage" and "confirm core logging description."

13. Despite a large accumulation of samples at Samarinda and assaying capacity available at Indo Assay, no samples were shipped unless Michael de Guzman or Cesar Puspos released the samples.

14. Poor reproducibility of assays.

15. Screen analyses of sample rejects indicate almost all gold in plus 106 microns (150 mesh) fraction.

16. Mineralogical studies identified gold in metallurgical samples as being "coarse, rounded and with gold-rich rims."

17. Metallurgical testwork indicated more than 90 percent gold recovery in gravity concentrates of one percent to six percent of feed.

18. Metallurgical recovery was independent of fineness of grind.

19. Request for drill holes exclusively for metallurgical testwork was denied.

20. Could one deposit contain as much as eight percent of the known gold resources of the world?

(¶ 189.) Note that several of these red flags are identical to those found by Indo Assay, Normet, Hazen, MRDI, and Lakefield. Farquharson stated that while "lesser flags" could also have been added to his list, the red flags described above were the "more significant ones." As such, they "could have been identified at some stage by the many others that preceded us to visit and report on Busang."

On May 8, 1997, Bre–X announced that it had sought and received court protection under the Companies Creditors Arrangement Act and the Alberta and Canadian Business Corporation acts. Bre–X also announced that Felderhof had resigned from the Bre–X Board and was no longer employed by Bre–X.

On June 16, 1997, Plaintiffs filed their Original Complaint.

## IV.

### KILBORN DEFENDANTS

There are three "Kilborn Defendants": P.T. Kilborn; Kilborn Engineering; and SNC–Lavalin. According to the Plaintiffs' Complaint, P.T. Kilborn and Kilborn Engi-neering performed geostatistical analyses and mine feasibility studies of the Busang site for Bre–X. In short, the Plaintiffs allege that in conducting their resource calculations, the Kilborn Defendants made significant departures from accepted industry practices. This, the Plaintiffs argue, creates a strong inference of conscious misbehavior or recklessness on the part of the Kilborn Defendants.

In dismissing the Second Amended Complaint, the Court found that in most cases, it was unclear whether the Bre–X announcements of new gold estimates failed to name which Kilborn Defendant provided the information, or whether the Plaintiffs simply chose to attribute the estimate to the Kilborn Defendants collectively. The Court stated that Plaintiffs should, when possible, avoid attributing actions to the Kilborn Defendants collectively. When not possible, the Plaintiffs should offer an explanation as to why that is the case. The Court also warned that in repleading, if the Plaintiffs allege nothing more than the fact that SNC is the parent company of Kilborn Engineering, the Plaintiffs' claim against SNC will be dismissed. See Baesa, 969 F.Supp. at 242 ("a subsidiary's fraud cannot be automatically imputed to its corporate parent"). The Court now turns to the allegations in the Fourth Amended Complaint.

The Court begins with an examination of the allegations concerning which Kilborn Defendant made the alleged misrepresentations. This analysis determines whether the allegations plead the misrepresentations with the required particularity. The Court will then turn to the allegations regarding scienter.

### A. Pleading Misrepresentation

On October 12, 1995, P.T. Kilborn entered into a contract with Bre–X to perform geostatistical analyses and mine

feasibility studies of Busang. This work included on-site inspections, resource calculations, and mining feasibility studies, with the goal of confirming the existence and amount of gold at Busang. P.T. Kilborn is a subsidiary of Kilborn Engineering, which, in turn, is a subsidiary of SNC–Lavalin. The Complaint alleges that the activities of these entities was inextricably interwoven and that the exact division of work among them is often unclear. The task of the Kilborn Defendants was to estimate the amount of gold at Busang. Each time Bre–X announced a new reserve estimate, it announced that the estimate had been calculated by one or more of these Defendants.

In an effort to comply with the Court's previous order, Plaintiffs have identified each alleged misrepresentation and tried to identify which Kilborn Defendant was involved with each one.

- October 17, 1995 Bre–X announced that Kilborn Engineering estimated that the Central Zone contained 2.75 million ounces of gold (¶ 275);
- February 20, 1996 Bre–X announced that Kilborn Engineering estimated that the Central Zone contained nearly 15 million ounces of gold (¶ 278);
- April 17, 1996 Bre–X announced that Kilborn SNC–Lavalin estimated that Busang contained 24.87 million ounces of gold (¶ 280);
- June 20, 1996 Bre–X announced that Kilborn SNC–Lavalin estimated that Busang contained 39.15 million ounces of gold (¶ 282);

- July 22, 1996 Bre–X announced that Kilborn SNC–Lavalin estimated that Busang contained 46.92 million ounces of gold (¶ 284);
- August 28, 1996 Bre–X filed an interim report to shareholder that stated Busang contained 46.9 million ounces of gold and that "[t]his resource calculation has been independently verified by Kilborn Engineering, engineering consultants" (¶ 286);
- December 3, 1996 Bre–X announced that Kilborn SNC–Lavalin estimated that Busang contained 57.33 million ounces of gold (¶ 289);
- February 17, 1997 Bre–X announced that Kilborn SNC–Lavalin estimated that Busang contained 70.95 million ounces of gold (¶ 291);

In the Court's previous order, the Court found that the Kilborn Defendants could be held liable if they knew that their resource estimates would be attached to a securities filing or if they played a "significant role" in preparing a false statement actually uttered by another. *McNamara*, 57 F.Supp.2d at 429.[17] Thus, the issue before the Court is whether the Plaintiffs have pleaded sufficient facts indicating that each of the Kilborn Defendants played a significant role in preparing these resource estimates. These allegations must be made with particularity.

P.T. Kilborn, the company that actually contracted with Bre–X, does not challenge the sufficiency of Plaintiffs' allegations of P.T. Kilborn's involvement. Kilborn Engi-

---

**17.** *See In re Software Toolworks, Inc.*, 50 F.3d 615, 628 n. 3 (9th Cir.1994) (holding that an accountant may be primarily liable based on its significant role in drafting letter which client sent to SEC); *Phillips v. Kidder Peabody & Co.*, 933 F.Supp. 303, 316 (S.D.N.Y.1996), aff'd, 108 F.3d 1370 (2d Cir.1997); *Cashman v. Coopers & Lybrand*, 877 F.Supp. 425, 432–34 (N.D.Ill.1995) (holding an accounting firm

primarily liable when it drafted sections incorporated into prospectus); *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 873 F.Supp. 111, 119 (N.D.Ill.), aff'd, 67 F.3d 605 (7th Cir. 1995); *In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960, 970 (C.D.Cal.1994) (holding that an accountant who was intricately involved in creating false documents issued by client is primary violator).

neering and SNC–Lavalin do. The Court will therefore examine the allegations concerning the involvement of each of these Defendants.

### 1. Kilborn Engineering

Plaintiffs point to several allegations in the Complaint regarding Kilborn Engineering. First, the Prefeasibility Study was prepared both by P.T. Kilborn and Kilborn Engineering. (¶ 299.) The Complaint also states that a Kilborn Engineering employee provided a certification for the study that it "may be used as a submission to government agencies." (¶ 323.) Second, Sean Walter, a Kilborn Engineering engineer, visited Busang in April 1996 to examine Bre–X's facilities and report back to Paul Semple, a Kilborn Engineering vice president. (¶ 314.) Third, according to the proposal for the Intermediate Feasibility Study, the second stage of the metallurgical testwork would be supervised by Kilborn Engineering in Vancouver. (¶ 300.) Fourth, Kilborn Engineering employees Semple and Ashby attended meetings on October 20–21, 1996 at Busang to review a draft of the Intermediate Feasibility Study with Bre–X and J.P. Morgan. (¶ 302.) Finally, the March 1997 Check Assay Program was, according to the report that summarized its findings, "supervised" by Ashby, a Kilborn Engineering employee. (¶ 306.)

■ Kilborn Engineering argues that because the Complaint does not explain Kilborn Engineering's precise role in the preparation of these resource estimates, the allegations do not meet the particularity requirement of Rule 9 and the PSLRA. Such information, however, is within the exclusive control of the Kilborn Defendants. Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous

suits brought solely to extract settlements. See Tuchman, 14 F.3d at 1067; Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989). Despite Rule 9(b)'s stringent requirements, however, "courts should be 'sensitive' to the fact that application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" In re Burlington Coat Factory Litig., 114 F.3d 1410, 1418 (3d Cir.1997). Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284–85 (3d Cir.1992).

■ It is clear from the Complaint that Kilborn Engineering played a significant role in the preparation of the feasibility studies and the check assay programs. It is also clear from the allegations in the Complaint that Kilborn Engineering knew that Bre–X would use these reports to attract investors and potential joint venture partners. Thus, the Court finds that these allegations are sufficient to plead that Kilborn Engineering played a significant role in the preparation of the resource estimates.

### 2. SNC–Lavalin

The Plaintiffs allege that SNC–Lavalin's substantial involvement is demonstrated by its acquiescence to Bre–X using its name in connection with the announcement of the estimates to investors; by a letter from James Booker, P.T. Kilborn's President, stating that "Kilborn SNC Lavalin" desired to play an active role in Busang's development; and by various statements made by SNC–Lavalin after the fraud was exposed.

■ As noted above, beginning in April 1996, Bre–X claimed that its resource estimates were performed by "Kilborn SNC–Lavalin." Both sides agree that there is no entity bearing this name. Plaintiffs

argue that SNC–Lavalin granting Bre–X permission to use its name creates a strong inference that SNC–Lavalin was substantially involved in preparation of the resource estimates. The Court rejects this argument. Substantial involvement must be plead with particularity. Even under the slightly relaxed application of Rule 9(b) under *Shapiro*, boilerplate and conclusory allegations will not suffice. *See Shapiro*, 964 F.2d at 285. Plaintiffs must accompany their legal theory with specific factual allegations. *Id.* The use of SNC–Lavalin's name hardly constitutes specific allegations with regard to SNC–Lavalin's substantial involvement in preparing the estimates.

The Court next turns to the allegations regarding the July 18 letter from James Booker. These allegations fail for the same reason—this allegation also contains no factual allegations regarding SNC–Lavalin's role. Conclusory allegations do not suffice. *Id.*

▮▮▮▮ Finally, Plaintiffs cite two statements by SNC–Lavalin after the fraud was exposed. The first of these was a press release issued on April 13, 1997. That press release attempted to explain P.T. Kilborn's check assay program from March. (¶ 309.) The second statement appeared in an article in the July 25, 1997 issue of the *Financial Post*. The article quoted a SNC–Lavalin spokesman as saying that "the firm had engineers on site, on and off, from 1995 until the fraud was discovered." (¶ 310.) Plaintiffs argue that these are both evidence of SNC–Lavalin's active role in the resource calculations. The Court disagrees. Neither these statements by SNC–Lavalin or any other allegations in the Complaint describe in any

way SNC–Lavalin's direct involvement at Busang. As this Court recognized in its previous order, "a subsidiary's fraud cannot be automatically imputed to the corporate parent." *McNamara*, 57 F.Supp.2d at 428 (citing *In re Baesa Securities Litig.*, 969 F.Supp. at 242).[18] These are mere conclusory allegations and give no information as to SNC–Lavalin's role at Busang.

Separate and apart from Plaintiffs' claims concerning SNC–Lavalin's role in performing the resource calculations, Plaintiffs argue that SNC–Lavalin made a direct misrepresentation on March 26, 1997 concerning P.T. Kilborn's role at Busang and also that SNC–Lavalin's acquiescence to Bre–X using its name in connection with the resource estimates was also somehow a direct misrepresentation by SNC–Lavalin.

The Court first addresses the statement by SNC–Lavalin concerning P.T. Kilborn. On March 26, 1997, the same day as Freeport's press release exposing the fraud, SNC–Lavalin stated that there was a strong possibility that the resource estimates "had been overstated because of invalid samples and assaying of those samples." (¶ 294.) SNC–Lavalin then stated that P.T. Kilborn had done the resource studies and modeling with geological data and sample and assay information provided by Bre–X. SNC–Lavalin described P.T. Kilborn's work as "reasonable and prudent." Plaintiffs claim that this "reasonable and prudent" characterization of P.T. Kilborn's work was itself an actionable misrepresentation. The Court concludes, however, that the statement was not material. SNC–Lavalin acknowledged in the statement that P.T. Kilborn relied completely on information provided by Bre–X.

---

**18.** Other courts have come to the same conclusion. *See e.g., Secon Serv. Sys., Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 413–16 (7th Cir.1988)(affirming district court's refusal to hold parent corporation liable for alleged fraud and securities law violations); *Pits, Ltd. v. American Express Bank Int'l*, 911 F.Supp. 710, 714–15 (S.D.N.Y.)(dismissing securities fraud and common law claims against a parent corporation).

This, along with the timing of the statement on the same day on which fraud was exposed, tends to negate Plaintiffs' contention that investors would have relied upon this statement in any way. *See Basic,* 485 U.S. at 231–32, 108 S.Ct. 978.

Turning to Bre–X's use of SNC–Lavalin's name in connection with the resource estimates, Plaintiffs do not cite a case for the proposition that allowing one's name to be used can constitute an actionable misrepresentation. Because this is an issue of first impression, the Court must reexamine what constitutes an actionable misrepresentation to determine whether this would fall under Rule 10b–5.

■ In determining whether conduct is proscribed under the securities laws, the Court must look first to the rule or statute. *See Central Bank,* 511 U.S. at 173, 114 S.Ct. 1439. Rule 10b–5 makes it unlawful to make any "untrue statement of material fact ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b). The issue is thus whether SNC–Lavalin made a statement when it allowed Bre–X to use its name when reporting the resource estimates to investors. The Court concludes that it did. The Complaint states that SNC–Lavalin knew that Bre–X was using its name to add credibility to the resource estimates and that Bre–X did so with SNC–Lavalin's approval. Thus, SNC–Lavalin essentially vouched for the credibility of Bre–X's resource estimates. By vouching for Bre–X's claims, SNC–Lavalin made a representation that the claims were accurate.

The use of SNC–Lavalin's name was also material. A statement is material when it alters the total mix of information available to investors. *See Basic Inc.,* 485 U.S. at 231–32, 108 S.Ct. 978. Bre–X was a small gold exploration company with no track record. It was claiming to own one of the largest gold deposits in the world. Bre–X needed SNC–Lavalin's name to legitimize its statements regarding this extraordinary gold discovery. The Complaint alleges that the use of SNC–Lavalin's name served that purpose well. Thus, the statement was material.

## B. Pleading Scienter

■ As discussed above, the facts as alleged in the complaint must give rise to a strong inference of severe recklessness. *See Tuchman,* 14 F.3d at 1067. Severe recklessness "is limited to those highly unreasonable omissions or misrepresentations that involve ... an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or· is so obvious that the defendant must have been aware of it." *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 n. 2 (5th Cir.1996)("A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."). The methods to demonstrate extreme departure from the standards of ordinary care may include "a conscious purpose to avoid learning the truthfulness of a statement," or an "egregious refusal to see the obvious, or to investigate the doubtful." *McNamara,* 57 F.Supp.2d at 404.

The allegations in the Complaint demonstrate that P.T. Kilborn and Kilborn Engineering shared much of the work with regard to Busang. The allegations regarding scienter as to these two Defendants are therefore considered together.[19]

19. Both of these Defendants devoted a considerable amount of their briefing to the argu-

The Court, however, first addresses the allegations regarding SNC–Lavalin's scienter.

### 1. SNC–Lavalin

■ In order to avoid dismissal of their claims against SNC–Lavalin, Plaintiffs must plead facts that give rise to a strong inference of severe recklessness. *See Tuchman*, 14 F.3d at 1067. This requires the Plaintiffs to allege an extreme departure from the standards of ordinary care. *See Lovelace*, 78 F.3d at 1018 n. 2. Allegations of severe recklessness must be plead with particularity. *See Tuchman*, 14 F.3d at 1068.

■ Plaintiffs do not allege at all, much less with specificity, what information SNC–Lavalin had access to; when it had access to it; or what that information showed. Plaintiffs' allegations as to what information was available to P.T. Kilborn and Kilborn Engineering are not sufficient to plead a 10b–5 claim against their parent corporation. See *McNamara*, 57 F.Supp.2d at 427 (stating that a complaint "should inform each defendant of the nature of his alleged participation in the fraud."); *see also Coates*, 26 F.Supp.2d at 916 (finding that "the group pleading presumption is inconsistent with the [PSLRA's] purpose"). Therefore, SNC–Lavalin's motion should be granted.

### 2. P.T. Kilborn and Kilborn Engineering [20]

The Court begins the analysis of Plaintiffs' recklessness allegations by examining the Complaint to determine what information the Kilborn employees allegedly knew and when they allegedly knew it. To plead scienter based upon recklessness, the facts as alleged in the complaint must give rise to a strong inference of (1) an extreme departure from the standards of ordinary care and (2) an obvious danger of misleading buyers or sellers. *See Shushany*, 992 F.2d at 521; *Lovelace*, 78 F.3d at 1018 n. 2.

■ The Court first examines the Complaint to determine if it raises a strong inference that Kilborn's conduct was an extreme departure from the standards of ordinary care. *See Shushany*, 992 F.2d at 521. Due to their extensive work at Busang, Plaintiffs allege that both P.T. Kilborn and Kilborn Engineering were "intimately familiar" with all aspects of the operation at Busang. (¶ 314.) As evidence of this, Plaintiffs point to the memorandum by Sean Walter, a Kilborn Engineering engineer, to de Guzman. In that memo, which was also sent to John Robertson, P.T. Kilborn's resident manager, and Semple, Walter explained the sample preparation procedures and the practice of crushing the entire sample. (¶ 314.) Plaintiffs allege that Kilborn's review of

ment that because the Plaintiffs often referred to these Defendants together, the allegations in the Complaint were not pleaded with the required level of particularity. Specifically, they complain of the Plaintiffs using the terms "Kilborn Defendants" and "Kilborn SNC–Lavalin." Attached to P.T. Kilborn's motion to dismiss, however, is a copy of Kilborn's report from the check assay program Bre–X asked Kilborn to perform in January 1997. The Court, just as the Plaintiffs, is unable to determine which Kilborn entity prepared or participated in the preparation of the report. The letterhead on the first page of the report simply says "Kilborn." The cover letter says that this report was being forwarded by Kilborn Engineering on behalf of P.T. Kilborn. (P.T. Kilborn's Br., Ex. 5.) The first page of the report states that the report is from P.T. Kilborn, but the body of the report simply refers to "Kilborn" and states that Zophia Ashby, whom Plaintiffs claim is a Kilborn Engineering employee, collected the samples. Lastly, at the bottom of each page is the name "Kilborn SNC–Lavalin."

20. When referring to Kilborn Engineering and P.T. Kilborn together, the Court will simply refer to "Kilborn."

sample preparation procedures was important because Kilborn was responsible for monitoring and overseeing the metallurgical work.[21] (¶ 315.) From the various observations made by Kilborn employees of Bre–X's facilities, Kilborn allegedly knew that Bre–X did not promptly process its core samples and did not seal crushed core samples in plastic bags. (¶ 334(b).) Plaintiffs state this was a gross violation of industry standards and created an obvious opportunity for salting. Furthermore, from their own observations of the crushing of the core samples, Kilborn's employees could see that there was no gold visible in the samples when they were crushed. Considering the size and coarse nature of the gold as reported in several reports by third parties, gold should have been visible in the crushed samples. (¶ 334(e).) P.T. Kilborn would have been concerned with the procedures for collecting and assaying the core samples because P.T. Kilborn was relying on assay results provided by Bre–X and Indo Assay.

Besides Plaintiffs' claim that P.T. Kilborn and Kilborn Engineering had free and open access to Bre–X's facilities in Busang, Plaintiffs also allege that Kilborn received copies of the reports by Indo Assay, Mintek, Normet, Hazen, and MRDI. Therefore, Kilborn knew of Bre–X's use of the nonstandard assay method and Bre–X's failure to split the core samples. (¶ 334(a).) From the Indo Assay report, Kilborn knew that Indo Assay found that there were "significant discrepancies between head assays from fire assaying and calculated heads from gravity and cyanide leach test work." (¶ 325.) Kilborn confirmed these "assay problems" during its own work on the Prefeasibility Study.

(¶ 325.) There were also wide discrepancies in the results of assays performed on samples from the same core intervals by different labs. (¶ 334(h).) From the Mintek report, Kilborn knew that Mintek had found no gold in the samples that Mintek had tested in 1995. From the Hazen and Normet reports, Kilborn knew of the unusually high recovery rate from gravity concentrate and the coarse, nugget-like appearance of the gold, both of which the Plaintiffs allege was inconsistent with gold coming from a primary, hard-rock deposit and instead consistent with alluvial, or riverbed, gold. (¶ 321, 326.) The Normet report included photographs of the gold and reported that no gold grains smaller that 150 microns had been detected. (¶ 330.) From this report, Plaintiffs allege that P.T. Kilborn and Kilborn Engineering must have suspected a problem at Busang, since these characteristics do not occur in gold from deposits such as that Bre–X claimed to have discovered. (¶ 330.)

Plaintiffs allege that while these reports highlighted the red flags for P.T. Kilborn and Kilborn Engineering, they had made these same observations in their own work. For example, in the Prefeasibility Study, Kilborn noted the use of the nonstandard assay procedures, the problems with high variance and poor repeatability of the assays, the unusually high rates of recovery, and the large, free gold grains in the samples. (¶ 229.) In the check assay program that Bre–X asked Kilborn to perform in January 1997 after Bre–X received news of Lakefield's first round of tests, Kilborn again mentioned the "relatively large variance in assays for individual samples" and the presence of "coarse free gold."[22] (¶ 333.)

---

**21.** Kilborn, however, was not responsible for drilling or collecting the core samples. Plaintiffs only cite to one occasion on which Kilborn employees actually collected core samples. (¶ 316.)

**22.** P.T. Kilborn attached a copy of this report in support of its motion claiming that the Court may consider it in determining the motion since the Plaintiffs rely upon it in making their claims. *See McNamara,* 57 F.Supp.2d at 396 n. 12. The report states that Kilborn's

The Court must examine the allegations in the Complaint as a whole and consider the circumstances faced by the Defendants. From 1994 to 1997, Bre–X's claims concerning Busang grew more and more extraordinary. The last resource estimate prepared by Kilborn indicated more than 70 million ounces of gold. This would have made Busang the largest gold deposit in the world. Faced with all these red flags described in the Complaint, there is a strong inference that P.T. Kilborn and Kilborn Engineering were aware of a substantial risk that these resources could be wildly overstated. Yet Kilborn continued to release the resource estimates.

In its motion to dismiss, P.T. Kilborn attacks several of the red flags pointed out by the Plaintiffs. P.T. Kilborn first attacks the allegation that Bre–X did not split its core sample. This is a three prong attack. First, P.T. Kilborn points out that while MRDI was critical of Bre–X's practice of not splitting the core, in its report, MRDI cited several other gold discoveries where the cores were not split. Second, P.T. Kilborn points out that the existence of the library core negates the Plaintiffs' claims that, due to failure to split the core samples, Bre–X's assay results could not be independently verified. Third, Bre–X's practice of not splitting the core was a matter of public record. It was discussed both in a March 23, 1996 article in the *Financial Post* and in McConvey's December 3 analyst report. (¶ 319, 395.) P.T. Kilborn even concedes that the *Financial Post* article stated that this practice, along with the use of the cyanide leach assay method, "raised serious technical issues concerning the accuracy of the testing." (P.T. Kilborn Mot. at 11.) P.T. Kilborn argues that since Bre–X's practice of crushing the whole core sample was public knowledge, this red flag is essentially "nullified."[23] There is a fundamental problem with P.T. Kilborn's argument— Plaintiffs are not suing P.T. Kilborn for a failure to disclose Bre–X's practice of crushing the entire core sample. P.T. Kilborn and Kilborn Engineering are being sued for recklessly preparing resource estimates that they knew Bre–X would use to drive up its stock price. Bre–X's practice of crushing the entire core sample was merely one of several factors listed in the Complaint that Plaintiffs contend must have put Kilborn on notice of a severe risk that those resource estimates were false.

P.T. Kilborn next attacks the alleged red flag that Bre–X used the cyanide leaching assay method instead of the industry standard fire screen assay method. Strathcona's report, issued on May 3, 1997, was not critical of Bre–X's use of the cyanide leaching method. In fact, the report stated that it was a "good choice," but that Strathcona would have agreed with MRDI's recommendation to begin a strict check assay program using fire assays to provide more rigorous quality control. P.T. Kilborn points out that the Complaint acknowledges that Bre–X's use of this

---

statistical analysis tended to confirm Indo Assay's initial gold determination. That may be true, but it also states that a Bre–X employee helped supervise the work, that the variance in assays for individual samples was relatively large, and that there was "coarse free gold" in the samples. Therefore, P.T. Kilborn's argument does nothing to negate Plaintiffs' allegations concerning the contents of the this report.

23. *See In re Tseng Labs, Inc. Sec. Litig.*, 954 F.Supp. 1024, 1029 (E.D.Pa.1996), *aff'd*, 107 F.3d 8 (3d Cir.1997)("[T]here can be no liability under the securities laws because of an alleged failure to disclose information that is already available to the public. This is because such information is already part of the 'total mix.' "); *see also Heliotrope General v. Ford Motor Co.*, 189 F.3d 971, 976 (9th Cir.1999)(holding that even highly technical tax data is part of the total mix of information if made available to the public).

method was public. (¶ 319.) As noted above, that does little to further P.T. Kilborn's argument. The use of cyanide leaching is merely one factor listed in the Complaint. P.T. Kilborn also attacks this red flag on the ground that cyanide leach assays in fact tend to understate and not overstate gold qualities. The Complaint, however, points to an Indo Assay finding that several batches of samples "showed seriously lower Au [gold] results from the FA [fire assay] checks compared to the AuCN [cyanide leach]." (¶ 318.) Indo Assay allegedly referred to these as "problem batches" and noted that these were the ones prepared "on-site" by Bre–X. (¶ 318.) And even though P.T. Kilborn points to one report that was not critical of Bre–X's use of this assay method, the Complaint is replete with allegations that other reports were. Furthermore, for the purposes of deciding this motion, the Court accepts as true that cyanide leach was not the industry standard and generally not appropriate under these circumstances.

P.T. Kilborn and Kilborn Engineering also argue that the Plaintiffs' allegations that they did not follow industry standards is not sufficient to plead severe recklessness. P.T. Kilborn argues that even if its alleged failures to follow industry standards amounted to gross negligence, those allegations alone would not be sufficient to plead severe recklessness under the securities laws. *See In re Worlds of Wonder,* 35 F.3d 1407, 1426 (9th Cir.1994), *cert. denied,* 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995). The Court agrees that failure to follow industry standards does not amount to severe recklessness unless the defendant knowingly violates those standards and is aware that the vio-

lation creates a substantial risk that the defendant will make a material misrepresentation.[24]

The Complaint does not simply allege, however, that P.T. Kilborn and Kilborn Engineering violated industry standards. That is simply one more factor on which the Plaintiffs rely. The Plaintiffs also allege that P.T. Kilborn was aware of characteristics of the gold at Busang that were inconsistent with the characteristics of gold found in a primary rock deposit. Assuming that Plaintiffs' allegations are true, coarse nuggets and gold particle the size of those found in the samples simply do not exist in samples taken from primary rock deposits. The same could be said of Plaintiffs' allegations concerning the unusually high recovery rates. These are characteristic of alluvial gold. Not only was Kilborn allegedly aware of the unusual nature of the gold, they were also aware that the samples were not sealed in plastic bags, that there was a substantial lag between the time the samples were prepared and when they were assayed, and that no sample was assayed unless it was released by de Guzman. These strange characteristics of the gold, along with the other allegations demonstrating Bre–X's opportunity to salt the samples, create a strong inference that P.T. Kilborn and Kilborn Engineering were aware of a substantial risk of fraud, and they ignored that risk.

Next the Court must determine whether the allegations give rise to a strong inference that P.T. Kilborn and Kilborn Engineering's resource estimates created a present danger of misleading buyers or sellers which was either known to these Defendants or was so obvious that they

---

24. *See, e.g., Lovelace,* 78 F.3d 1015, 1020 (quoting *Fine v. American Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990))("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information.").

must have been aware of it. *See Shushany,* 992 F.2d at 521; *Lovelace,* 78 F.3d at 1018 n. 2. This requires little discussion. It is clear that these announcements were driving Bre–X's and Bresea's stock price.

In sum, P.T. Kilborn's and Kilborn Engineering's motions to dismiss Plaintiffs' 10b–5 cause of action are denied.

## V.

## J.P. MORGAN

According to the Complaint, J.P. Morgan began acting as Bre–X's financial advisor in September 1996. (¶ 224.) The Plaintiffs allege that J.P. Morgan made public statements touting the gold resources at the Busang site even though the members of J.P. Morgan's Bre–X team knew that there was a substantial risk that Busang was a fraud. In the Court's previous order dismissing the Second Amended Complaint, the Court determined that Plaintiffs had pleaded the alleged misrepresentations by J.P. Morgan with sufficient particularity. The Court then held that the Plaintiffs had failed to plead scienter with sufficient particularity that J.P. Morgan knew or recklessly disregarded a significant risk that there was no gold at Busang and that the Plaintiffs had failed to allege sufficient motive on the part of this Defendant. The Plaintiffs essentially alleged that J.P. Morgan was motivated by its desire to ingratiate itself with Bre–X, to collect professional fees for its advisory position, and to enhance its business reputation. The Court found these allegations insufficient to satisfy the motive test. The Fifth Circuit rejected similar motive allegations as insufficient in *Melder v. Morris,* 27 F.3d 1097, 1103 (5th Cir.1994).

The Plaintiffs essentially conceded that there was little motive for J.P. Morgan to commit fraud by not adding any additional motive allegations. Thus, the Plaintiffs rely on a recklessness theory of scienter. As in the Second Amended Complaint,

Plaintiffs allege that J.P. Morgan was reckless due to its conscious disregard of a severe risk that Busang was a fraud and that J.P. Morgan learned of this risk through its review of various reports and visits to the Busang site. In its motion to dismiss the Fourth Amended Complaint, J.P. Morgan states that the Court previously rejected Plaintiffs' theory of recklessness. That is not true. The Court clearly stated that Plaintiffs failed to allege J.P. Morgan's scienter with sufficient particularity. *See McNamara,* 57 F.Supp.2d at 423. The Court did not conclude that Plaintiffs could not allege J.P. Morgan's scienter based upon its review of those reports and the visit to Busang.

The Court will now examine the Fourth Amended Complaint to determine if the Plaintiffs have cured these earlier deficiencies.

### A. Pleading Misrepresentation or Omission

Plaintiffs' claims against J.P. Morgan are based on two statements. The first is a July 23, 1996 statement by David Neuhaus, a J.P. Morgan analyst. Neuhaus was quoted in *The Financial Post* as saying, "I'd say 150 million ounces is a conservative guess as to what Bre–X will ultimately come up with." (¶ 202.) He allegedly made this statement after returning from the tour of Busang with, among others, McConvey. Plaintiffs also rely upon Doug McIntosh's comments during the February 17, 1997 conference call with analysts and reporters. During the call, Doug McIntosh, a J.P. Morgan investment banker, allegedly made the following statements, which the Plaintiffs contend were false and misleading:

1. We expect the cash costs [of production] to be significantly less than the $96/ounce estimate in the [November 1996] Kilborn intermediate feasibility study.

2. [T]he resources are estimated to be 71 million ounces.[25]

3. The metallurgy at Busang is relatively simply because of the nature of the assaying being cyanide soluble values rather than total gold. We expect metallurgical recovery to be in excess of 95% of contained gold. Over ½ of the gold will probably be recovered in a gravity circuit quite inexpensively and efficiently.

4. I think you are looking at more or less North American costs of mining.... I'd say something well below $1 a tonne.

5. "[T]here shouldn't be much variability [in mining costs] through time. What we're seeing is pretty consistent [ore] grade."

6. If you look at the cash flows of this [project], it pays off at any reasonable gold price [and even at] unreasonably low prices. In a period of time which is way, way shorter than any mining project I've ever seen, the margins are so huge that it is relatively insensitive to either higher costs or lower gold prices.... [The project] clearly kicks off a lot of cash flow.

(¶ 204.) In the Court's prior order, the Court agreed with the Plaintiffs that a reasonable investor could have considered these statements as a representation of J.P. Morgan that there was gold at Busang. The question now, as then, is whether the Plaintiffs have adequately pleaded facts from which the Court can infer that J.P. Morgan knew of or recklessly disregarded facts to the contrary. See McNamara, 57 F.Supp.2d at 422.

### B. Pleading Scienter

As with the Kilborn Defendants, the Court begins the analysis of Plaintiffs recklessness' allegations against J.P. Morgan by examining the Complaint to determine what information the J.P. Morgan employees allegedly knew and when they allegedly knew it.

The Court first examines the Complaint to determine if it raises a strong inference that J.P. Morgan's conduct was an extreme departure from the standards of ordinary care. See Shushany, 992 F.2d at 521. The Court gives little weight to the allegations regarding Neuhaus's visit to Busang. Neuhaus made that trip with nine other securities analysts. Tours of Busang, Indo Assay's laboratory, and Bre-X's facilities alone would not likely put a securities analyst on notice of a severe risk of fraud.

Plaintiffs real allegations of recklessness begin with McIntosh's alleged visit in August 1996. As discussed above, McIntosh is a mining engineer, and his examination of Bre-X's operation in Indonesia was much more thorough than that of Neuhaus. Plaintiffs allege based on a memorandum sent by McIntosh to de Guzman that McIntosh concluded that Bre-X and Kilborn's sampling and statistical techniques were nonstandard, incomplete, and possibly inaccurate. (¶ 220.) Specifically, he saw that Bre-X did not split its core samples and crushed the entire sample leaving nothing left to be independently tested. (¶ 264(a).) McIntosh also saw that the samples were not sealed, tagged, and sent directly to Indo Assay for testing. (¶ 264(b).) Instead the samples were sent to Bre-X's facilities in Samarinda or Loa Duri where they would sit for weeks.[26]

---

**25.** The Plaintiffs omit a portion of this statement. According to a transcript of the conference call filed by J.P. Morgan, the entire statement was as follows: "As had been disclosed [by Bre-X] this week, the resources are estimated to be 71 million ounces...."

**26.** J.P. Morgan characterizes the allegations concerning McIntosh's visits to Busang as

(¶ 264(b).) More importantly, the Complaint alleges that a result of what he allegedly saw in Indonesia, McIntosh requested that Bre–X hire MRDI. (¶ 221.)

In September 1996, J.P. Morgan allegedly received a copy of Kilborn's Prefeasibility Study. (¶ 227.) The Prefeasibility Study discussed Bre–X's unorthodox sampling techniques, including the use of whole cores in assaying rather than split cores, the retention of only 10 centimeters of each core meter for future reference, and the use of cyanide leach process assays rather than conventional fire assay technique.[27] It noted some of the same sampling problems that had allegedly caused McIntosh such concern on his visit to Busang. Furthermore, McIntosh participated in a conference call with Barrick on October 2, 1996 in which he discussed Barrick's technical concerns with Bre–X's resource estimates. (¶ 235.) During this call, he and Barrick allegedly talked about

some of the same red flags contained in the Prefeasibility Report including the size of the gold particles in the samples, the poor repeatability of the assay results, and the abnormally high percentage of recovery from simple grinding. (¶ 235.)

In October, J.P. Morgan allegedly received a copy of the Intermediate Feasibility Report, which included the report by Hazen,[28] which explained the "coarse nugget" effect of the gold in the samples, the unusually high recovery rate, and the abundance of "free" gold. (¶ 248.) These characteristics are allegedly all plainly inconsistent with gold found in a primary rock deposit. McIntosh had been to Busang and seen core samples. (¶ 264(e).) He allegedly noticed that there was no visible gold in the samples, which was inconsistent with the characteristics of the gold described by Hazen. (¶ 264(e).) "Coarse nuggets" would have been visible in the samples.

"conclusory allegations and generalizations." (J.P. Morgan Mot. at 13.) On the contrary, Plaintiffs allege not only what McIntosh allegedly saw on these visits and when he saw it, but also its significance. (¶ 264.)

27. For reference, the Court repeats the alleged red flags in the Prefeasibility Study:

- No gold was found in the composite core samples examined by Australian geological consultant Mintek Services Trust in late 1995. In its words, "particles of free gold ... were ... not detected during this study."
- The core sampling procedure at Busang—which used whole (not split) cores and saved only a 10–centimeter sliver of each core meter—was not industry standard practice.
- The cyanide leach assay procedure used at Busang, rather than conventional fire assay techniques, was not industry standard practice.
- Bre–X's assay results had chronic variance and repeatability problems, which allegedly indicates problems with either the sampling protocols or the assay procedures.

- Bre–X only assayed core from so-called "mineralized" zones.
- The rates of recovery from simple coarse grinding were extraordinarily high, which indicated that the gold particles were not embedded in the host rock.
- Simple coarse grinding yielded large free gold grains, which is strongly atypical of a primary rock deposit where gold particles are embedded in the host rock.
- The gold in the samples was unusually large for a primary deposit like Busang—86.3 percent of the gold was larger than 106 microns.
- Kilborn believed that a higher confidence level in the test results was needed.
(¶¶ 214, 229–31.)

28. In its motion, J.P. Morgan states that there are no allegations concerning who at J.P. Morgan received these reports and when they were received. (J.P. Morgan Mot. at 15.) Once again, J.P. Morgan simply misrepresents what the Complaint alleges. Paragraph 237 of the Complaint clearly states that according to minutes kept by Kilborn, McIntosh reviewed the Intermediate Feasibility Report on October 20–21, 1996 with representatives from Bre–X and Kilborn.

McIntosh allegedly received a copy of MRDI's report on December 2, 1996. (¶ 251.) MRDI's report again highlighted some the same red flags such as the non-standard assay method, the failure to split the core samples and save half for future reference, and the practice of only assaying "mineralized" portions of the core. (¶ 252.) MRDI's report stated that Bre–X's sampling procedures were not suitable for submission to joint venture partners and financing sources and that Kilborn's resource models were "not adequate for a feasibility study which will be used by external lenders and investors." (¶ 252.) The report described the one-kilogram samples used by Bre–X for gold assays— and relied upon by Kilborn—as "useless." (¶ 252.) MRDI also made several recommendations. For example, the report stated that "most of the rest of the world relies on fire and screened fire assays" and that "[a] routine check program using these methods is mandatory." (¶ 252.) MRDI recommended a statistical study of assay variability similar to that which Barrick later hired Merks to do. (¶ 252.) McIntosh was aware of MRDI's recommendations and allegedly discussed them with de Guzman. (¶ 253.) He also was aware that none of MRDI's recommendations were followed. (¶ 254.)

On December 15, 1996, McIntosh and Morrison learned of Barrick's results from Lakefield's first round of tests at the December 15 board meeting.[29] (¶ 256–57.) He knew that Lakefield had found no appreciable gold in 130 out of 135 of the samples Lakefield tested. In response to Barrick's insistence that its successful on-site due diligence be made a condition for concluding the transaction, J.P. Morgan allegedly counseled Bre–X to refuse. (¶ 258.)

J.P. Morgan discusses each of the above allegations separately and claims that none of them are sufficient alone to raise a strong inference that J.P. Morgan was aware of extreme risk of fraud. The Court, however, views the allegations in the Complaint as a whole. In light of the all the information allegedly available to J.P. Morgan, the Court concludes that J.P. Morgan's reliance on Bre–X's gold claims when making its statements during the February 1997 conference call was an extreme departure from the standards of ordinary care. *See Shushany*, 992 F.2d at 521.[30]

29. J.P. Morgan's motion states: "plaintiffs do not allege when, where, in what form, and from whom JPM received such a report." Again, J.P. Morgan flatly mischaracterizes the Complaint. On December 15, 1996, Pat Garver, Barrick's General Counsel, faxed three pages of assay results to John Sabine, Bre–X's chief outside counsel. Sabine was at a board meeting attended by McIntosh and Morrison from J.P. Morgan. The minutes of the board meeting allegedly note that McIntosh and Morrison discussed these results with Barrick. (¶ 256–63.)

30. In its motion to dismiss, J.P. Morgan addresses each allegation in isolation instead of considering the totality of the circumstances. For example, J.P. Morgan claims that Plaintiffs cannot sustain a cause of action by simply alleging J.P. Morgan's position as Bre–X's financial advisor, its access to Bre–X officials, and its general knowledge of adverse facts.

*See Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.*, 2 F.Supp.2d 1345, 1360 (D.Colo.1998)(stating that it is "implausible" to assert that an accountant's access to company internal data implied awareness of the fraudulent scheme, as such a rule would routinely subject professionals to liability); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 529 (3d Cir.1999)("Generalized imputations of knowledge [based on position] do not suffice, regardless of the defendants' positions within the company."); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1122 (D.Nev.1998)(stating that the plaintiff's suggestion of scienter from facts that defendant was co-lead underwriter and had access to company and top officials would "read the particularity requirement out of" the PSLRA). The Complaint, however, does not make general allegations that J.P. Morgan had access to Bre–X information and officials. On the contrary, the Complaint goes into specific de-

Next the Court must determine whether the allegations give rise to a strong inference that J.P. Morgan's statements created a present danger of misleading buyers or sellers which was either known to J.P. Morgan or was so obvious that J.P. Morgan must have been aware of it. *See Shushany,* 992 F.2d at 521; *Lovelace,* 78 F.3d at 1018 n. 2. The conference call on February 19, 1997, was with stock analysts following Bre–X. There can be no doubt that McIntosh intended these analysts to rely on his statements. The allegations raise a strong inference that McIntosh consciously disregarded a substantial risk that Busang was a fraud when making these statements. As such, McIntosh must have been aware that there was a substantial risk that these statements were false or materially misleading. Therefore, the Court concludes that this second prong of the test is satisfied and Plaintiffs have adequately pleaded a 10b–5 misrepresentation with respect to McIntosh's statements during the February 1997 conference call.

In addition to their claim that J.P. Morgan's statements were reckless, Plaintiffs also claim that Neuhaus's July 1996 statement gave rise to a duty on the part of J.P. Morgan to correct this statement when J.P. Morgan became aware that there was no credible basis for the assertion that Busang held 150 million ounces of gold.[31] In its motion, J.P. Morgan posits two arguments as to why the Complaint fails to allege an actionable omission. First, J.P. Morgan argues that the Complaint fails to allege that J.P. Morgan knew that Neuhaus's statements lacked a credible basis. This is basically the same as J.P. Morgan's argument concerning scienter. The Court has already concluded that the Complaint gives rise to a strong inference of recklessness and therefore rejects this argument. Second, J.P. Morgan also argues that the omission claim is not pleaded with particularity because it fails to allege the date on which J.P. Morgan learned of the severe risk that Busang was a fraud. J.P. Morgan offers no authority to support its argument that pleading such a date is essential. The Court finds that the Plaintiffs are only required to plead with particularity those facts that they allege put J.P. Morgan on notice of the severe risk for fraud, including the dates upon which J.P. Morgan learned of those facts. It is the jury's role to determine the exact date on which J.P. Morgan's failure to correct its previous statement became severely reckless. Thus, the Court concludes that Plaintiffs have also adequately pleaded their 10b–5 omission claim against J.P. Morgan. J.P. Morgan's motion to dismiss Plaintiffs' 10b–5 claims is denied.

### C. J.P. Morgan's Motion to Dismiss Claims of Purchasers Prior to July 23, 1996 and After March 27, 1997

J.P. Morgan moves separately to dismiss the claims of purchasers of Bre–X and Bresea who purchased their shares prior to J.P. Morgan's first alleged statement on

---

tail about what that information was and its significance in light of all the information available. The Complaint also states who at J.P. Morgan received the information and when it was received.

**31.** *See Rubinstein v. Collins,* 20 F.3d 160, 170 n. 41 (5th Cir.1994) ("[D]efendants have a duty under Rule 10b–5 to correct statements if those statements have become materially misleading in light of subsequent events"); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267–68 n. 4 (2d Cir.1993) ("[A] duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events."); *Greenfield v. Heublein, Inc.,* 742 F.2d 751, 758 (3d Cir.1984) ("[I]f a corporation voluntarily makes a public statement that is correct when issued, it has a duty to update that statement if it becomes materially misleading in light of subsequent events."), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985).

July 23, 1996 and those who purchased their shares after Bre–X disclosed the fraud on March 27, 1997. J.P. Morgan argues that the Complaint fails to allege reasonable reliance for purchasers before July 23, 1996 and after March 27, 1997. J.P. Morgan offers no authority in support of this portion of its motion.

Plaintiffs define the Class Period as January 17, 1994 to May 2, 1997. Neither the Complaint nor J.P. Morgan's motion states the exact date that any of the named Plaintiffs purchased their shares. The Complaint merely alleges that each of the Plaintiffs purchased his or her shares during the Class Period.

The Court has already concluded that the Complaint sufficiently states a cause of action under the federal securities laws. This issue goes to whether class certification is proper and whether it would be necessary for the court to divide the class into subclasses. This is not a pleading issue. Therefore, this portion of J.P. Morgan's motion is also denied.

## VI.

## BARRICK

The Court dismissed the Plaintiffs' Second Amended Complaint against Barrick for failure to allege scienter with the required level of particularity. Plaintiffs base their scienter allegations on Barrick's severe recklessness in making public statements about gold at Busang despite Barrick's knowledge that its own due diligence tended to show that Busang was a fraud. The Second Amended Complaint described Barrick's test results as follows:

> Barrick was given access to 135 waste core samples from Busang, which had not been used for assay testing. Tests demonstrated that of the 135 samples tested, 130 contained no gold. Based on its testing of core samples, Barrick knew that Bre–X's claims about Busang were false. Nevertheless, Barrick issued

public statements ... directed to actual and potential shareholders of Bre–X, which lent credibility to Bre–X's false statements about the gold prospect at Busang.

(2d Am. Compl. at ¶ 157.) In the Court's previous order, the Court directed Plaintiffs to answer the following questions: How conclusive were these tests? Did the negative tests represent the entire universe of information available to Barrick, or was it overwhelmed by other positive tests? Did the negative test results only involve core samples from a limited area of Busang, or did the samples purport to represent the entire area? What is the significance of the fact that five of the samples were not negative? *See McNamara*, 57 F.Supp.2d at 415. As described above, the Fourth Amended Complaint goes into great detail about these tests and the other information available to Barrick.

### A. Pleading Misrepresentation or Omission

The first requirement is that the Plaintiffs specifically allege the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams*, 112 F.3d at 177. Plaintiffs point to several statements by Barrick that they allege were false, incomplete, or misleading. First, Borg, Barrick's spokesman, stated on January 13, 1997 that the positive assay results disclosed by Bre–X that day were "consistent with our [Barrick's] understanding of the property" and that "you would expect infill results like these." (¶ 435.) This statement was then quoted the next day in *The Globe & Mail*. Second, Plaintiffs cite a January 22, 1997 Barrick press release in which Munk is quoted as saying that Barrick was "the only team" that could develop "a mine operation the scale of Busang." (¶ 435.) This statement was reported in the February 18, 1997

edition of *The Globe & Mail.* Third, in its reports to the Indonesian government, Barrick stressed that it was the "most suitable and qualified operator" of the Busang mine and that Barrick understood the "gold being in their hands." (¶ 435.) This statement was reported in the February 15, 1997 edition of the *Financial Post.* Finally, Barrick made several statements that it would be "fair" to Bre–X shareholders, as reported in *Reuters* on December 16, 1996, the *Financial Post* on December 21, 1996, and the *Northern Miner* on December 23, 1996. (¶ 464.) The Plaintiffs argue that Barrick intended these statements to further the impression that Busang was the "gold discovery of the century," when Barrick was well aware that *its own* test results did not support that conclusion.

The Court has already held that Barrick's statements that it would be fair to Bre–X shareholders were not tantamount to a representation that there was gold at Busang. These statements were of the vague, optimistic type that do not result in a 10b–5 violation. *See Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir. 1997) ("[v]ague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions"); *Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993) (stating that investors "rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen"). Barrick's alleged statements that it would be fair "lack the sort of definite positive projections that might require later correction." *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996). Barrick was also not required to accompany its alleged statements regarding a proposed deal with cautionary language conditioning those statements on the accuracy of Bre–X's representations that there was gold at Bu-

sang. It would go without saying that if Bre–X were orchestrating a hoax about the existence of gold at Busang, there would be no deal between Bre–X and Barrick.

The Court now turns to the other three statements cited by Plaintiffs. Barrick is not challenging the particularity of the allegations concerning these statements. The Complaint clearly specifies the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation." *Williams,* 112 F.3d at 177. Barrick does, however, argue that these statements were not material. A false statement or omission is material "if there is a substantial likelihood a reasonable shareholder would consider it important" to the investment decision. *Basic,* 485 U.S. at 231–32, 108 S.Ct. 978. Materiality is looked at in context of the total mix of information. *See Mercury Air Group, Inc. v. Mansour,* 237 F.3d 542 (5th Cir.2001); *Rubinstein v. Collins,* 20 F.3d 160, 167–68 (5th Cir.1994)(stating that materiality is judged in light of the surrounding circumstances). The Court will not dismiss a complaint on grounds of immateriality of the alleged misrepresentation unless the misrepresentation is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman,* 754 F.2d at 1067. Barrick argues that these statements were not definite enough to be material. In other words, even assuming that Barrick knew there was a substantial risk that there was no gold at Busang when the statements were made, Barrick argues that these are not the type of statements upon which investors would rely in making investment decisions. *See Grossman,* 120 F.3d at 1119.

1. *January 14, 1997 Statement in* The Globe & Mail

The first of these is the statement of a Barrick spokesperson, Vince Borg, on

January 14, 1997. On January 13, Bre–X had announced assay results, which Bre–X projected to provide a "significant increase" in the size of the deposit from its then-current estimated level of 57 million ounces. (¶ 435.) Borg was then quoted in the January 14, 1997 edition of *The Globe & Mail* as saying that "from our point of view [Bre–X's assay results] are consistent with [Barrick's] understanding of the property" and "you would expect infill results like these . . . ." (¶ 469.)

In its motion to dismiss, Barrick tries to put these statements in context. The article in question reported: "Bre–X Minerals Ltd. released some stunningly rich assay results on its Busang gold deposits in Indonesia yesterday that might put more pressure on Barrick Gold Corp. to sweeten its undisclosed offer for the motherload." After reporting Bre–X's actual results, the article attributes the following quote to Borg: "You would expect infill results like these and from our point of view they are consistent with our understanding of the property." (Barrick Mot., Ex. 17.) Barrick explains that infill holes are drilled in between previously-drilled mineralized holes and are designed to fill in the gaps in a survey area to confirm that a given body of ore is continuous. (Barrick Mot. at 21 n. 6.) Barrick argues that based on Bre–X's previous disclosures about the mineralization at Busang, one would expect Bre–X to announce rich infill results as well. Viewing this statement in context, Barrick argues, one would assume that Barrick was simply relying on Bre–X's representations and not necessarily vouching for their veracity.

The Court disagrees and concludes that this statement was material. At that time,

Barrick was negotiating with Bre–X and the Indonesian government for 67.5% interest in the Busang gold reserves.[32] After the announcement, Bre–X shareholders immediately looked to see Barrick's reaction. While Borg did not explicitly state that Barrick had done its own independent testing or verified Bre–X's data, his statement implies that. We know now that Barrick was never in fact allowed to do its own on-site testing or drilling and had no basis on which to give any such assurances, but the analysts and investors who were closely watching Barrick's next move did not know that. On the contrary, they would expect Barrick to be in the middle of its due diligence on the site. A reasonable investor would therefore likely conclude from the statement that Barrick had some other data upon which it could form its own "understanding of the property." Thus, this statement altered the "mix of information available" to investors.

■■■■ Borg's January 14 statement also forms the basis of the Plaintiffs' omission claim under Rule 10b–5. As the Court previously noted, silence is only actionable if a defendant had a duty to speak. *See Chiarella v. United States,* 445 U.S. 222, 229–30, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). A corporation such as Barrick has no general duty of disclosure to the shareholders of another corporation. *See Gordon v. Diagnostek, Inc.,* 812 F.Supp. 57, 59–60 (E.D.Pa.1993). Plaintiffs argue, however, that Borg's statement gave rise to such a duty. *See First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir.1977). In *Virginia Bankshares,* the Fifth Circuit held that silence or omission to state a fact is proscribed by Rule 10b–5 when the defendant has revealed some relevant, material information even though he had no duty to do so.[33] In

---

**32.** 75% of the 90% left after the 10% requested by the Indonesian government.

**33.** In *Rubinstein,* the Fifth Circuit noted that "at least facially, it appears the defendants

other words, "the defendant may not deal in half-truths." *Id.* In the Court's previous order dismissing the claims against Barrick, the Court stated:

> [E]ven though Barrick made several public statements that it was negotiating with Bre–X and that it would be fair to Bre–X shareholders, it had no duty to disclose the negative test results. Such a duty would have arisen had Barrick said something to the effect of "we know there is gold at Busang, and we will be fair to Bre–X shareholders in attempting to get in on the action" or "we have done our own testing and it looks like there is gold there."

*McNamara,* 57 F.Supp.2d at 416. In their current complaint and response to Barrick's motion, Plaintiffs claim that this is exactly what Barrick did when it stated that Bre–X's claims "were consistent" with Barrick's "understanding of the property." [34] (Pls.' Resp. to Barrick Mot. at 12.) The Court agrees. When Barrick's "understanding of the property" changed, it had a duty to disclose that change.

In conclusion, Plaintiffs have pleaded facts concerning Borg's January 14, 1997 misrepresentation with the required particularity. The Court also finds that the statement was material and that it was the type of "half-truth" that gives rise to a duty of disclosure.

### 2. February 5, 1997 Statement to Mining Analysts

■ The next alleged misrepresentation highlighted by Plaintiffs is a February 5, 1997 statement by Peter Munk, Barrick's president, to mining analysts. This statement was quoted in a February 18, 1997 article in *The Globe & Mail.* According to the article, Munk told the mining analysts that Barrick has a "unique mine development team—the only team, the only team, gentlemen—that can point to putting on stream a mine operation the scale of Busang ... from scratch, on budget, on time, without a single hitch." (¶ 473.)

Once again, Barrick does not challenge the particularity of the Plaintiffs' pleading with regards to this alleged misrepresentation. It challenges whether these statements are material. Barrick points out that the article that Plaintiffs cite came out on February 18, 2001, the day after Barrick learned that it would be shut out of the Busang project. Barrick argues that the statement could not, therefore, be material. Munk, however, made this statement to a group of analysts on February 5. (¶ 473.) At that time, Barrick was still in the running to get the project and the analysts were carefully monitoring the situation.

The issue of concern to the Court is whether the statement altered the "total mix" of the facts available to investors and

have a duty under Rule 10b–5 to correct statements if those statements have become materially misleading in light of subsequent events." 20 F.3d at 170 n. 41.

**34.** Barrick cites *Gordon v. Diagnostek, Inc.,* 812 F.Supp. 57 (E.D.Pa.1993) in support of its argument that its failure to disclose its test results was not an actionable omission. In *Gordon,* a class of Diagnostek shareholders sued Diagnostek for allegedly inflating its earnings. They also sued Medco, a corporation that had unsuccessfully tried to acquire Diagnostek for failing to disclose the inflated earnings, which the plaintiffs argued Medco had discovered during its due diligence for the proposed acquisition. The court dismissed the claims against Medco holding that Medco "had no special fiduciary responsibility to the shareholders of a separate corporation whose stock it was planning to acquire as part of an arm's length transaction." *Id.* at 60. This case does little to further Barrick's argument, however, since the Court has already determined that absent Borg's January 14 statement, Barrick had no duty to disclose.

whether a reasonable shareholder would have considered this statement important in making a decision to invest in Bre–X. *See Basic*, 485 U.S. at 231–32, 108 S.Ct. 978. The critical language in this quote is, of course, "a mine operation the scale of Busang." The context of this statement is quite unlike that of Borg's January statement discussed above. Borg was commenting on Bre–X's claims of huge reserves of gold. Munk's February 5 statement was touting Barrick's mining capabilities—not the gold reserves at Busang. The Court, therefore, finds it unlikely that Bre–X investors would give the same weight to this statement as they would likely have given Borg's. Because the statement did not alter the total mix of information available to Bre–X investors, it is not material.

### 3. February 15, 1997 Statement in the Financial Post

The third statement identified by Plaintiffs is one that Vince Borg made to the *Financial Post*, which the paper published on February 15, 1997. Borg, referring to a report that Barrick intended to file with the Indonesian government, stated: "We'll tell them [the Indonesian government] we believe we're the most suitable and qualified operator. We understand the gold being in their hands, its [sic] their decision." (¶ 475.)

The Court finds that this statement is no more misleading than the other statements about "fairness" that the Court has already rejected. It did not alter the total mix of information available to investors, and the Court finds it highly unlikely that investors at that point in time would have relied even in part on such a vague reference to gold at Busang in making investment decisions regarding Bre–X stock.

### B. Pleading Scienter

■ Now that the Court has determined that the January 14th misrepresentation was material, the Court now turns to whether Plaintiffs have adequately pleaded the scienter. While the Court gives Plaintiffs the benefit of all reasonable inferences, it must hold Plaintiffs to the standard of showing a strong inference of scienter.

In the Complaint, Plaintiffs assert that Borg's January 14 statement was reckless. To plead scienter based upon recklessness, the facts as alleged in the complaint must give rise to a strong inference of severe recklessness. *See Tuchman*, 14 F.3d at 1067. Severe recklessness involves (1) an extreme departure from the standards of ordinary care and (2) an obvious danger of misleading buyers or sellers. *See Shushany*, 992 F.2d at 521; *Lovelace*, 78 F.3d at 1018 n. 2.

The Court must first consider whether Borg's January 14 statement involved an extreme departure from the standards of ordinary care. To make this determination, the Court must examine what information was known to Barrick at the time Borg made the statement. Barrick had received Kilborn's Intermediate Feasibility Study on November 27, 1996, which included the Hazen report. From these reports, Barrick allegedly knew about the size and shape of the gold particles found in the samples and the unusually high recovery rate. These are the red flags repeatedly cited by the Plaintiffs throughout the Complaint. More importantly, Barrick had received the first round of Lakefield tests some time prior to December 15, 1996. As the Court described above, these tests allegedly caused Barrick great concern. Finally, a review of Jan Merks' correspondence with Barrick from December 17, 1996 to January 12, 1997, shows that Barrick should have been extremely cautious with regard to Bre–X's claims about Busang. While Barrick correctly points out that Merks had not unequivocally stated

that Busang was a fraud, he had warned Barrick of the potential for fraud and advised Barrick to proceed with "extreme caution." (¶ 507.) In fact, every independent test Barrick allegedly reviewed or had performed indicated problems with Bre–X's claims. Therefore, the allegations indicate that Barrick consciously disregarded a known risk that Busang was a fraud.[35] In light of these facts, the Court concludes that Plaintiffs' allegations give rise to a strong inference that Borg's statement constituted an extreme departure from ordinary care.

Next the Court must determine whether Borg's statement created a present danger of misleading buyers or sellers which was either known to Barrick or was so obvious that Barrick must have been aware of it. *See Shushany*, 992 F.2d at 521. Considering the nature of Borg's statement and its context, the question is whether Borg must have known that buyers and sellers of Bre–X securities would have been mislead into believing that Barrick had done its own independent tests that in some way verified Bre–X's January 13 announcement. The Court has already concluded above that there is a strong possibility, based upon the allegations in the Complaint, that investors were so mislead. That, however, is a separate issue from the issue of whether Borg must have been aware that this would occur. In this phase of the analysis, Barrick's explanation of Borg's statement becomes more important because the Complaint must create a strong inference that Borg was aware of the risk that his statement would mislead investors and yet he ignored that risk.

Plaintiffs argue that one could only conclude from this statement that Barrick was making a "direct, unqualified, and unequivocal representation ... about gold at Busang." (¶ 469.) Plaintiffs point out that Borg made the statement while commenting on Bre–X's announcement of "stunning" new assay results that were projected to result in a "significant increase" of the then-current level of 57 million ounces. (¶ 468.) Plaintiffs argue that for Barrick to say at that point that these new assay results were "consistent with [Barrick's] understanding of the property" necessarily implies that Barrick must have some information in addition to the results on which Borg was commenting.

Barrick, of course, disagrees. Barrick's argument necessarily involves mining terminology and exploration techniques that neither Barrick nor the Plaintiffs adequately described or explained to the Court. Apparently when exploring for gold, holes are drilled rather far apart in an attempt to locate a body of ore. When gold is found in two or more of these holes, other holes are drilled in between them to determine the shape and continuity of the ore body. These are called infill holes. Barrick argues that the assay results announced by Bre–X on January 13 were from these infill holes and that considering the assay results from the exploratory holes, one would expect the assays from the infill holes to show significant amounts of gold. Barrick's "understanding" referred to by Borg was the projected reserves from the exploratory holes, which the infill holes were intended to verify. Thus, Barrick argues that *The Globe &*

**35.** The Court's previous order stated: "In order for the Plaintiffs' theory to survive this motion to dismiss, the allegations in the complaint must give rise to a strong inference that Barrick's awareness of these negative test results is equivalent to Barrick's learning definitely or recklessly disregarding the fact that there was no gold at Busang." *McNamara,*

57 F.Supp.2d at 415. An articulation of the standard for recklessness stated alone would be that the allegations in the Complaint must create a strong inference that the test results made Barrick aware of a substantial risk that Busang was a fraud and that Barrick consciously disregarded that risk.

*Mail* took Borg's statement out of context and that, in context, a proper understanding of Borg's statement would be as follows: "You would expect infill results like these [considering Bre–X's public announcements of test results from the exploratory holes] and from our point of view they are consistent with our understanding of the property [which is based solely on those previous announcements]." Looking at Bre–X's announcement, however, this explanation is unconvincing. Bre–X did not say that the new assay results confirmed earlier projections. On the contrary, *The Globe & Mail* describes them as "stunning." (¶ 468.) The article goes on to say that based upon these new results, the estimated gold reserves were expected to rise "dramatically." (Barrick Mot., Ex. 17.) On what information could Barrick have possibly formed an understanding with which these new assay results could have been consistent?

Borg had to have known that his statement would mislead investors. This was already projected to be the largest, or at least one of the largest, gold mines in the history of the world. That alone warranted caution. But there were numerous other reasons to be cautious. Barrick's independent assay results showed that the vast majority of core samples Bre–X reported as being rich in gold in fact contained no appreciable gold. (¶ 482.) Barrick's own statistical expert had warned of fraud and advised Barrick to proceed with extreme caution. (¶ 507.) Barrick was aware that the properties of the gold in the samples prepared by Bre–X were not consistent with the properties of gold in deposits like the one supposedly at Busang. (¶ 458.) Barrick had been denied free access to Busang to do its own drilling. (¶ 258.) Finally, Barrick knew that investors were carefully watching its reaction to the announcement due to the ongoing negotiations concerning Barrick's participation in the mine. Taking the allegations in the Complaint as true, Barrick's main concern seemed to be closing the deal with Bre–X, and the substantial risk that Busang was a fraud was overwhelmed by even the slightest chance of developing the largest gold mine in history.

The Court concludes that Plaintiffs have pleaded the facts surrounding Barrick's alleged misrepresentation and omissions with the required level of particularity and that the facts as alleged give rise to a strong inference of Barrick's severe recklessness. Therefore, Plaintiffs have adequately stated a claim against Barrick, and Barrick's motion is denied.

## VII.

## NESBITT BURNS

Nesbitt does not challenge the particularity of the alleged misrepresentations and bases its motion on Plaintiffs failure to plead scienter. The Plaintiffs allege that Nesbitt made a series of positive statements regarding the presence of gold at Busang. The question is whether the Plaintiffs have adequately pleaded facts that give rise to strong inference that Nesbitt knew or recklessly disregarded facts indicating the absence of gold. The Court dismissed the Second Amended Complaint as to Nesbitt concluding that the Plaintiffs failed to particularize their scienter allegations. The Court stated that there was no explanation of how the Plaintiffs learned of what they alleged regarding Nesbitt mining analyst Egizio Bianchini and his visits to Busang. Plaintiffs have corrected these deficiencies in the Fourth Amended Complaint.

Nesbitt claims that it, along with Bianchini, was simply a victim of the Bre–X fraud. Since any such salting operation would inevitably be discovered, Nesbitt argues that it is nonsensical for a reputable securities firm to knowingly participate in any such scam. The Court agrees. But that is not the Plaintiffs' allegation. Plain-

tiffs' allegations with regard to Nesbitt focus solely on Bianchini. Plaintiffs allegation is that while Bianchini may have been innocent at first, once he became deeply involved, and heavily invested, in Bre–X, he ignored sure signs of fraud. He continued to give positive reports on Bre–X stock even after it must have been apparent to him that there was a strong likelihood of fraud.

Plaintiffs argue that without the blessing of Nesbitt and Bianchini, the fraud would not have likely succeeded. The mining group at Nesbitt was known as the best in the investment banking industry and Bianchini was the preeminent financial analyst in Canada covering that sector. (¶ 335.) With this "Superstar" mining analyst at such a highly respected bank recommending its stock, any "obscure" mining company like Bre–X would have instant credibility.

The analysis of Plaintiffs' claim against Nesbitt begins with an examination of what Bianchini allegedly knew and when he knew it. Plaintiffs allege that Bianchini made three trips to Busang and that during these visits he had far greater access than other analysts who made such visits. Plaintiffs also make various allegations to demonstrate that Bianchini had a very close relationship with the Bre–X insiders, particularly Walsh, and that he had unparalleled access to Bre–X information, including assay results and the P.T. Kilborn Prefeasibility Report.

Bianchini's first trip to Indonesia was allegedly in September 1995.[36] (¶ 372.) According to the trip's itinerary, it included tours of the Busang site and Bre–X's offices in Manado and Jakarta. (¶ 372.) Bianchini's second trip to Indonesia was in November of 1995. (¶ 373.) This time he was given a private tour of Busang by de Guzman, one of the chief orchestrators of the fraud, and Puspos, a Bre–X Project Manager.[37] (¶ 373.) Bianchini made his third and last trip to Busang in June 1996. (¶ 381.) De Guzman gave him a tour of the facility where the samples were prepared to be shipped off for testing. During this last visit, Bianchini also videotaped the sample handling process. (¶ 381.) The Complaint therefore clearly alleges that Bianchini saw that Bre–X was crushing the whole core sample, thus making cross-checking difficult, and that the samples were sent to Bre–X's offices in Samarinda instead of directly to the assay labs. (¶ 382(b).) Plaintiffs also allege that Bianchini must have noticed that Bre–X was underutilizing its on-site sample preparation facilities even though it had a large backlog of samples. (¶ 383(f).)

Plaintiffs next allege that on April 23, 1996, Bre–X had a copy of Kilborn's Prefeasibility Study delivered to Bianchini.[38] The report noted the chronic problems with sample variance and repeatability of test results, the extraordinarily high recovery rate from coarse grinding, the large, free gold grains, and the nugget-like appearance of the gold. These are some the often-repeated red flags in the Complaint that indicate that the samples had been salted with riverbed gold.[39] Bianchini is

**36.** Nesbitt disputes that Bianchini was the first analyst to visit the site. *See supra* note 2.

**37.** Nesbitt disputes that this tour was private. *See supra* note 5.

**38.** The Fourth Amended Complaint does not contain any allegations that Bianchini had access to other information such as: (1) the independent mineralogical tests by Normet and Hazen; (2) Kilborn's Intermediate Feasibility Report; (3) MRDI's report to Bre–X and J.P. Morgan; (4) Lakefield's assay results from the 135 library core samples; or (5) the results of Merks' statistical analysis.

**39.** Plaintiffs allege that because Bianchini has a degree in Geology and "considerable geological experience," he must have appreciated

not only an financial analyst, but also a geologist. The Complaint alleges that he therefore knew that gold with these characteristics simply does not exist in primary rock deposits. The Prefeasibility Study also included the report by Mintek, which allegedly found no gold in the mineralized samples it tested in late 1995.

Plaintiffs make several allegations concerning Bianchini's unusually close relationship with Walsh. First, on October 18, 1995, Bianchini sent a memorandum to Walsh in which he showed Walsh his latest resource calculations and recommended that Walsh review them. (¶ 370.) Plaintiffs allege not only that this demonstrates the close relationship between Walsh and Bianchini, but also that Bianchini had unique access to Bre–X information that enabled him to make such calculations. Second, Plaintiffs point to Bianchini's alleged response to an article that appeared in the *Financial Post* in March 1996. In the article, a Canadian mining analyst and an executive at another mining company criticized Bre–X's assaying techniques and cast doubt on the reliability of Bre–X's studies. (¶ 376.) Bianchini allegedly contacted Walsh and told him that he would call institutional investors and defend Bre–X's assay methods and urge them to buy Bre–X stock if the article precipitated a sell-off. (¶ 377.) Third, Bianchini made a conference call to investors the day before Freeport's March 26, 1997 announcement that they had found no appreciable levels of gold at Busang. During that call, Bianchini responded to rumors concerning Freeport's due diligence by defending Bre–X and casting doubt on Freeport's methods. (¶ 364–65.) These specific allegations create a strong inference that Bianchini not only was aware of the numerous red flags concerning Busang, but that he also teamed together with Walsh

and his other friends at Bre–X to quell the suspicions that they created in the financial community.

The Plaintiffs allege that these allegations support a strong inference of Bianchini's recklessness because he had staked his reputation on Bre–X. One can observe from the discussion of the Complaint above that Bianchini was certainly one of the star's of the Bre–X cheerleading squad. His published resource estimates were consistently higher than those announced by Bre–X. To even make such calculations, Bianchini had to be privy to the details of Bre–X's assay results and the location of the drillholes from which the assay samples came. One can only infer that he received that information directly from Bre–X.

Bianchini also allegedly held over one million shares of Bre–X stock worth at one point many millions of dollars. Plaintiffs allege not that these were motives to commit securities fraud, but that they were a very strong motive to turn a blind eye to the increasing evidence that Busang was fraud. Bianchini allegedly knew that if Bre–X were a fraud, his professional reputation would be ruined and his stock in Bre–X, which he could not sell until two days after he issued a "sell" recommendation, would be worthless.

The Court must analyze the allegations of scienter as a whole considering the surrounding circumstances. Bre–X was a penny Canadian mining stock run by an ex-stockbroker claiming to have discovered gold in a remote region in Indonesia. Bre–X's claims of the size of the gold reserve there grew and grew until it became one of the largest gold mines in the world. Bianchini got in early and started recommending the stock. He was wildly

---

the significance of these red flags. (¶ 382.) Plaintiffs fail to allege, however, that Bianchi-

ni has any experience in the mining industry other than as a financial analyst.

successful as the stock rose from C$3.25 to C$280. He developed a close relationship with the Bre–X insiders and invested heavily in Bre–X stock. When outsiders started to question Bre–X's unconventional assaying technique and its practice of crushing the entire core sample, he vowed to defend the company. He had access to the Prefeasibility Study, which showed him that the gold displayed unusual characteristic for a primary deposit. His geology background would have put him on notice of the implications of this, especially considering that he had been to Busang and was familiar with the sample preparation procedures. These and the other allegations, read as a whole, raise a strong inference that Bianchini was consciously aware of a substantial risk that Busang was a fraud.

Next the Court must determine whether Bianchini's statements created a danger of misleading buyers or sellers which was either known to Bianchini or was so obvious that he must have been aware of it. Bianchini consistently reported extraordinary resources estimates for Busang—estimates that he created himself and exceeded even those reported by Bre–X. It is obvious that he intended investors to rely on these statements. He repeatedly vouched for the integrity and professionalism of Bre–X's management and geologists—also with the intent that investors rely on his statements. He did this in the face of signs that Bre–X was a fraud of unparalleled proportions. Thus, he must have been aware that his statements created a present danger of misleading investors.

Therefore, Nesbitt's motion is denied.

## VIII.

## LEHMAN

Beginning November 16, 1996, Lehman issued a series of positive analyst reports on Bre–X. The Plaintiffs contend that the positive statements contained in these reports, as well as Lehman's failure to disclose certain negative information about Busang, give rise to Lehman's liability under 10b–5.

### A. Pleading Misrepresentation or Omission

In the Court's previous order, it determined that the Plaintiffs have met the particularity requirements of Rule 9(b) with regard to Lehman's alleged statements. *See McNamara*, 57 F.Supp.2d at 419. They specified in their Complaint the "time, place and contents" of Lehman's statements at issue, and they adequately specified the identify of the person making the statements. In fact, the Complaint points to specific reports which contain the alleged misstatements. This is sufficient to get the Plaintiffs over the particularity hurdle. *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir.1979) (finding that the complaint satisfied Rule 9(b) by referring to specific dated documents). Lehman does not challenge this aspect of the Plaintiffs' current complaint. Lehman does, however, challenge whether Plaintiffs have pleaded facts giving rise to a strong inference of scienter.

### B. Pleading Scienter

In the Second Amended Complaint, which the Court found deficient as to Lehman, the Plaintiffs argued that Lehman learned of the absence of gold in two ways. First, they argue that McConvey, the author of Lehman's analyst reports, was Barrick's comptroller for six years prior to joining Lehman, and Barrick gave him access to its negative test results. The Court held that the Plaintiffs failed to make the allegation regarding McConvey's knowledge of the test results with sufficient particularity. Specifically, the Plaintiffs did not specify when and how McCon-

694

vey learned of the test results. Second, Plaintiffs alleged that McConvey "visited Busang in June or July of 1996 and had access to [Bre–X's] engineers, assayers, and other employees and contractors, where he learned or recklessly disregarded the fact that Bre–X was violating gold mining industry standards and customs." (2d Am. Compl. at ¶ 65). The Court held that these allegations did not create a strong inference of Lehman's fraudulent intent and that it was not reasonable to conclude that McConvey, a financial analyst, learned or recklessly disregarded during his visit a substantial risk that there was no gold at Busang.

The Court then gave the Plaintiffs guidance as to how to correct the deficiencies in its next complaint. The Plaintiffs must allege in more detail the information McConvey was given. What tests did McConvey observe Bre–X perform and how did those test depart from accepted practices? Also, the Plaintiffs must state not only what they believe McConvey saw at Busang, but they must also state with particularity the facts that should have alerted McConvey to the substantial risk that Busang was a fraud. The Court now turns to Plaintiffs Fourth Amended Complaint to see whether Plaintiffs have corrected these previous deficiencies.

### 1. McConvey's Alleged Special Knowledge

McConvey has no training as a mining engineer or geologist like the employees of the other Defendants discussed above. So the Plaintiffs make an effort in the Complaint to allege his special knowledge in those fields so that the Court will not hold him to lower standard. Plaintiffs first allege that in addition to being a financial analyst, McConvey spent six years as the operations controller of Barrick. Plaintiffs allege that he was therefore familiar with all aspects of gold mining operations and that his technical knowledge is superior to

that of most other financial analysts. Plaintiffs argue that due to McConvey's special situation, he had to have known of the severe risk that there was no gold at Busang.

Plaintiffs make numerous factual allegations that they claim demonstrate McConvey's special knowledge and access to information. Plaintiffs note that Lehman's December 3, 1996 report, written by McConvey, stated that "we believe that it is important for potential investors to understand the geological situation to put things in perspective." (¶ 413.) McConvey then presented a five-page "simplified summary" of the relevant geology and a three-page analysis of the assaying techniques used by Bre–X at Busang, both of which Plaintiffs argue reflect a firm grasp of the complexities of gold mining. (¶ 413.) McConvey's geology "summary" reported his detailed views of Busang's volcanic hard-rock formations. (¶ 414.) He claimed that Busang was a "Diatreme" deposit created by magma intrusion into underwater surface rocks over millions years. (¶ 414.) Plaintiffs argue that McConvey "touted" his knowledge of these deposits, stating at one point in the report that the Diatreme dome deposit "is a type that is foreign to even many geologists." (¶ 414.) Plaintiffs allege that McConvey's analysis of Bre–X's assaying techniques in the December 3 report displayed similar technical sophistication. For example, he explained in the report that, while fire assaying of a split core was the "standard assay process," Bre–X used a cyanide leaching process without splitting the core. (¶ 415.) He explained that Felderhof decided not to split because the gold "falls off like dust." (¶ 415.) He also explained the differences between the fire assay and cyanide leaching processes, including how the results from the two processes must be analyzed differently. (¶ 415.) Plaintiffs next point to McConvey's questions during Bre–X's con-

ference call with analysts on February 19, 1997. During the call, McConvey allegedly questioned Bre–X insiders on highly technical issues relating to the planned mining operations at Busang, including the calculated throughout rates, the effect of internal waste on the grade calculations (the effect of mixing unmineralized host rock with mineralized ore), acid rock drainage (the creation of sulfuric acid when rain is mixed with an exposed sulfide ore body), and the sulfide content of waste material. (¶ 412.)

Lehman, on the other hand, points out in its brief that McConvey is merely an accountant—not a geologist, mineralogist, or metallurgist. While conceding that McConvey worked at Barrick for a number of years, Lehman explains that his position there was financial and claims that while he is familiar with the economics of the mining industry, he does not have any technical expertise.

The Court tends to agree with Lehman. It is necessary for accountants and financial experts in particular industries to have a basic understanding of the science and technology in those industries. That certainly does not make these financial experts scientists. Any financial analyst in the mining industry would be generally aware of the different methods of mineral extraction and the relative cost of the different methods and how they would affect throughput rates. He or she would also be aware of the relative expense of extracting the ore from different types of formations. These types of calculations would be essential to determining how a mining company should deploy its limited resources. That being said, McConvey is obviously not a mere layman with regard to mining technology, and the Court will consider this fact in analyzing whether what he allegedly heard and saw concerning Busang had to have raised serious

doubt in his mind as to whether Busang was a fraud.

### 2. Plaintiffs' Allegations of McConvey's Recklessness

The Court now moves on to consider what the Plaintiffs suggest should have tipped McConvey off to the potential for fraud. They first point to a July 1996 report by Normet, which McConvey admitted that he read in his December 3, 1996 report. Plaintiffs claim that to an experienced "mining professional" like McConvey, Normet's report would indicate a number of red flags at Busang. (¶ 416.) First, the report allegedly stated that more than 90 percent of the gold in the Busang samples could be recovered in a gravity concentrate. According to the Plaintiffs, recovery rates of such a magnitude are inconsistent with a primary deposit and are indicative of alluvial gold. Second, the gold particles allegedly photographed by Normet were disc-shaped and rounded. (¶ 416.) Plaintiffs point out that because primary deposits are embedded in their host rock, they appear to be wiry. "Rounded" gold is alluvial in origin. Lehman argues that this report did nothing to highlight these inconsistencies. It merely noted that there was a great deal of gold at Busang. Lehman argues that McConvey's failure to recognize these inconsistencies could, at most, amount to mere negligence—not recklessness. Lehman stresses that this is particularly so in light of the fact that McConvey is a financial analyst and not a geologist.

The Plaintiffs next point to McConvey's visit to Busang from July 12–19, 1996. McConvey spent July 13–14, 1996 with de Guzman and Felderhof touring in and around Busang. (¶ 419.) Lehman argues that de Guzman and Felderhof used these visits by securities analysts to convince them that Busang was a world-class gold

find. Lehman states that nine other analysts also toured Busang with de Guzman and Felderhof. During his trip to Busang, McConvey also visited the Indo Assay labs in Balikpapan on July 13, 1996. (¶ 419.) Accompanied by de Guzman and Felderhof, he was given a tour of the facility by the lab's chief chemist, Jamie Ordona, who showed McConvey how Bre–X's core samples were assayed. (¶ 419.) McConvey was also allegedly shown Bre–X's "core yard" during his visit. (¶ 420.) Plaintiffs allege that Bre–X stored core samples for prolonged periods of time while awaiting processing. Plaintiffs argue that from viewing the core yard, McConvey would have noticed that Bre–X was drilling cores far in excess of their ability to process the cores, and it was dumping the unprocessed core samples there. Bre–X's practice of storing core samples in an open warehouse, and not processing the core samples in a timely manner, would have allegedly raised another red flag of the likelihood of tampering, for any experienced "mining professional" like McConvey. Lehman argues that Plaintiffs offer nothing to indicate why this would be a red flag and that it is just as likely that de Guzman and Felderhof left the yard full of unprocessed core samples to further the impression that Busang was awash in gold.

McConvey, however, fully disclosed all of these red flags from the Normet report and his visit to Busang in his December 3, 1996 report. He stated that the gold at Busang was "coarse," "loose," "powder like,"and "fee" in nature (¶ 375), which Plaintiffs claim is patently inconsistent with primary deposit of gold embedded in host rock such as that Bre–X claimed to have discovered at Busang. He also stated that because gold particles in Bre–X's samples were not attached to their host rock, they could be separated with astounding ease—gravitational circuit recoveries were 75–85 percent in the Central Zone to 83–93 percent in the Southeast Zone. (¶ 375.) Plaintiffs argue that recovery rates of such a magnitude are also inconsistent with a primary deposit and are indicative of alluvial gold being added to the samples. He even mentioned that Bre–X was using cyanide leaching process even though the fire assaying was the "standard assay process" and that Bre–X was crushing the entire core sample.[40] (¶ 395.) Lastly, the December 3 report includes a photograph of the core yard filled to the brim with unprocessed cores. These are several of the crucial facts that Plaintiffs argue should have tipped off an experienced "mining professional" like McConvey to the fraud.[41]

The fact that McConvey disclosed many of the alleged red flags in his reports tends to negate that he was consciously aware that they indicated a substantial risk of fraud. As argued by Lehman, absent McConvey's subjective awareness of a substantial risk that Busang was a fraud, McConvey's actions could amount to no more than mere negligence. *See Meadows v. SEC*, 119 F.3d 1219, 1226 (5th

---

**40.** In his March 24, 1997 report, McConvey stated: "The assay lab techniques used, while not common place, have been looked at and reviewed by knowledgeable professionals." (¶ 408.) McConvey also relayed Felderhof's explanation as to why Bre–X used a cyanide leaching process instead and explained how the results from the two processes must be analyzed differently.

**41.** In the current Complaint, the Plaintiffs point to Jan Merks' comments to Barrick on McConvey's December 3 report. (¶ 544.) Merks was apparently surprised at McConvey's positive outlook about Busang in light of the other information in the report. Merks, however, is an expert in the field and had substantially more information available to him when he made these comments in February 1997 than McConvey had in December 1996.

Cir.1997)("Severe recklessness is limited to those unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care...."); *In re Baesa Sec. Litig.*, 969 F.Supp. 238, 240–41 (S.D.N.Y.1997)(holding that recklessness in the context of a Rule 10b–5 action requires a "conscious and purposeful disregard of a known risk").

Plaintiffs also allege that McConvey was told about or provided the results of Barrick's due diligence testing in December 1996.[42] (¶ 421.) Plaintiffs state that McConvey's source concerning the Barrick test results "may well have been one of the participants at the December 15, 1996 meeting of the Bre–X Board of Directors." (¶ 422.) As evidence of this, Plaintiffs point out that at the meeting Morrison stated that J.P. Morgan was prepared to sign a fairness opinion with respect to the pending Barrick transaction. (¶ 422.) Bre–X did not inform the public of J.P. Morgan's opinion. Five days after the board meeting, however, McConvey disclosed in a research report that J.P. Morgan had informed Bre–X that it was willing "to sign a fairness opinion on the current agreement with Barrick." (¶ 422.) At the same board meeting, Barrick's negative test results were discussed in great detail. (¶ 422.) Therefore, Plaintiffs argue, McConvey heard the results of those tests. Plaintiffs also allege that McConvey later acknowledged knowing about Barrick's test results. In his March 24, 1997 report, he wrote that Barrick "has done its own checks." (¶ 423.) At the time of this report, Barrick's testing had not been publicly disclosed. Plaintiffs therefore argue

that McConvey had to have been told about the tests.

Plaintiffs allegations concerning McConvey's access to Barrick's due diligence still fall short of meeting the particularity requirements of the PSLRA. In the Court's previous order dismissing the Plaintiffs' claims against Lehman, the Court directed the Plaintiffs to state when and how the Plaintiffs learned of the Barrick's tests. *See McNamara*, 57 F.Supp.2d at 420. In the Fourth Amended Complaint, however, there are no specific factual allegations as to what, if anything, McConvey was told about Barrick's first round of tests, who gave McConvey that information, or when this alleged communication occurred. Finally, McConvey's March statement that Barrick had done its own tests is too vague to support an inference that McConvey had access to the test results.

Based upon the allegations in the Fourth Amended Complaint, the Court finds that the Plaintiffs have not pleaded facts that give rise to strong inference that McConvey was aware of a substantial risk that Busang was a fraud. At most, Plaintiffs' allegations show that Lehman was negligent. Therefore, Lehman's motion is granted.

## IX.

### STATE LAW CLAIMS

Plaintiffs have also brought claims under Texas law for common law fraud and negligent misrepresentation. All of the moving Defendants move to dismiss these claims because the Plaintiffs do not allege actual

---

**42.** Plaintiffs only allege that McConvey had access to the first round of Lakefield's tests. As described in detail above, Lakefield's test results were all that Barrick had available at the December 15 meeting. Barrick did not contact Jan Merks until December 16, and

Merks made his first report to Barrick on December 17. Thus, there is no allegation that Lehman ever had access to Lakefield's second round of tests or any other information supplied by Merks.

reliance on statements by any of these Defendants.

■ An element of a common law fraud claim under Texas law is actual reliance on the allegedly fraudulent statements. *See Schwartz v. Pinnacle Communications,* 944 S.W.2d 427, 434 (Tex.App.—Houston [14th Dist.] 1997, no writ). The Defendants claim that the "fraud-on-the-market" doctrine does not apply to a Texas law fraud claim. In support of this argument, they cite *Steiner v. Southmark Corp.,* 734 F.Supp. 269, 279 (N.D.Tex. 1990). In *Steiner,* the court noted that Texas has not adopted the fraud-on-the-market theory for reliance in fraud cases. The court therefore rejected the plaintiff's attempt to incorporate this theory in his fraud claim,[43] but denied the defendants' motion to dismiss because the plaintiff had sufficiently alleged direct reliance. *See id.*

■ Similarly, in *Griffin v. GK Intelligence Sys., Inc.,* 87 F.Supp.2d 684, 690 (S.D.Tex.1999), the court denied the defendant's motion to dismiss the plaintiff's federal securities claims but granted its motion to dismiss the plaintiff's state law fraud claim. The court, citing *Steiner,* held that "the 'fraud-on-the-market' theory does not apply to a Texas law fraud claim."

*See Griffin,* 87 F.Supp.2d at 690. Since the Complaint does not allege that any of the named Plaintiffs actually relied on the representations by any of these Defendants, the common law fraud claims against these should be dismissed.

■ The Court now examines the Plaintiffs' negligent misrepresentation claim. In their responses, the Plaintiffs do not address the negligent misrepresentation claims. Texas courts follow section 552 of the Restatement (Second) of Torts in imposing liability for negligent misrepresentations. *See Hermann Hosp. v. National Standard Ins. Co.,* 776 S.W.2d 249, 253 (Tex.App.—Houston [1st Dist.] 1989, writ denied).[44] Section 552(2)(b) limits liability to damages suffered "through *reliance* upon [the misstatement] in a transaction that [the defendant] intends the information to influence or knows that the recipient so intends...." (Emphasis added). Plaintiffs fail to cite, and the Court's research failed to uncover, a Texas case adopting fraud-on-the-market theory in a negligent misrepresentation case. Because the Complaint fails to allege that any of the named Plaintiffs actually relied on any statements by these Defen-

---

**43.** *See Rubinstein v. Collins,* 20 F.3d 160, 172 (5th Cir.1994)("It is axiomatic, of course, that we will not expand state law beyond its presently existing boundaries.").

**44.** Restatement (Second) of Torts § 552:
  (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
  (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to the loss suffered

  (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
  (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
  (3) The liability of one who is under a public duty to give the information extends to losses suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

dants, these causes of action are dismissed.

## X.

### CONCLUSION

Having considered the Defendants' motions, the Court enters the following **ORDER**:

- P.T. Kilborn's motion to dismiss is **GRANTED** in part and **DENIED** in part (Dkt. No. 446);

- Kilborn Engineering's motion to dismiss is **GRANTED** in part and **DENIED** in part (Dkt. No. 444);

- SNC–Lavalin's motion to dismiss is **GRANTED** (Dkt. No. 442);

- J.P. Morgan's motion to dismiss is **GRANTED** in part and **DENIED** in part (Dkt. No. 448);

- Barrick's motion to dismiss is **GRANTED** in part and **DENIED** in part (Dkt. No. 441);

- Nesbitt's motion to dismiss is **GRANTED** in part and **DENIED** in part (Dkt. No. 450); and

- Lehman' motion to Dismiss is **GRANTED** (Dkt. No. 451).

The Court hereby enters the following ORDER:

1.  Plaintiffs' claims against SNC–Lavalin, Inc. and Lehman Brothers, Inc. are **DISMISSED with prejudice**.

2.  Plaintiffs' state law causes of action for fraud and negligent misrepresentation against P.T. Kilborn Pakar Rekayasa, Kilborn Pacific Engineering Pacific Limited, J.P. Morgan Securities, Inc., and Nesbitt Burns, Inc. are **DISMISSED with prejudice**.